1  Mark C. Goodman (Bar No. 154692)
   Ethan A. Miller (Bar No. 155965)
2  Stacy Hovan (Bar No. 271485)
   HOGAN LOVELLS US LLP
3  3 Embarcadero Center, Suite 1500
   San Francisco, California 94111
4  Telephone: (415) 374-2300
   Facsimile: (415) 374-2499
5  mark.goodman@hoganlovells.com
   ethan.miller@hoganlovells.com
6  stacy.hovan@hoganlovells.com

7  Attorneys for Defendant
   BIMBO BAKERIES USA, INC.

8
                   UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                     SAN FRANCISCO DIVISION
11

12 | ALEX ANG and LYNN STREIT, individually | Case No. 13 Civ. 1196 (EMC)
   | and on behalf of all others similarly situated, |
13 |                                        | **NOTICE OF MOTION AND MOTION
   |                    Plaintiffs,         | TO DISMISS AMENDED
14 |                                        | COMPLAINT**
   |          v.                            |
15 |                                        | Hearing: August 22, 2013
   | BIMBO BAKERIES USA, INC.,              |
16 |                                        | Time: 1:30 pm
   |                    Defendant.          |
17 |                                        | The Hon. Edward M. Chen
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

### TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** defendant Bimbo Bakeries USA, Inc., ("BBUSA") will and hereby does move to dismiss the plaintiffs' amended complaint filed in this matter. Hearing on this motion will be held on August 22, 2013 at 1:30 pm.

BBUSA brings this motion on the grounds that (1) certain aspects of the complaint are preempted by federal law; (2) plaintiffs fail to allege facts sufficient to state a claim on which relief may be granted with respect to all aspects of the complaint; (3) plaintiffs fail to plead their claims in accordance with Rule 9(b) with respect to all aspects of the complaint; (4) plaintiffs lack standing to bring any claim with respect to the seventy-two products that they concede they did not purchase; (5) plaintiffs allege an improper claim for unjust enrichment and restitution; (6) plaintiffs have failed to comply with the pre-suit filing requirements of the Consumer Legal Remedies Act; and (7) plaintiffs have failed to plead the necessary facts to support a claim for punitive damages.

BBUSA bases this motion on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, all pleadings and papers filed in this action, the oral argument of counsel and any other matters that the Court may wish to consider.

Dated: June 19, 2013                                    HOGAN LOVELLS US LLP


By: /s/ Mark C. Goodman
    Mark C. Goodman
    Attorneys for Defendant
    Bimbo Bakeries USA, Inc.

1

2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................1

II.   SUMMARY OF THE ALLEGATIONS ..........................................................4

III.  DISCUSSION ..............................................................................................5

      A.    Plaintiffs Do Not Allege Facts Sufficient To Meet Pleading Standards ................5

            1.    Plaintiffs do not Plead Specific Products or Labels ....................................5

            2.    Plaintiffs do not Plead Injury Caused by the Labels ....................................7

            3.    Plaintiffs' "Toasted Bread" Claims Fail Under the Reasonable Consumer Standard ..........................................................................8

            4.    Plaintiffs' Whole Grain Claims Fail as a Matter of Pleading ...................11

            5.    Plaintiffs' Challenge Regarding Soy Flour Fails ........................................13

            6.    The "Fresh" Claim Cannot Meet a Reasonable Consumer Standard........15

            7.    The Heart-Check Mark Claims are not Actionable....................................16

            8.    Plaintiffs Fail to Allege Facts Establishing their Other Bagel Thins Claims ..........................................................................17

      B.    Plaintiffs Do Not Have Standing As To Products They Never Purchased ...........20

      C.    Plaintiffs' Unjust Enrichment Claim Is Improper .................................21

      D.    Plaintiffs' Claims Are Contrary To Federal Law And Are Preempted.................22

      E.    Plaintiffs' Claims Under The CLRA Should Be Dismissed .................................23

IV.   CONCLUSION ..........................................................................................25

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*,
  986 F.2d 605 (1st Cir. 1993) ................................................................................. 15

*Arroyo v. Pfizer, Inc.*,
  2013 WL 415607 (N.D. Cal. 2013) ......................................................................... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................... 6, 14, 15

*Brazil v. Dole Food Co., Inc.*,
  2013 WL 1209955 (N.D. Cal. Mar. 25, 2013) ......................................................... 22

*Brod v. Sioux Honey Assoc.*,
  2013 WL 752479 (N.D. Cal. Feb. 27, 2013) ..................................................... 19, 20

*Brod v. Sioux Honey Assoc.*,
  895 F.Supp.2d 972 (N.D. Cal. 2012) ..................................................................... 22

*Carrea v. Dreyer's Grand Ice Cream*,
  2012 WL 1131526 (9th Cir. 2012) .................................................................. 22, 23

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
  2011 WL 159380 ....................................................................................... 21, 23

*Chin v. General Mills, Inc.*,
  12-cv-2150, 2013 U.S. Dist. Lexis 77345 (D. Minn. June 3, 2013), slip op. ......... 8, 10, 20, 21

*Conley v. Gibson*,
  355 U.S. 41 ....................................................................................................... 3

*Cullen v. Netflix, Inc.*,
  2013 WL 140103 (N.D. Cal. 2013) ......................................................................... 14

*Dvora v. General Mills, Inc.*,
  2011 WL 1897349 (C.D. Cal. 2011) ....................................................................... 10

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ............................................................................ 7, 10

*Garcia v. Sony Computer Entertainment America, LLC*,
  859 F.Supp.2d 1056 (N.D. Cal. 2012) ..................................................................... 8

*Hairston v. South Beach Beverage Co., Inc.*,
  2012 WL 1893818 (C.D. Cal. 2012) ................................................................. 10, 20

*Hemy v. Perdue Farms, Inc.*,
    2011 WL 6002463 (D.N.J. 2011)........................................................................ 21

*In re Apple & AT & T iPad Unlimited Data Plan Litig.*,
    802 F.Supp.2d 1070 (N.D. Cal. 2011) ........................................................... 21, 24

*In re Sony HDTV Television Litig.*,
    758 F.Supp.2d 1077 (S.D. Cal. 2010) ............................................................. 9, 13

*In re Tobacco II Cases*,
    46 Cal.4th 298 (2009) ........................................................................................ 14

*Johns v. Bayer Corp.*,
    2010 WL 476688 (S.D. Cal. 2010) ..................................................................... 21

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009)............................................................................... 6

*Kelley v. Mortgage Elec. Reg. Sys.*,
    642 F.Supp.2d 1048 (N.D. Cal. 2009) .................................................................. 8

*Lanovaz v. Twinings North America, Inc.*,
    2013 WL 2285221 (N.D. Cal. May 23, 2013) ..................................................... 21

*Lanovaz v. Twinings North America, Inc.*,
    2013 WL 675929 (N.D. Cal. Feb. 25, 2013)........................................................ 22

*Lavie v. Procter & Gamble Co.*,
    105 Cal.App.4th 496 (2003)................................................................................... 7

*Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,
    865 F.Supp.2d 529 (D.N.J. 2011) ....................................................................... 21

*Mason v. The Coca-Cola Co.*,
    774 F.Supp.2d 699 (D.N.J. 2011) ................................................................... 9, 10

*McKinnis v. Kellogg USA*,
    2007 WL 4766060 (C.D. Cal. 2007)...................................................................... 7

*Pom Wonderful v. The Coca-Cola Co.*,
    679 F.3d 1170 (9th Cir. 2012)............................................................................. 22

*Rooney v. Cumberland Packing Corp.*,
    2012 WL 1512106 (S.D. Cal. 2012) .................................................................... 14

*Ross v. Sioux Honey Association Co-op*,
    2013 WL 146367 (N.D. Cal. Jan. 14, 2013) ................................................... 14, 15

*Turek v. General Mills, Inc.*,
    662 F.3d 423 (7th Cir. 2011)............................................................................... 23

-iv-

*Vega v. JPMorgan Chase Bank, N.A.*,
   654 F.Supp.2d 1104 (E.D. Cal. 2009) ................................................................... 3

*Williams v. Gerber Products Co.*,
   552 F.3d 934 (9th Cir. 2008) ................................................................................. 11

*Young v. Johnson & Johnson*,
   2012 WL 1372286 (D.N.J. April 19, 2012) ........................................................ 10

*Yumul v. Smart Balance*
   2011 WL 1045555, (C.D. Cal. 2011) ................................................................... 22

*Yumul v. Smart Balance, Inc.*,
   733 F.Supp.2d 1117 (C.D. Cal. 2010) ................................................................... 6

**STATUTES**

21 U.S.C. §§ 343-1(a)(2), (a)(3) ................................................................................ 22

21 U.S.C. § 343(g) and (i) .......................................................................................... 9

21 U.S.C. § 343(r) ..................................................................................................... 23

21 U.S.C. § 393(b)(2)(A) ........................................................................................... 22

Cal. Civil Code § 1782(a) ................................................................................... 23, 24

**RULES**

21 C.F.R. § 101.3 ........................................................................................................ 9

21 C.F.R. § 101.4(a) ................................................................................................. 13

21 C.F.R. § 101.9 ..................................................................................................... 11

21 C.F.R. § 101.12 ................................................................................................... 18

21 C.F.R. § 101.13 ................................................................................................... 11

21 C.F.R. § 101.54 ................................................................................................... 18

21 C.F.R. § 101.95 ................................................................................................... 15

21 C.F.R. § 101.95(a) ............................................................................................... 15

21 C.F.R. § 136.110(c)(17) ........................................................................................ 8

21 C.F.R. § 136.110(e)(1) .......................................................................................... 9

21 C.F.R. § 136.180 ................................................................................................. 13

58 Fed. Reg. 2302 ............................................................................................... 15, 16

77 Fed. Reg. 62122 ........................................................................................................................... 17

**FEDERAL CIVIL PROCEDURES**

Rule 8 ............................................................................................................................................ 8

Rule 9 ................................................................................................................................. 2, 3,6,8

Rule 11 ........................................................................................................................................ 22

**OTHER AUTHORITIES**

FDA Compliance Policy Guide § 505.350 .................................................................................. 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

As this Court is well aware, a typical food mislabeling claim involves allegations that the labels at issue do not allow a consumer to understand what is really in that product.  Such claims often involve allegations of a complete failure to provide information, such as labels claiming that a product is organic when, in fact, it is not or that a product is sugar-free or "all natural" when it includes undisclosed sugar or preservatives.  In those cases, the plaintiffs usually (if not always) attach the labels to their pleading to demonstrate that the information that the consumer needs to understand what they are buying is not included on the label.  This case is not such a case.

Here, plaintiffs try to play an opportunistic game of "gotcha" to manufacture a "mislabeling" class action by pretending that the labels do not provide the information that would allow them to understand what they were purchasing.  But the actual product labels -- conveniently not attached to or fully recited in the pleading -- demonstrate that this is not true.  At most, plaintiffs claim technical violations of federal regulations in the unidentified labels of six bakery products to allege causes of action under California law for unfair business practices, unfair advertising, consumer fraud and unjust enrichment.[1]  Plaintiffs then allege that certain aspects of the labels do not comply with technical regulations promulgated by the Food and Drug Administration ("FDA") under the Food, Drug and Cosmetic Act ("FDCA") and the Nutrition Labeling and Education Act ("NLEA") but they do not identify *what* labels are allegedly at issue, what any labels or advertisements *say* or even what version of the products they *actually* purchased.  Nor do plaintiffs allege how they were misled (what they expected to buy and what they actually bought) and what damages they supposedly incurred.  Indeed, plaintiffs do not even adequately allege a violation of the federal labeling laws with respect to any of BBUSA's products.  This lack of specificity alone dooms the amended complaint.

Plaintiffs' claims also fail because the alleged regulatory violations in the amended

---

[1]      Plaintiffs have incorrectly sued BBUSA.  A review of the product labels clearly shows that BBUSA was not the manufacturer of all of the products alleged in the amended complaint and did not create or produce advertisements relating to all of those products.  BBUSA reserves the right to challenge the complaint on this basis at the appropriate time.

complaint are not violations at all but are the product of plaintiffs' mischaracterizing applicable regulations.  For example, plaintiffs attack the phrase "good source of whole grain" on the Sara Lee labels as an absolutely prohibited nutrient content claim because there is no recommended daily intake ("RDI") for whole grain.  Not surprisingly, plaintiffs cite no statute or regulation setting forth the purported prohibition.  This is because the challenged phrase is not a nutrient claim at all; it is what FDA terms an ingredient statement, whose ***use on food labels is proper*** under the governing regulations.  Plaintiffs also misquote and mischaracterize -- and never identify -- an FDA advisory statement concerning paid endorsements and then misapply that statement to an American Heart Association ("AHA") certification appearing on a Thomas' label.  But when FDA's actual statement is examined, it reveals that the guidance does not even apply to the Thomas' label and the relevant regulatory materials permit using the AHA mark on products that meet its certification standards.  This failure to allege facts demonstrating an actual violation of the applicable regulations not only requires dismissal of the complaint under Rule 9, it means that the claims are preempted -- since they comply with federal law, the labels cannot be actionable under state law -- and must be dismissed on that basis as well.

In other instances, plaintiffs misapply the regulations by isolating words within phrases or product names when in context they have a defined legal meaning under the regulations.  For example, plaintiffs allege that "bread" as defined by FDA prohibits color additives.  That is correct law misapplied:  While color is added to Bimbo Toasted Bread, that is a distinct, innovative melba toast-like product that is not named "bread."  The addition of food coloring to non-standard bakery products does not violate any law or regulation.  Likewise, plaintiffs attack the term "fresh" on an Entenmann's label, completely ignoring the fact that (1) the word appears as part of the phrase "baked fresh daily" and that FDA has explicitly recognized that the term "fresh" may be used for products, such as baked goods, that must be processed, (2) that the ingredient statement expressly includes preservatives and (3) the word fresh is used to connote the unfrozen state of this particular product.

Even if plaintiffs ***could*** show that any of the identified products were technically misbranded (and they certainly have not), they would have satisfied only half of their pleading

-2-

1   burden.  Plaintiffs must allege facts establishing that they relied on and were deceived by the

2   content of the labels.  Indeed, plaintiffs do not and cannot connect their alleged technical

3   regulatory violations with the substance of a viable consumer protection claim.  Without

4   allegations that a reasonable consumer would have a certain expectation created by a false or

5   misleading statement, and that such an expectation was defeated when the true facts were

6   revealed, plaintiffs' claims must be dismissed.

7          It is also well settled that parties cannot maintain claims with respect to products they did

8   not buy and cannot maintain claims under California consumer statutes if they are not California

9   consumers. Plaintiffs' claims arising out of such products must be dismissed.  In addition,

10   plaintiffs allege false advertising claims without providing any facts as to which advertisements

11   they are referring to, whose advertisements they are and what those advertisements said, meaning

12   that those claims must be dismissed for failure to arguably allege the facts to maintain them.

13   They also allege an unjust enrichment claim when such claims are redundant of the statutory

14   claims (and their counsel know that such claims are improper because they have lost a number of

15   motions to dismiss such claims they have brought on behalf of other plaintiffs in food labeling

16   cases).  Finally, plaintiffs do not allege facts sufficient to state a claim (or damages) under

17   California's Consumer Legal Remedies Act (the "CLRA").

18          In the end, plaintiffs have not alleged their claims with the particularity required by Rule

19   9(b):  They nowhere specify when or where they bought the challenged products, let alone what

20   they understood the challenged label statements to mean.  Nor do they allege that the labels

21   violate actual federal regulations.  This is fatal with respect to the six products that plaintiffs

22   allege they bought, and exponentially so with respect to 72 additional products (the so-called

23   "substantially similar" products spanning nine pages of their complaint) that they admit they did

24   not buy but in connection with which they purport to represent a nationwide class of consumers.

25   Plaintiffs cannot be allowed to maintain a pleading that does not allow the defendant to

26   understand exactly for what it is being sued.  *See Vega v. JPMorgan Chase Bank, N.A.*, 654

27   F.Supp.2d 1104, 1111 (E.D. Cal. 2009) ("a pleading must "give 'fair notice' of the claim being

28   asserted and the 'grounds upon which it rests'") (quoting *Conley v. Gibson*, 355 U.S. 41, 47–48

-3-

1    (1957)).  Accordingly, the Court should dismiss plaintiff's first amended complaint without leave

2    to amend.

3    **II.      SUMMARY OF THE ALLEGATIONS**

4            While they do not attach or fully recite the content of any product labels, plaintiffs

5    challenge labeling statements on six products from four distinct brands that they supposedly

6    purchased.  Each of the challenged label statements, in turn, appears to be the basis of each of

7    plaintiffs' legal claims:  Three under California's Unfair Competition Law ("UCL"), two under

8    California's False Advertising Law ("FAL"), one under the CLRA and one for unjust enrichment.

9    Plaintiffs allege statements on each label but do not provide context for those statements, ignoring

10   the fact that the purchased products often used multiple different labels during the applicable time

11   period.  (*See, e.g.,* Exs. 1-20 to the Request for Judicial Notice ("RJN") filed herewith.)[2]  Plaintiff

12   also fails to allege any advertisement by BBUSA or that they complied with the requirements of

13   the CLRA.  As to the allegedly purchased products, plaintiffs allege as follows:

14           **Sara Lee 100% Whole Wheat Bread.**   Plaintiffs challenge two aspects of this label --

15   (1) the claim "100% Whole Wheat," which plaintiffs claim is improper insofar as the product

16   contains soy flour, and (2) the claim "excellent source of whole grain," which plaintiffs contend is

17   an improper nutrient content claim -- but plaintiffs ignore the fact that the label states that the

18   bread contains trace amounts of soy flour and that whole grains are ingredients, not nutrients, that

19   are not subject to the regulations on which plaintiffs rely.  (*See* Exs. 1-4.) (First Amended

20   Complaint ("FAC") at ¶¶ 111-24.)

21           **Sara Lee 100% Classic Whole Wheat Bread.**  Plaintiffs challenge (1) "100% Whole

22   Wheat," which plaintiffs claim is improper insofar as the product contains soy flour, and (2)

23   "good source of whole grain," which plaintiffs contend is an improper nutrient content claim

24   insofar as there is no recommended daily intake of whole grain. (FAC at ¶¶ 97-110.)  Plaintiffs

25   again fail to allege facts to establish that they could not know that soy flour is an ingredient listed

26   on the label, that the presence of trace amounts of soy flour is material to a reasonable consumer

27

28   [2] All "Ex._" citations in this brief refer to exhibits to the RJN.

or that the bread is not actually a good source of whole grains. (*See* Exs. 5-8.)

**Sara Lee Soft & Smooth Whole Wheat White Bread.**  Plaintiffs challenge "good source of whole grain," which, like the claims above, is an ingredient claim and not a regulated nutrient claim and, therefore, is entirely proper.  (FAC at ¶¶ 125-34; *see* Exs. 9-12.)

**Bimbo Original Toasted Bread.**  Plaintiffs allege that this product is not "bread" because FDA's standard of identity for bread precludes added colors and the product contains added colors but they do not allege facts indicating that they thought this product was "bread" or did not contain added colors when they purchased it.  (FAC at ¶¶ 136-41; *see* Ex. 21.)

**Thomas' Plain Bagel Thins.**  Plaintiffs challenge (1) an alleged "heart-check mark" as an "endorsement" that they maintain should have been accompanied by a disclosure that it was paid for and (2) the alleged statement "excellent source of fiber," which plaintiffs contend is improper because the product purportedly contains 16% rather than 20% of the RDI of fiber.  (FAC at ¶¶ 46-81.)  However, plaintiffs fail to allege facts that (1) the AHA mark is an endorsement for compensation, the AHA certifies products without charging a fee or there were products that they could have bought with the mark that did not pay such a fee or (2) the actual fiber content was different from what they reasonably expected and materially so.  (*See* Exs. 13-20.)

**Entenmann's Soft'ees.**  Plaintiffs challenge the term "fresh," which appears on the label in the phrase "baked fresh daily," but the term is expressly allowed to be used in that context by the regulations.  (FAC at ¶¶ 83-96.)  A reasonable consumer would understand that "baked fresh daily" simply means that it was not previously frozen, not that it contains no preservatives.  Indeed, any reasonable consumer would know that a donut is processed and one need only read the label to see the specifically-identified "preservatives" on the ingredient list.  (Ex. 23.)

## III.   DISCUSSION

### A.   Plaintiffs Do Not Allege Facts Sufficient To Meet Pleading Standards

#### 1.   Plaintiffs do not Plead Specific Products or Labels

Plaintiffs' fail to allege the specific products that they bought, where they bought them, what exactly the labels say (in full) and how they were misled by the product labeling into purchasing a product that they otherwise would never have purchased.  These allegations are

-5-

1   required to avoid dismissal.  *See, e.g., Kearns v. Ford Motor Co*., 567 F.3d 1120, 1125 (9th Cir.

2   2009); *Yumul v. Smart Balance, Inc*., 733 F.Supp.2d 1117, 1123-24 (C.D. Cal. 2010) (dismissing

3   claims where plaintiff did not allege when or where she purchased the challenged product).

4           These facts particularly matter here because, despite having generally identified

5   "purchased products," plaintiffs do not identify the labels and the labels for the products

6   identified vary according to the particular product that is purchased (for example, the 16 pack

7   Thomas' Plain Bagel Thins has a different label than the 24 pack), where in the U.S. it was

8   purchased (different Sara Lee 100% Whole Wheat Bread labels are used in different markets) and

9   when it was purchased (some labels have been changed over time).  In addition, as the Court can

10  see once it reviews the labels for the "purchased products," the information provided on those

11  labels is either accurate (for example, all of the Thomas' Plain Bagel Thins labels include the

12  term "good source of fiber" and the product undisputedly contains sufficient fiber to make that

13  claim) or contains sufficient information to allow a reasonable consumer to understand what he or

14  she is purchasing (as the Sara Lee labels which plaintiffs complain tell the consumer that soy

15  flour is in the product).  (*See* Exs. 1-23.)  That plaintiffs do not include copies of the challenged

16  labels, when the labels are the entire bases for each of their claims, is striking.  One could easily

17  conclude that the labels are not provided because plaintiffs hope to avoid calling attention to the

18  fact that the labels either do not include incorrect statements at all or the information purportedly

19  concealed or obscured by the challenged statements in fact appears quite plainly on the labels that

20  plaintiffs say they read and relied on in making their purchases.  Or perhaps it is because some

21  labels simply do not say what plaintiffs contend they say.  In any event, BBUSA includes copies

22  of relevant labels in its RJN so the Court can make its own determinations.[3]  *Id.*

23          In addition to omitting the labels, the operative pleading fails to allege (1) when, where

---

[3] We do not belabor the axiomatic pleading standards applicable to plaintiffs' claims.  Suffice to say, plaintiffs must allege facts sufficient to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Because the complaint is grounded in fraud (*e.g*., FAC at ¶¶ 13, 298), plaintiffs must plead with particularity under Rule 9(b).  *E.g., Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL").  Plaintiffs do not recite the labels and do not state facts as to how they were misled, meaning that they do not allege facts sufficient to state a claim for mislabeling, much less the heightened requirements for fraud.

1   and how often plaintiffs purchased the products, (2) what plaintiff paid for them, (3) what

2   plaintiffs believed the challenged statements meant when they read them and (4) why the

3   characteristics that they purportedly believed the products had are more desirable, either to

4   plaintiffs or to reasonable consumers, than the characteristics the products actually have.  These

5   same pleading deficiencies existed in plaintiffs' original complaint, a pleading that BBUSA

6   informed plaintiffs' counsel was significantly deficient in a number of specific respects, including

7   (1) its failure to identify the products and labels at issue and (2) its inclusion of claims on

8   products that plaintiffs did not purchase and an unjust enrichment claim, claims that had been

9   dismissed in a number of other suits that plaintiffs' counsel had brought in this district and

10  throughout California. (*See* Ex. 24.) At that time, BBUSA submitted that such claims subjected

11  plaintiffs and/or their counsel to sanctions and plaintiffs agreed to amend the complaint, taking

12  over 30 days to do so.  However, despite acknowledging the deficiencies in the original

13  complaint, the amended complaint does not cure the problems that required amendment in the

14  first place.  The failure to plead exactly what was purchased and exactly what the labels read,

15  when combined with the fact that at least some of the labels for the products identified by

16  plaintiffs do not include the language that plaintiffs allege, is fatal to plaintiffs' complaint.

### 2.      Plaintiffs do not Plead Injury Caused by the Labels

18          Under all three of California's consumer protection statutes -- the UCL, the FAL and the

19  CLRA -- plaintiffs who claim to have been deceived must satisfy the "reasonable consumer"

20  standard.  *Freeman v. Time, Inc*., 68 F.3d 285 (9th Cir. 1995).  Pursuant to this standard, plaintiffs

21  must show that a ***reasonable*** consumer is ***likely*** to be deceived by an express statement or

22  conduct, which requires looking beyond a plaintiff's alleged experiences to the reasonable beliefs

23  and behaviors of the public at large.  And deception must be more likely than not, which raises

24  the standard to one of probability.  *McKinnis v. Kellogg USA*, 2007 WL 4766060, at *3 (C.D. Cal.

25  2007); *see also Lavie v. Procter & Gamble Co*., 105 Cal.App.4th 496, 508 (2003).  This must be a

26  probability of deception with respect to "consumers acting reasonably in the circumstances, not

27  just any consumers."  *Freeman*, 68 F.3d at 289.

28

Plaintiffs here plead no facts establishing that a reasonable consumer would likely be deceived by any particular statements on a BBUSA product.  To satisfy Rule 9(b) of course, a complaint must include facts showing "why plaintiffs' reliance on [the challenged] statements was reasonable."  *E.g., Kelley v. Mortgage Elec. Reg. Sys*., 642 F.Supp.2d 1048, 1056 (N.D. Cal. 2009).  Plaintiffs do not allege how they understood the challenged statements or how they were deceived (for example, what the terms "good source," "excellent source," "baked fresh daily" and "toasted bread" mean to them, what the heart-check mark icon signifies or where and when they believed the Entenmann's product had been baked).  But this information is critical because it goes to the heart of the elements of reliance and deception that must appear in the complaint.  *See, e.g.,Chin v. General Mills, Inc.*, 12-cv-2150, 2013 U.S. Dist. Lexis 77345 (D. Minn. June 3, 2013), slip op. at 21 (dismissing complaint where plaintiffs "have failed to plead how they were deceived by the [challenged statement]" and "have not alleged with any specificity what they believed [the statement] to mean"); *Garcia v. Sony Computer Entertainment America, LLC*, 859 F.Supp.2d 1056, 1063 (N.D. Cal. 2012) (failure to plead deception and reliance are "fatal under Rule 9(b)").  Plaintiffs therefore fail to sufficiently plead a claim under either Rule 8(a) or 9(b).

### 3.   Plaintiffs' "Toasted Bread" Claims Fail Under the Reasonable Consumer Standard

A prime example of plaintiffs' failed efforts to concoct highly technical violations of FDA regulations to support a massive putative class action is the claim based on Bimbo Toasted Bread. Plaintiffs do not even contend, much less allege any facts demonstrating, that they thought Toasted Bread was "bread" as defined in the regulations or that reasonable consumers believe that if colors are added to a product that would otherwise be "bread," it ceases to be "bread" or a product that the consumer intended to buy.  Plaintiffs contend only that the Bimbo Toasted Bread product should not be labeled as "bread" because the standard of identity for "bread" precludes added colors and this product has added coloring.  (FAC at ¶¶ 136-37 (citing 21 C.F.R. § 136.110(c)(17)).)  But the product identified by the plaintiffs in their pleading is plainly labeled as "Toasted Bread," a unique and innovative melba toast-like product, and the label emphasizes the

fact that the product is different from what one would expect to be "bread."[4] (Exs. 21-22)

Product names are governed by 21 U.S.C. § 343(g) and (i) and by 21 C.F.R. § 101.3,which provides that a product must be named in accordance with the standard of identity if one exists for that product. Plaintiffs do not contend that a standard of identity exists for "toasted bread" and none does. Nor does the fact that the word "bread" is in the name "Toasted Bread" mean that the product must conform to the "bread" standard of identity as plaintiffs suggest. That standard expressly applies only to foods named "bread," "white bread," "rolls," "white rolls," buns" and "white buns." 21 C.F.R. § 136.110(e)(1). FDA has explained that a product will fall outside the "bread" standard of identity *where its name combines the word "bread" with another term that refers to those characteristics of the product that distinguish it from "bread."* For example, even though it -- like "Toasted Bread" -- includes the word "bread, "honey bread" has been determined to fall outside the "bread" standard of identity. *FDA Compliance Policy Guide* § 505.350 (Ex. 29). There is no rational basis on which to treat the name "Toasted Bread" differently than "honey bread."

But even if that were not the case, and the federal regulations prohibited adding color to "toasted bread," plaintiffs plead no facts that would link the alleged regulatory violation with consumer deception or injury, they allege nothing about what they believed the product contained or how their expectations were purportedly frustrated when the "truth" became known and they do not explain how they did not know that the product included added color when they could see the product through the packaging and the added color was included on the label. Without such allegations, there can be no consumer protection claim. *See, e.g.*, *In re Sony HDTV Television Litig.*, 758 F.Supp.2d 1077, 1089 (S.D. Cal. 2010).

In *Mason v. The Coca-Cola Co.*, 774 F.Supp.2d 699 (D.N.J. 2011), the plaintiff relied on an FDA warning letter to support his claim that defendant violated an FDA regulation but did not

---

[4] The ingredient statement on the label confirms that "Toasted Bread" is not simply "bread" by another name. It is formulated differently from "bread," has ingredients not found in "bread" and does not look or feel like "bread." Indeed, the packaging at issue here has a see-through window that allows a consumer to see what he or she is buying and clearly lists all ingredients. (Exs. 21-22.)

allege that he was aware of the regulation or its requirements. The court dismissed the claim because, among other reasons, it alleged only an FDA violation:

> [T]he complaint is an attempt to capitalize on an apparent and somewhat arcane violation of FDA food labeling regulations.  But not every regulatory violation amounts to an act of consumer fraud. It is simply not plausible that consumers would be aware of FDA regulations regarding "nutrient content" and restrictions on the enhancement of snack foods.  (*Id.* at 705 n.4.)

Plaintiffs here are basing their claim entirely on the same alleged technical violations of regulations without creating the required nexus to fraud.

Plaintiffs' claims are further weakened by the fact that the coloring to which they allegedly object is plainly disclosed in the ingredient statement and the product's color can be seen through the packaging.  (Exs. 21-22.)  Under the reasonable consumer standard, plaintiffs are deemed to read not just one term in a document or label but all of the relevant terms and consider the packaging as a whole.  *See Freeman*, 68 F.3d at 289 (plaintiff was presumed to have read all relevant statements regarding defendant's sweepstakes and dismissal was appropriate where allegedly concealed terms appeared in the document).[5]   A consumer relying on the term "bread" on a label should also be deemed to have read and relied on the ingredient list on that same label.  *See, e.g., Chin v. General Mills, Inc.*, 2013 U.S. Dist. Lexis 77345.   The same result follows if one posits, as plaintiffs implicitly do, a consumer who shops armed with a complete knowledge of the minutiae in FDA's food labeling regulations, down to the list of acceptable ingredients in each of the scores of standards of identity.  Such a knowledgeable consumer would surely read the ingredients plainly listed on the package.  Because plaintiffs have not pled facts

---

[5] Not surprisingly, courts routinely dismiss food claims where the purportedly concealed facts are disclosed on the packaging. *Hairston v. South Beach Beverage Co., Inc.*, 2012 WL 1893818 at *5  (C.D. Cal. 2012) ("to the extent there is any ambiguity in the term ["all natural"], it is clarified by the detailed information in the ingredient list, which explains the exact contents of [the product]"); *Young v. Johnson & Johnson*, 2012 WL 1372286, at *3 (D.N.J. April 19, 2012) (dismissing consumer fraud claim where ingredient list disclosed the presence of the ingredient to which plaintiff objected); *see also Dvora v. General Mills, Inc.*, 2011 WL 1897349, at *6-7 (C.D. Cal. 2011) (consumer could not reasonably believe that Total Blueberry Pomegranate cereal contained blueberries and pomegranates, given representations elsewhere on the label); *Chin v. General Mills, Inc.*, 2013 U.S. Dist. Lexis 77345 (dismissing claims that the term "natural" on a granola bar was misleading when the label also listed preservatives as ingredients).

plausibly establishing a likelihood of consumer deception, their claim fails under both federal pleading law and California consumer protection law.[6]

**4.      Plaintiffs' Whole Grain Claims Fail as a Matter of Pleading**

Plaintiffs do not plead facts suggesting that the statements "good source of whole grain" and "excellent source of whole grain" were false or are likely to deceive reasonable consumers. Instead, plaintiffs claim that "[t]here is no recognized daily value for whole gain and thus it is not possible to make a good or excellent source claim about whole grain." (FAC at ¶ 127.)  This does not come close to approaching an allegation that plaintiffs were deceived.

Plaintiffs do at one point try to connect the purported regulatory violation to the concept of consumer deception, asserting that the challenged ingredient statements have been "specifically deemed to be false and misleading by the FDA." (FAC at ¶ 130.)  This attempt relies entirely on mischaracterizing the regulations:  Plaintiffs contend that the statements "good source" and "excellent source" of whole grain are improper because they are nutrient content claims that do not satisfy the NLEA. (FAC at ¶¶ 101-06, 115-20, 125-31.)  But nutrient content claims (unsurprisingly) are statements that characterize the level of a ***nutrient*** in a food, not an ingredient.  21 C.F.R. § 101.13.  Whole grains are not "nutrients" as FDA defines that term; nutrients include the major ***nutritional*** components of food (protein, fat, carbohydrates), other broadly defined nutritional categories (fiber, sugar) and vitamins and minerals, but do not include the ingredients themselves.  21 C.F.R. § 101.9.  On the other hand, whole grains are ***ingredients*** and the challenged statements in this case are, therefore, ***ingredient claims*** and not nutrient claims.

While plaintiffs baldly proclaim that, "under the FDCA and regulations promulgated

---

[6] *Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008), does not warrant a different conclusion.  That court preserved plaintiffs' challenge to the words "fruit juice" juxtaposed with pictures of fruits, none of which was actually in the product.  *Id.* at 936.  The court rejected the manufacturer's argument that corrective information could have been found in the ingredient list. because the challenged label was allegedly misleading on its face: a reasonable consumer might plausibly have expected the product to contain the fruit pictured on the label.  Plaintiffs' claims here require imputing to consumers knowledge of the food labeling regulations, not simply seeing a depiction of ingredients.  Again, consumers familiar with such requirements should be deemed to read other parts of the label and to read those parts within the context of the same knowledge.

thereunder, labels may not indicate that a product is a 'good source' or 'excellent source' of whole grain" (FAC at ¶ 101), no section of the FDCA and no related regulation addresses -- much less prohibits -- statements about whole grain. Plaintiffs contend that "[t]here is no recognized daily value for whole grain," as if this establishes a regulatory violation. It does not. The reason there is no "recognized daily value" for whole grain *is that whole grain is an ingredient* and there is no such value for *ingredients*. If there is no recognized daily value for any ingredients, then stating that a product is a good or excellent source of that ingredient does not run afoul of the federal regulations. Plaintiffs' attack on the whole grain ingredient statements consists of imagining a prohibition that simply does not exist.

Plaintiffs contend that FDA has "specifically ruled" that statements about whole grains are permitted only if they "do not imply a particular level of the ingredient, *i.e.*, 'high' or 'excellent source.'" (FAC at ¶¶ 104, 118, 129.) But FDA has never "ruled" in the manner plaintiffs represent. The language plaintiffs quote is from a "draft guidance statement." *Draft Guidance: Whole Grain Label Statements* (Feb. 17, 2006) (Ex. 31.) The statement is just what it says it is: *draft* guidance "distributed for comment purposes only." *Id.* And even if the draft statement had reached final form -- and there is no indication that it did -- it would not be the binding authority that the plaintiffs need it to be. The text of that document prominently states that the guidance "does not create or confer any rights for or on any person and does not operate to bind FDA or the public" and "do[es] not establish legally enforceable responsibilities." *Id.* Thus, this "authority" expressly confers no rights on plaintiffs and no obligations on BBUSA. In any event, the draft statement nowhere provides, specifically or otherwise, that the challenged ingredient claims are incorrect or misleading and plaintiffs do not allege a single fact indicating that to be the case.

As with their other claims, plaintiffs plead no facts suggesting what either they or reasonable consumers believed "good source of whole grain" and "excellent source of whole grain" means. Nor do they plead facts establishing any consumer expectations formed on the basis of these claims or how such expectations might have been defeated when the "truth" became known (or even what the truth supposedly is). "For a statement to be deceptive or misleading, consumers must have held expectations about the matter in question" and those

1   expectations must have been defeated.  *In re Sony HDTV Television Litig.*, 758 F.Supp.2d at

2   1089.  Because plaintiffs have not even alleged their expectations, much less whether they were

3   met, their claims must be dismissed.

### 5.   Plaintiffs' Challenge Regarding Soy Flour Fails

5        Plaintiffs challenge two Sara Lee products on the basis that they claim to be "100% whole

6   wheat" but actually contain soy flour, making them "mislabeled" under 21 C.F.R. § 136.180.

7   (FAC at ¶¶ 100, 114.)  However, plaintiffs do not allege any facts outside of the labels indicating

8   that the products actually contain soy flour:  The information plaintiffs use to attack the

9   challenged statement comes from the label that plaintiffs claim is misleading, robustly

10  demonstrating that the label includes the very information that plaintiffs allege they had no way

11  of knowing.  (Exs. 3-8, 11-12.)  If plaintiffs' belief that the product contains soy flour is based on

12  the ingredient list that plaintiffs admittedly read and saw, how could they have been misled in the

13  first place?

14       On some, but not all (some of these labels do not even reference soy flour (Exs. 1-2, 9-

15  10)), Sara Lee 100% Whole Wheat bread labels, soy flour is the last of 18 ingredients on the list,

16  13 of which each constitutes less than 2% by weight of the product.  (Exs. 3-8, 11-12.)  Contrary

17  to what plaintiffs' would have the Court believe, a reference to "soy flour" is not a violation of

18  FDA's "bread" standards but is voluntarily provided by BBUSA as part of its efforts to alert

19  allergic consumers to the potential for soy residue due to cross-contact with grains that are milled

20  into flour used in bakery products.[7]  Because ingredients are listed in descending order by weight,

21  soy flour is the smallest among the group of ingredients each constituting less than 2% of the

22  weight of the product.  21 C.F.R. § 101.4(a).  Again, plaintiffs plead no facts even suggesting that

23  they formed reasonable expectations on the basis of the challenged statement or that any

24

25  [7] If this case gets beyond the pleading stage, BBUSA will show that it takes very seriously
26  notifying consumers of the presence of potential allergens in its products and it is remotely
    possible that soy flour, which is a potential allergen not part of the composition of the products at
27  issue, could have been introduced into a product during the process of milling wheat flour.  Given
    that possibility, soy flour was included in the ingredient statement, even though it is not an
28  ingredient, as the last, and therefore smallest by weight, trace ingredient to ensure that consumers
    with an acute allergy to soy would be aware of its potential presence.

expectation was frustrated when the "true" facts were revealed.  Most notably, plaintiffs plead

nothing showing that a trace amount of soy flour is a material fact to any purchaser.

This Court dismissed claims very similar to plaintiffs' soy claims in *Ross v. Sioux Honey Association Co-Op*, 2013 WL 146367 (N.D. Cal. Jan. 14, 2013), in which the plaintiff objected to the word "honey" on the defendant's label, arguing that, because pollen had been removed from the product, it could not be called "honey." *Id.* at *1.  Plaintiff cited scientific literature regarding the nutritional benefits of pollen to argue that a product without pollen did not provide those benefits so that the term "honey" was misleading. *Id.* at *1-2.  The Court, acknowledging the scientific literature and that some consumers might have purchased defendant's product believing that it contained pollen, nevertheless dismissed the complaint because it did not plead facts showing that the public at large was likely to have been deceived by the term "honey" and that the removal of pollen would be a material factor in a reasonable consumer's purchasing decision. *Id.* at *16-18.  Indeed, the plaintiff "provide[d] no indication that the presence or absence of pollen 'play[s] a substantial part' in the reasonable consumer's decision to purchase honey." *Id.* at *18 (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009)).  The Court further noted that, while the plaintiff invoked the concept of the reasonable consumer, a "threadbare recital" of this sort could not take the place of facts supporting the inference that a reasonable consumer would consider the alleged misstatement material. *Id.* at *16 (citing *Iqbal*, 556 U.S. at 678).[8]

The claims in this case are significantly weaker than the dismissed claims in *Ross,* as plaintiffs here cite nothing suggesting that the presence of trace amounts of soy flour was material even to them (because they had an allergy or other problem with soy).  Nor do plaintiffs include facts showing that reasonable consumers generally would deem a product containing trace

---

[8] Other recent decisions similarly confirm that failing to plead facts sufficient to support the claim that reasonable consumers would be misled cannot survive a motion to dismiss. *Rooney v. Cumberland Packing Corp.*, 2012 WL 1512106, at *4-5 (S.D. Cal. 2012) (no facts supporting inference that the name "Sugar in the Raw" would cause reasonable consumers to believe that product contains unprocessed and unrefined sugar); *see also Cullen v. Netflix, Inc.*, 2013 WL 140103, at *7 (N.D. Cal. 2013) (plaintiff offered only "his conclusory iterations that a reasonable consumer would interpret the statements as he did and would thus be misled by the statements"); *Arroyo v. Pfizer, Inc.*, 2013 WL 415607, at *4 (N.D. Cal. 2013).

amounts of soy flour inferior.  This Court dismissed the claims in *Ross* because they "failed to allege facts giving 'facial plausibility' to [the] claim that pollen (and its removal from [the product]) is of material concern to the ordinary consumer."  2013 WL 146367, at *18 (citing *Iqbal,* 556 U.S. at 678).  Substitute "soy flour" for "pollen" and substitute "presence" for "removal" and the *Ross* case and this case are nearly indistinguishable.

### 6.      The "Fresh" Claim Cannot Meet a Reasonable Consumer Standard

Plaintiffs' claim that the Entenmann's Soft'ees label violates 21 C.F.R. § 101.95 fails because the label simply does not make a "fresh" claim governed by the statute.  The word "fresh" on the Entenmann's label appears as part of the phrase "baked fresh daily."  (Ex. 23.)  To make their argument, plaintiffs take a single word out of context and then allege a regulatory violation as if it appeared in isolation.  In other words, plaintiffs would have the Court believe that the label says something completely different than what it actually says.

The regulation on which plaintiffs rely applies to the word "fresh" only "when used on the label or in labeling of a food in a manner that suggests or implies that the food is unprocessed." 21 C.F.R. § 101.95(a).  The term "fresh" is not used in this way on the Entenmann's label.  Far from "suggest[ing] or imply[ing] that the food is unprocessed," the challenged phrase in this case expressly states that the product has been processed:  It has been ***baked*** and the ingredient list expressly includes ***preservatives***.  Instead, the term "baked fresh daily" is meant to tell the consumer that that product, unlike some other bakery products, is not frozen.  By its terms, the federal regulation cannot apply to products where the challenged phrase refers to a method of processing such as baking.  *See, e.g.*, *Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 986 F.2d 605, 606 (1st Cir. 1993) (rejecting claims in connection with describing of pasta as "fresh" because pasta is necessarily the result of an artificial process).

FDA's 1993 Preamble (Ex. 30) specifically identifies baked goods as among those that do not exist in a raw, unprocessed state and, therefore, are not subject to "fresh" restrictions in the way that fruits or vegetables would be.  FDA explained that "[b]read is not a food that exists in a raw state, ***and the term 'fresh bread' does not imply that the food is unprocessed and in its raw state***."  58 Fed. Reg. 2302 at 2403 (emphasis added).  FDA had initially considered more

sweeping regulation of the term "fresh" but found that such a definition was "too restrictive, because it did not allow for various contexts in which 'fresh' is appropriately used." *Id.* at 2402. FDA explained that the more restrictive rule was unwarranted because it "would have disallowed uses of this term that are *not misleading* and are *widely accepted by consumers* ('*fresh bread*')." *Id.* (emphasis added). Plaintiffs here seek to impose precisely the restriction that FDA has rejected. Given the actual state of the law, and the actual label at issue, plaintiffs cannot contend that the Entenmann's product is "misbranded."

### 7.     The Heart-Check Mark Claims are not Actionable

Plaintiffs challenge the use of the AHA's "heart-check mark" on the label of Thomas' Plain Bagel Thins, which shows the iconic red heart, crossed by a check mark, accompanied by the statement "Low in Saturated Fat & Cholesterol – Certified by American Heart Association – heartcheckmark.org." (Exs. 13-20.) According to plaintiffs, the label does not "disclose that this was a paid endorsement." (FAC at ¶ 58.) But plaintiffs plead no facts suggesting that the heart-check symbol is an "endorsement made for compensation" and, in fact, it is not.

The flaw in plaintiffs' theory is revealed by the way that AHA certifies products that meet its guidelines, which involves an objective evaluation of whether a product's qualities meet the AHA standards rather than a subjective endorsement of a particular product over others. The AHA's certification requirements, including the fee, are identified in the materials cited in plaintiffs' complaint and are explained on the AHA website identified on the product label. (FAC at ¶¶ 71-74; Ex. 28.) In statements directed to manufacturers (from which plaintiffs draw), the AHA explains that the heart-check mark is available *only when products have passed through the organization's certification process*. (Ex. 28.) To be eligible to use the mark, manufacturers must first apply detailed nutritional criteria (relating to fat, cholesterol, sodium and other nutrients) to a given product. (*Id.*) If a manufacturer believes the product satisfies those criteria, they must complete and submit forms and product packaging to the AHA, *together with a certification fee*, "which is used to cover program operating expenses." (*Id.*) This fee is not paid "for the endorsement," as it must be paid whether or not a product is ultimately certified. (*Id.*) Only after the forms are filled out and the fee is paid does AHA review the product for

-16-

compliance with its nutritional criteria, in some cases performing laboratory testing as part of the process.  (*Id*).  If the AHA determines that the product complies with its nutritional standards, which is an objective test not dependent upon any compensation, the manufacturer is asked to sign a Certified Mark License Agreement and can use the mark on that product for one year.  (*Id.*)  Because certification can be withheld even after payment of the fee, such payment is not "for" the certification (much less for an endorsement).

While plaintiffs desperately try to equate the two, this process is far removed from one in which a celebrity or other figure endorses a product for money.  The AHA certification process, unlike an endorsement, is known (the entire process is on its website), uniform (meaning that every product that has the mark has gone through the same process and involves payment of a fee) and success does not depend upon whether money was paid.  The FDA Preamble materials from which plaintiffs selectively and misleadingly quote therefore do not even on their own terms apply to the heart-check mark certification.

Significantly, FDA has explained that it has no jurisdiction over claims of the type at issue here.  (Ex. 32 at 2484.)  Such claims fall instead to the Federal Trade Commission, the agency tasked with protecting consumers from false or misleading advertising.  And the FTC recently held that certifications pose no risk of consumer deception and, thus, that fees like the certification fee charged by the AHA need not be disclosed.  In the explanatory materials accompanying its recently issued *Guides for the Use of Environmental Marketing Claims*, the FTC stated that, unless a manufacturer has other ties to a certifying agency, "marketers featuring certifications from third-party certifiers ***need not disclose their payment of a reasonable certification fee*** . . . because ***consumers likely expect that certifiers charge a reasonable fee for their services***."  77 Fed. Reg. 62122 (Oct. 11, 2012) (emphasis added) (Ex. 33).  Plaintiffs' claims arising out of the presence of the AHA certification mark on the Thomas' Bagel Thins products are, therefore, without any basis in law.

### 8.  Plaintiffs Fail to Allege Facts Establishing their Other Bagel Thins Claims

The first problem with the claim that the Thomas' Plain Bagel Thins label misstates that they are an excellent source of fiber is that it is not supported by each of the product labels.  As

the Court can see from the labels attached as exhibits to the RJN, not all Thomas' Plain Bagel Thins labels include the words "excellent source of fiber." (*See* Exs. 13-18.) Is it plaintiffs' contention that they and other members of the proposed nationwide class bought only bagels in packages that included an "excellent source" claim? That is not what they have alleged in the amended complaint. Since not all of the labels include the statement alleged, plaintiffs must plead facts establishing that the labels of the Thomas' Plain Bagel Thins products that they bought all included the statement "excellent source of fiber." Without such facts, plaintiffs cannot state a claim relating to this product.

Even if plaintiffs could allege that all of the products they and the putative class members purchased included the term "excellent source of fiber," they would need to allege facts, not conclusions, showing that statement is materially false. In fact, they cannot. For instance, all of the Thomas' Plain Bagel Thins labels actually do include the claim that the product is "a good source" of fiber. (Exs. 13-20.) Even the label on one of the eight-count packages of the product that includes the words "excellent source," which is a typographical error, more prominently states that the product is a "good source" of fiber. (Exs. 19-20.) In addition, the amount of dietary fiber actually in the product is also plainly quantified on the label -- 16% of the RDI for a one-bagel (or 46g) serving -- and right where a reasonable consumer would expect it. Since FDA regulations permit a fiber content over 10% RDI to be called a "good source" of fiber, the label provides the information that the consumer needs to understand what level of fiber is being provided.

Plaintiffs' inability to allege the materiality of the fiber claim becomes even more clear when the actual reference amount for bagels is used to calculate the RDI of fiber provided by this product. The 20% "excellent source" threshold plaintiffs cite in their complaint applies to the "reference amount commonly consumed" of a given food product. 21 C.F.R. § 101.54. FDA's "reference amounts" are established in a regulation that provides values, generally in weight, for each type of food. 21 C.F.R. § 101.12. The regulatory reference amount for bagels is 55g. *Id.* The 16% figure plaintiffs cite for the Thomas' product comes from the Nutrition Facts panel on the challenged label, though plaintiffs do not even allege that much. That figure corresponds to a

1    one-bagel serving size, which is 46g.  (Exs. 19-20.)  Converting the 46g serving size to the 55g

2    reference amount yields 19.1% of fiber.  The Thomas' product therefore actually provides 19.1%

3    of the RDI of fiber per reference amount under the FDA standards.  Plaintiffs' claim, by which

4    they seek to recover millions of dollars on behalf of a nationwide class of consumers, is thus

5    based on a difference in RDI of fiber of less than 1%.  Plaintiffs plead no facts suggesting that a

6    reasonable consumer not familiar with the minutiae of the Code of Federal Regulations would

7    draw the line separating "good" from "excellent" precisely at a point between 19.1% and 20%.

8            Assuming, for the sake of argument, that reasonable consumers would have at their

9    command the requirements of the nutrient content claim regulation, and know that an excellent

10   source of fiber means at least 20% of the RDI, plaintiffs *still* do not and cannot plead that such

11   consumers would be likely to be deceived by the Thomas' label.  In fact, the challenged label

12   states that the product is a "good source of fiber," a statement with which plaintiffs would

13   apparently agree and that appears in significantly larger font and with more prominent placement

14   than the "excellent source" claim that plaintiffs allege.  (Exs. 19-20.)  If plaintiffs wish to posit a

15   consumer whose expectations somehow incorporate all of the regulatory food labeling

16   requirements, that same consumer, upon reading the more prominent statements on the

17   challenged label that plaintiffs concede are true, would accurately conclude that the product

18   contains between 10% and 20% of the RDI of fiber per reference amount.

19           This Court has dismissed consumer protection claims under nearly identical

20   circumstances.  In *Brod v. Sioux Honey Assoc.*, 2013 WL 752479, at *16 (N.D. Cal. Feb. 27,

21   2013), plaintiff challenged the use of the word "honey" on a label, arguing that term could not be

22   applied to a product from which pollen had been removed and, according to plaintiff,  knowledge

23   of those regulations could be imputed to consumers because "'the reasonable consumer expects if

24   there is a law governing their foodstuffs that they go to buy, that that law has been complied

25   with.'"  *Id.* at *16 (quoting transcript).  The Court rejected that argument, explaining that, "if one

26   could construct a theoretical basis for finding reasonable consumer expectations based on

27   constructed notice" of the labeling regulation on which plaintiff relied, one would also have to

28   impute knowledge of regulations governing *other* parts of the label.  *Id.*  And because the other

-19-

parts of the label, understood in light of the applicable regulations, would correct or cancel out the conclusions plaintiff reached on the basis of the disputed part of the label, there could be no deception even under plaintiffs' theory.  *Id.*  A similar conclusion was reached recently by a court in Minnesota that found that the term "all natural" on a granola bar could not be misleading when the ingredient list included preservatives and, thus, would lead a reasonable consumer to understand that the product included the preservatives that plaintiffs claimed rendered the product not "natural."  *Chin v. General Mills, Inc.*, 2013 U.S. Dist. Lexis 77345.

The same logic applies to this case.  A consumer to whom knowledge of the nutrient content claim regulations is imputed might arguably believe that the term "excellent source" means that the product contained at least 20% of the RDI for fiber per reference amount but, when that consumer reads the same label and sees the term "good source" (in larger print) and the Nutrition Facts panel's notation that each 46g bagel contains 16% of the RDI for fiber, that consumer would have to conclude, based on the same knowledge of applicable regulations, that the product contains less than 20% of the fiber RDI.  Thus, if it were truly crucial for the plaintiffs that their bagels provide more than 20% of the RDI for fiber, they had the information to allow them to not buy this particular product.  Under such circumstances, neither plaintiffs' hypothetical consumer nor the statutory reasonable consumer could be deceived.

**B.      Plaintiffs Do Not Have Standing As To Products They Never Purchased**

Although plaintiffs have not adequately pled claims even with respect to the six products that they allege they bought, they seek to expand this litigation to include 72 additional products that they concede they did not buy.  (FAC at ¶¶ 172-220.)  Plaintiffs justify their inclusion of these products by claiming, without any factual support whatsoever, that each of those 72 products is "substantially similar" to one of the purchased products and that their claims with respect to the purchased product labels therefore apply to the labels of the 72 additional products as well.  These claims are without any legitimate basis.

A long line of decisions holds that consumers do not have standing to pursue claims challenging labels on products that they never bought and that the constitutional defect in such claims cannot be remedied.  *E.g., Hairston v. South Beach Beverage Co*., 2012 WL 1893818, at

-20-

*5 n.5 (C.D. Cal. 2012) (consumer who purchased certain flavors of "Lifewater" did not have standing to challenge labels on differently-flavored products); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159380, at *3 (consumer who purchased Drumstick ice cream products did not have standing to challenge labels on Dibs ice cream products), *aff'd on other grounds*, 2012 WL 1131526 (9th Cir. 2012); *Johns v. Bayer Corp.*, 2010 WL 476688, at *5 (S.D. Cal. 2010) (plaintiff "cannot expand the scope of his claims to include a product he did not purchase or advertisement relating to a product that he did not rely upon").[9]

In a recent decision, Judge Whyte permitted the plaintiff, who had purchased one of the defendant's tea products, to pursue claims "based upon the exact same label" on numerous additional varieties of tea provided they came from the same tea bush. *Lanovaz v. Twinings North America, Inc.,* 2013 WL 2285221, at *3 (N.D. Cal. May 23, 2013). Here, no fact has been alleged that the same labels that are used on the purchased products are used on the additional products and no facts are alleged showing how Sara Lee bread and Thomas' Pita Pockets are the same products. Indeed, plaintiffs have failed to allege the content of labels even for the products they actually purchased. While plaintiffs use the ***words*** "substantially similar," they plead no ***facts*** to support that allegation. As with the six products they purportedly purchased, plaintiffs have chosen to leave secret the labels of the 72 additional products and do not describe those labels and products, nor explain in what way they are allegedly similar to the labels on the products plaintiffs purchased. On such facts, it cannot be said that the products, their labels or the claims regarding them are "substantially similar" like teas from the exact same plant with the exact same label would be similar. And without such descriptions, and without the labels themselves, plaintiffs' "substantially similar" allegations are unsupported and insupportable.

### C.   Plaintiffs' Unjust Enrichment Claim Is Improper

Unjust enrichment and restitution causes of action are simply improper as redundant under California law with respect to putative consumer class actions. *See, e.g.*, *In re Apple & AT & T*

---

[9] Decisions from outside the Ninth Circuit are similar. *E.g.*, *Chin v. General Mills, Inc.*, 2013 U.S. Dist. Lexis 77345 slip op. at 8-9; *Hemy v. Perdue Farms, Inc.*, 2011 WL 6002463, at *10-11 (D.N.J. 2011); *Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F.Supp.2d 529, 536-37 (D.N.J. 2011).

*iPad Unlimited Data Plan Litig.*, 802 F.Supp.2d 1070, 1077 (N.D. Cal. 2011)..   No one knows this better than plaintiffs' counsel, which have routinely had such claims dismissed in this Court and others in California.  *See, e.g.*, *Brazil v. Dole Food Co., Inc.*, 2013 WL 1209955, at *18 (N.D. Cal. Mar. 25, 2013); *Lanovaz v. Twinings North America, Inc.*, 2013 WL 675929, at *7 (N.D. Cal. Feb. 25, 2013).   BBUSA tried to circumvent having to move to dismiss this claim by pointing out to plaintiffs' counsel the Rule 11 implications of bringing a claim that they know had no merit.   (Ex. 24.) Despite agreeing to amend their complaint after receiving this position, plaintiffs decided to keep the meritless restitution claim in the first amended complaint.  Needless to say, BBUSA submits that claim should be dismissed with prejudice.

### D.    Plaintiffs' Claims Are Contrary To Federal Law And Are Preempted

Even if plaintiffs had actually identified the labels at issue, and supported their claims with facts about reliance and injury, their claims would still need to be dismissed.  It cannot be contested that federal law "comprehensively regulates food and beverage labeling."  *Pom Wonderful v. The Coca-Cola Co*., 679 F.3d 1170, 1175 (9th Cir. 2012).  The FDCA authorizes FDA to protect public health by ensuring that food is properly labeled.  21 U.S.C. § 393(b)(2)(A). The NLEA added an express preemption provision, section 343-1, prohibiting states from imposing labeling requirements that are "not identical" to federal requirements in specified areas. Among the provisions granted preemptive effect are those governing so-called "nutrient content claims" and those governing standards of identity such as what may be called "bread" and the common names of foods.  21 U.S.C. §§ 343-1(a)(2), (a)(3).

When a plaintiff asserts a claim seeking to "declare unlawful the very statement that federal law permits and defines," that claim must be dismissed because it "would impose a burden through state law that is not identical to the requirements" imposed by federal law. *Carrea v. Dreyer's Grand Ice Cream*, 2012 WL 1131526, at *1 (9th Cir. 2012).   Thus, "so long as [a challenged] product meets the conditions imposed by the FDCA and accompanying regulations, plaintiff's claims are expressly preempted by the FDCA and NLEA." *Yumul v. Smart Balance*, Inc. 2011 WL 1045555, at *9 (C.D. Cal. 2011); *see also Brod v. Sioux Honey Assoc*., 895 F.Supp.2d 972, 979-81 (N.D. Cal. 2012) (a state claim is preempted where a product

-22-

1   complies with federal regulation governing the name of that product).  Stated differently, state

2   tort actions are preempted where the challenged label statements are not contrary to the

3   regulations promulgated under NLEA section 343(r), which governs nutrient content claims.

4   *Turek v. General Mills, Inc.*, 662 F.3d 423, 426-27 (7th Cir. 2011); *Carrea v. Dreyer's Grand Ice*

5   *Cream, Inc.*, 2011 WL 159380, at *3 (C.D. Cal. 2011).

6          As discussed in detail *supra*, the product labels that plaintiffs challenge meet the federal

7   regulations that occupy and control the sphere of the regulatory framework at issue.  For example,

8   plaintiffs' claims that the Sara Lee products improperly claim to be an "excellent" or "good"

9   source of whole grain is contrary to the federal regulations that (1) expressly state that such

10  "source claims" are dependent upon RDI only when they are made in relation to a nutrient and (2)

11  do not prohibit such claims when they are made with respect to an ingredient.  Likewise,

12  plaintiffs' claim under California law that "Toasted Bread" cannot be called "bread" is contrary to

13  the federal regulations mandating that products not within the standard of identity for bread and

14  not called "bread" can include the word "bread" in their name.  And the claims that Entenmann's

15  Softee's labels improperly say they are "baked fresh daily" conflict with the federal regulations

16  that allow the word "fresh" to connote the unfrozen state of a product and have expressly

17  recognized the ability to refer to bread products as "fresh baked."  Finally, stating that Thomas'

18  Plain Bagel Thins provide a "good source of fiber" is consistent with what the label says,

19  meaning that this claim complies with federal law.  Since plaintiffs' claims seek to impose

20  obligations that are not identical to those imposed by federal regulation, and in light of the fact

21  that the applicable regulations were promulgated under 21 U.S.C. § 343(r) and, therefore, have

22  express preemptive force, plaintiffs' claims are preempted by federal law and must be dismissed.

23  *Carrea*, 2012 WL 1131526, at *1.

24          **E.     Plaintiffs' Claims Under The CLRA Should Be Dismissed**

25          Just as they fail to provide notice in their First Amended Complaint of the facts and

26  damages they allegedly sustained, plaintiffs' CLRA claims fail to provide notice to BBUSA of

27  exactly what they were complaining about.  Under the CLRA, plaintiffs must provide sufficient

28  notice of purported violations before filing suit.  Cal. Civil Code § 1782(a).  The policy behind

1   the CLRA's presuit demand requirement is to ensure that manufacturers are given the right to

2   avoid costly litigation by remedying the purported wrongs on which potential plaintiffs would

3   base their claims. *See, e.g., In re Apple & AT & T*, 802 F.Supp.2d at 1077 (recognizing "the

4   [CLRA's] goals of expeditious remediation before litigation").

5          While plaintiffs in this case served a "Notice and Demand Letter" almost a month ***after***

6   filing the original complaint in this action, that communication utterly failed to meet the

7   requirements of the CLRA because it did not provide any meaningful opportunity for BBUSA to

8   respond to or resolve the claims outside of litigation.  (Ex. 26.)  Section 1782(a) requires potential

9   plaintiffs to identify "the particular violations" on which future claims might be based.  Plaintiffs

10  here did no such thing, as their CLRA letter came after they had filed suit and is skeletal in the

11  extreme.  (*See* Exs. 26-27.)   For instance, plaintiffs' letter does not identify a single product or

12  label they contend is misbranded or misleading, referring instead only to their original complaint,

13  which, by the time of the CLRA letter, plaintiffs had already acknowledged was deficient and had

14  agreed to amend.  (*See* Exs. 24-25.)  Nor are any particular alleged violations identified in the

15  one-and-a-half page letter, most of which is boilerplate.  The letter does not even refer to the FDA

16  regulations that are now the centerpiece (however misguided) of plaintiffs' claims.

17         The purpose of section 1782 is to provide companies with an opportunity to avoid

18  litigation by correcting errors, by making changes to ways of doing business where appropriate,

19  by offering refunds or replacements or, more generally, by opening a dialogue with consumers in

20  which a complaint can be explored or resolved.  Plaintiffs' "notice" letter does not provide a basis

21  on which any of this could happen.  No products are identified, let alone purchase prices or

22  quantities and there is, therefore, no data on which to make an offer of a refund.  No information

23  about the two plaintiffs' expectations of the (unidentified) products is provided and there is no

24  indication of the ways in which any products fell short of those expectations.  Consequently, there

25  is no basis on which to engage with these consumers about their experiences with the product.  It

26  is clear that plaintiffs regarded the CLRA letter as merely a hoop they needed to (but originally

27  forgot to) jump through before they could bring a putative class action that would pay their

28  lawyers handsomely.  This does unquestionable violence to the intent of the Legislature in

1  enacting the pre-suit notice provision.  Plaintiffs have not complied with that provision in any

2  even arguably meaningful way and their CLRA claim should accordingly be dismissed.

3  **IV.      CONCLUSION**

4          Plaintiffs assert a putative class action based on misleading labels and advertisements but

5  do not identify the labels or advertisements on which they base their claims.  The failure to allege

6  the content of those labels and advertisements in full is fatal to their complaint because BBUSA

7  cannot prepare to defend against such nebulous allegations.  But even when one considers the

8  various labels for the products that plaintiffs attempt to identify as "purchased products," it is

9  clear that there are no misstatements or misinformation on which plaintiffs could maintain a

10  mislabeling claim:  Each of those labels complies with the federal regulations that apply to it and

11  provides the ingredient information that plaintiffs claim they had no way of knowing.

12          Given plaintiffs' failures to recite the labels at issue and their inability to use the labels of

13  the products that they actually purchased to state any cognizable claim against BBUSA,

14  plaintiffs' complaint must be dismissed.  Because plaintiffs have now had multiple opportunities

15  to plead claims against BBUSA and place the labels before the Court and have utterly failed to do

16  so -- and because the labels in any event all meet the federal regulations governing them, thereby

17  preempting separate state law claims -- plaintiffs should not be afforded leave to amend.

18

19  Dated: June 19, 2013                              HOGAN LOVELLS US LLP

20

21                                                    By:  /s/ Mark Goodman
                                                          Mark Goodman
22                                                        Attorneys for Defendant
                                                          Bimbo Bakeries USA, Inc.

23

24

25

26

27

28