Exhibit 5

Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
Telephone: (408) 369 0800
Fax: (408) 369-0752
pgore@prattattorneys.com

Keith M. Fleischman (admitted *pro hac vice*)
Bradley F. Silverman (admitted *pro hac vice*)
THE FLEISCHMAN LAW FIRM, PLLC
565 Fifth Avenue, Seventh Floor
New York, New York 10017
Telephone: (212) 880-9571
Fax: (917) 591-5245
keith@fleischmanlawfirm.com
bsilverman@fleischmanlawfirm.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX ANG and LYNNE STREIT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIMBO BAKERIES USA, INC.,<br>Defendant. | Case No. CV13-01196-HSG (NC)<br><br>**DECLARATION OF DR. DONALD M. MAY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, FOR APPOINTMENT OF CLASS REPRESENTATIVES, AND FOR APPOINTMENT OF CLASS COUNSEL** |

I, Dr. Donald M. May declare and state that:

1.      I have been asked by counsel for plaintiffs to provide a declaration in support of class certification.

2.      I hold a Bachelor of Science in Business Administration (BSBA) degree in accounting from the Roosevelt University, a Master of Business Administration (MBA) degree in statistical methods and finance from the University of Chicago Graduate School of Business (now the Booth School of Business), and a Doctor of Philosophy (PhD) in Finance and Economics from the University of Chicago Graduate School of Business.  I have passed the Certified Public Accountant (CPA) exam in the State of Illinois.

3.      I was a professor of Accounting, Finance and Economics at the Massachusetts Institute of Technology Sloan School of Management, where I conducted research and taught classes on financial statement analysis, finance research methods, statistics, and valuation.

4.      I have spent over 25 years analyzing and opining on valuations and damages in both litigation and non-litigation contexts and across numerous industries.

5.      A list of references used for this declaration is shown in Appendix A. A copy of my *curriculum vitae*, which includes publications over the past 10 years is attached as Appendix B to this declaration, and a list of cases where I been deposed or testified in court or arbitration over the past four years is attached as Appendix C to this declaration.

6.      I am being compensated at a rate of $525 per hour and my fee is not contingent upon the findings or opinions I express or will express in this matter.

7.      I have reviewed the Second Amended Complaint of Plaintiffs Alex Ang and Lynne Streit ("Plaintiffs") against Bimbo Bakeries USA, Inc. ("Bimbo Bakeries" or "Defendant"). I have also reviewed relevant information on products from Bimbo Bakeries website.

8.      According to the second amended complaint, and my review of Bimbo Bakeries website, Defendant is the largest bakery company in the United States.  Defendant

owns and distributes numerous leading bakery brands in the United States, including, Arnold, Ball Park. Bimbo, Boboli, Brownberry, Earthgrains, Entenmann's, Francisco, Freihofer's, Marinela, Mrs. Baird's, Oroweat, Sara Lee, Stroehman, Thomas', and Tia Rosa.

9.      According to the second amended complaint, Defendant makes the following misrepresentations regarding products produced by various Bimbo Bakery brands:

- The label of Defendant's Thomas' Plain Bagel Thins and other products bear the American Heart Association Heart-Check Mark, which is alleged to be an undisclosed paid endorsement that violates federal and California law;

- The labels of Defendant's Sara Lee 100% Whole Wheat Bread and other products claim that each is an "Excellent Source of Whole Grain," and labels of Defendant's Sara Lee Soft & Smooth Whole Grain White Bread, Sara Lee Classic 100% Whole Wheat Bread, and other products claim that each is a "Good Source of Whole Grains." It is alleged that Defendant is barred from making these claims under federal and California law;

- The labels of Defendant's Sara Classic 100% Whole Wheat Bread, Sara Lee 100% Whole Wheat Bread, and other products represent that each is made of "100% Whole Wheat," when they are partially made with non-whole wheat flour. It is alleged that Defendant is barred from representing that such products are "100% whole wheat" under federal and California law;

- Defendant's Bimbo Original Toasted Bread and other products are labeled as "bread," but contain added coloring, which precludes these products from satisfying the FDA's standard identity for bread. It is alleged that, under federal and California law, such products cannot be labeled as "bread."

10.     I understand that Plaintiffs seek certification of four classes under Federal Rule of Civil Procedure 23(b)(3), each of which includes consumers in California, who, since March 18, 2009, purchased specific products containing one of the four alleged misrepresentations discussed above.

11.     Defendant recognizes that claims or representations on food labels, such as the ones discussed above, influence food sales and promotes the purported health benefits of the products in question.  From an economic standpoint, Bimbo Bakeries would not continue to undertake the payments to the American Heart Association, or the manufacturing, advertising, and promotion of products labeled with the Heart-Check Mark

unless the benefits from doing so outweighed the costs of doing so. Bimbo Bakeries, as is typically the case of manufacturers of food products, develops strategies in general which serve to maximize profits as well as to minimize costs. In this instance, certainly one motivation for the health and nutrition claims on food labels is the provision of differentiated products from competitors consistent with the notion of the maximization of profits. In fact, a number of economic studies in the extant literature deal with the impacts of health and nutrition claims on food labels.[1]

12. A number of recently conducted scientifically-based surveys support the contention that labels matter to consumers. That is, labels indeed are material factors in purchasing food and beverage products. To illustrate, a 2008 Health and Diet Survey conducted by the Food and Drug Administration, based on a telephone survey of 2,584 non-institutionalized adults (18+) in the 50 states and the District of Columbia found that: (1) when buying a product for the first time, 77 percent of respondents reported reading food labels often or sometimes to discern the list of ingredients and to obtain the nutrition information; (2) 73 percent of respondents reported using food labels often or sometimes to decide which brand to buy; (3) 85 percent of respondents reports using food labels often or sometimes to get a general idea of nutritional content; (4) nearly half of the respondents reported instances wherein the decision to buy food products within the most recent two-week period were changed because of reading the nutrition label; and (5) 72 percent of respondents reported using front-of-package (FOP) symbols often or sometimes when making decisions to purchase food products.[2] Additionally, a recent Freeborn and Peters Food Industry Team White Paper published in 2014 related that: (1) the number of shoppers who say a no additives/preservatives claim is very important rose 10 percent

---

[1] Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere, 2013. "The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals," *Journal of Food Products Marketing* 19:279-298.

[2] Choinière CJ, Lando A. Health and diet survey. 2008. Retrieved May 2010, from Food and Drug Administration.

over the past two years; (2) natural claims now have greater appeal than organic and are more strongly associated with no artificial flavors/colors/preservatives; this contention was supported as well in a detailed 2008 study commissioned by Packaged Facts; and (3) natural ingredients now rank third on the list of most looked for items on the ingredient label, after type of fat/oil and sweeteners.[3]

13.    A 2007 research study undertaken by the National Marketing Institute ("NMI") primary consumer survey of 2,074 adults (18+) was conducted in July 2007 designed to measure and describe the marketplace for the U.S. Lifestyles of Health and Sustainability ("LOHAS") products.[4]  The results of this survey were nationally projectable to the U.S. adult population and were statistically valid at the 95 percent confidence level, with a margin of error of +/- two percentage points. According to this NMI study, 85 percent of adults indicated that the term "natural" meant 100 percent natural ingredients; 63 to 66 percent of adults that the term "natural" meant no artificial flavors, no artificial colors, no additives, or no preservatives. Further, this study related that functional foods, defined as those products with a specific health claim, have grown in favor among consumers. Notably, the NMI study reported that package labels (and not television, radio, newspapers, physicians, government agencies, consumer advocacy groups, friends/relatives, or the internet or web sites) were the most important influence when purchasing foods and beverages.

14.    Finally, a recent *Consumer Reports* nationally representative telephone survey of 1,004 adults, conducted April 17-21, 2014 with a margin of error of +/- three percentage points at a 95 percent confidence level, related that close to 60 percent said they look for the term "natural" on food labels when grocery shopping, while about two-thirds said that the term means a product does not contain artificial ingredients, pesticides, or genetically-

---

[3] Sloan, Elizabeth, A., Top 10 Food Trends, Food Technology Issues, April 2011, Volume 65, No. 4 also at, http://www.ift.org/food-technology/past-issues/2011/april/features/food-trends.aspx?page=viewall

[4] National Marketing Institute, 2007. Understanding the LOHAS Market Report, Sixth Edition.

modified organisms.[5] Avoiding artificial ingredients such as preservatives, colors, or flavors also was important to close to 70 percent of respondents.

15. Various approaches exist to establish the quantitative appraisal of damages associated with the misbranding of the aforementioned food products. For purposes of the calculation of damages associated with the misbranding of products, I assume that Plaintiffs' allegations are true. Based on my review of all materials to date, several methods exist to calculate damages to the proposed class using evidence that is predominantly common to all class members.

16. I understand from Plaintiffs' counsel that Plaintiffs believe that class members are entitled to a full refund of the purchase price of the products at issue. As discussed below, such relief can be calculated by aggregating the total units sold in California with the average retail price estimated over the class period.

17. Alternatively, should the Court determine that class members are entitled to less than the full purchase price, there are several scientifically-based methods of calculating the difference in value between what class members paid and what they received. These methods include multiple regression analysis using both the hedonic and before and after approaches as is detailed below. They include the analysis of the value of product labeling characteristics (which calibrates differences in prices and sales of products with and without the labeling claims at issue); and the analysis of incremental sales revenues (which calibrates differences in prices and sales of the products at issue during the time in which they have been labeled with the labeling claims at issue and prices and sales of these products before the misrepresentations were placed on the labels, or after they were removed).

---

[5] Consumer Reports National Research Center Survey Research Report, Food Labels Survey 2014 Nationally-Representative Phone Survey.

**Retail Price Damages**

18.     Plaintiff is also pursuing claims for restitution of the purchase price paid by the Class Members for the misbranded products.  These methods of calculating damages can be arrived at using retail or wholesale weighted average prices of the products and units sold in California over the class period.

**Full Purchase Price Restitution**

19.     The Plaintiffs claim, under California law, that the misbranding of the product makes the product worthless.  I understand that a misbranded product is illegal to sell, purchase or possess and therefore, from a legal standpoint, has no value.  The aggregate damages to the Class can be determined from the retail sales data in the possession of the Defendant or obtained from third party vendors who provided this information to Defendant and other retailers.  These third party vendors include Information Resources, Inc. (IRI) and Nielsen, who provide point-of-sale retail price data.[6]  Restitution is the return of the weighted average purchase price to the Plaintiff and members of the class, which can be determined in alternative ways.  This measure can be calculated using scientifically sound economic and statistical principles to account for variations in prices charged by retailers.  The information needed to perform these calculations is possessed by the Defendant and/or is available from the third party vendors. With such information, I can fully perform the necessary damages calculations.[7]  The retail price measure will rest on the use of weighted average prices available from Defendant and or the third party vendor data previously described and the number of units sold by Defendant in California over the class period.

20.     The calculation of damages under the full purchase price restitution approach will involve calculating total units sold and weighted average price per unit paid by

---

[6] A list of Multi-outlets associated with the use of the IRI data is contained in Appendix D of this declaration.

[7] Our analysis of the data provided by Defendant is in process, and we will update our data requests if we find that there are additional data items required to complete our analysis.

consumers in California over the class period.

**Restitutionary Disgorgement**

21.     Restitutionary disgorgement is another way to determine the relief to which class members are entitled. Here, the loss suffered by class members (the retail price) is necessarily greater than revenues or profits received by Defendant at the wholesale level. Therefore, if class members are unable to establish the full extent of their loss at the retail level, they can establish a "floor" for the relief to which they are entitled because their actual retail loss is no less than the amount received by Defendant at the wholesale level.

22.     Revenues or profits received at the wholesale level can be calculated directly using Defendant's revenues over the class period. These represent units sold multiplied by the wholesale price per unit. Revenues or profits at the retail level can be calculated based on the weighted average price per unit over the class period multiplied by units sold.

23.     The only distinction between these measures is that the wholesale price per unit will be lower than that average retail price per unit due to the markup that will be added on by retailers to bring the wholesale price up to the retail price. Thus the loss to class members at the wholesale level will be lower than the loss at the retail level based on the average retail markup per unit multiplied by total units sold.

24.     Data on wholesale revenues or profits could be obtained from Defendants and data on retail prices and markups can be obtained from Defendants and third party vendors such as IRI.

**Value of the Product Labeling Characteristic**

25.     An alternative measure of the relief to which class members are entitled would result from estimating the value of the labeling characteristic itself. This approach refers to the principle that a buyer may recover from the seller as damages the value of certain product characteristics such as the Heart-Check Mark that the product claims to have but that in actuality does not. To illustrate, suppose that the retail price for one of Defendant's challenged product is $1. If it is calculated that 10% of this price is attributed

to the misrepresentation of the product through a false labeling claim, then the restitution is 10 cents. The value of the product labeling claim will be determined through the use of the hedonic regression approach described below.

**<u>Value of the Product Labeling Characteristic</u>**

26.     An alternative measure of restitution would result from estimating the value of the labeling characteristic itself. This approach refers to the principle that a buyer may recover from the seller as damages the value of certain product characteristics such as the Heart-Check Mark that the product claims to have but that in actuality does not. To illustrate, suppose that the retail price for one of Defendant's challenged product is $1. If it is calculated that 10% of this price is attributed to the misrepresentation of the product through a false labeling claim, then the restitution is 10 cents. The value of the product labeling claim will be determined through the use of the hedonic regression approach described below.

27.     The following facts are relevant to a damages calculation based on the retail price. There is no bargaining or negotiating when consumers purchase food products from retail establishments. Consumers in essence are price takers in these situations. Even if one consumer bought more product than another consumer, the damage is common to the class. Each stock-keeping unit ("SKU") has a unique universal product code ("UPC"), which is the code recognized by scanners at the supermarket cash register that is used to determine the price of the SKU. These prices in the "register" are the prices consumers paid at a given point in time. Therefore, if one knows the "register" price for any SKU sold by the Defendant in any given store on any given day, then one knows the price facing *all consumers* for that item in that store in that time period. It is recognized that differences in retail prices may exist across different stores in any given time period. To that end, a weighted average price can be generated for any product on any given day. The weights to be used in this calculation are the number of units sold of the products from the respective retailers on that day. Consequently, this weighted average price constitutes the representative price for the

product in any given time period. Importantly, this weighted average price is common to the class of purchasers.

28. Consumers typically pay the common "register" price for goods purchased at supermarkets and other food retailing establishments. I have no reason to believe this situation would differ in this case. Simply put, consumers do not haggle or try to negotiate individual prices as is common in other retail businesses. For example, car dealerships may advertise a manufacturer suggested retail price ("MSRP") for a particular car model, but the actual price a consumer pays to purchase that model typically is negotiated individually.

29. Restitution can be calculated using either the retail price of the subject products, as described above, or using the wholesale price of the subject products. Using sales information directly obtainable from the Defendant, we are in position to calculate a wholesale price which equals the sales of the Defendant to its distributors divided by the number of units sold. This price could be calculated for any time period for the subject products under scrutiny. In the event that data associated with retail prices of the challenged products are not available, then the wholesale prices, derived using data from the Defendant, with appropriate markups, can be used to arrive at the retail prices. Data on retail food markups can be obtained from defendants or industry sources such as the National Association of Convenience Stores or Food Marketing Institute and are common to all class members.

30. Importantly, these proposed methodologies for calculating restitution not only do not require any information specific to individual class members, but also are consistent with the notion of rigorous scientific analyses. Additionally, these proposed methodologies represent scientifically accepted quantitative methods in the calculation of damages.

**Incremental Sales Revenues**

31. Another measure of the relief to which class members are entitled rests on the portion of sales attributed to the misrepresentations by the Defendant. For example,

with the use of this measure, the difference in the sales, revenues, or profits of the Bimbo Bakeries products before and after the appearance of the labeling statement at issue on the product can be calculated to determine damages. With knowledge of the sales figures for the challenged products (figures in possession of the Defendant and third party vendors), and when the labeling claims appeared on the product, class-wide damages can be calculated in a straightforward manner. To illustrate, if the increase in sales of the Thomas' Plain Bagel Thins before and after the Heart-Check Mark placed on the product is calculated to be 10%, controlling for all other factors that may influence the difference in sales over this time period, and if total retail sales of the challenged products amounted to $100 million over the class period, then the class-wide damages would total $10 million.

32.     With appropriate data, both the value of the labeling characteristic and incremental sales damages methodologies can be used to determine damages associated with partial restitution of the purchase price and most importantly, can be calculated using data that is common to all class members.

33.     It is important to note that both of these damage calculation approaches should lead to similar estimates of damages because the value priced by consumers for the labeling characteristic multiplied by the units sold is functionally equivalent to the value of incremental revenues received from the labeling characteristic.

**Value of the Product Labeling Characteristic – Calculation Methodology**

34.     The calculations method described below is designed to estimate the value of the product characteristic such as the Heart-Check Mark and thus derive total damages by using this information along with total units sold containing this characteristic over the class period.  To value the product labeling characteristics, before and after labeling information would be very useful but not critical.  However, for the incremental sales methodology, also described below, data on revenues before and after the label change is necessary to calculate damages.

35.     To arrive at the partial purchase price restitution calculation by valuing the

labeling characteristic or incremental sales or profits, the scientifically accepted methodology is econometric or regression analysis. Regression analysis is a statistical tool for understanding the relationship among two or more variables. With regression analysis, it is possible to isolate the consequence of the alleged misrepresentation by controlling for all other factors that may affect the price differentials, prices and/or volume sold of the challenged products. Variables in econometric analyses often are quantitative measures like price or quantity, common variables in economic analyses. Variables may also be categorical in nature to represent events such as seasonal sales fluctuations, entry into markets, or presence or absence of a food label.

36. Regression analysis involves the relationship between a variable to be explained, known as the dependent variable, such as the quantity demanded of a particular good or the price of a particular good, and additional variables that are thought to produce or to be associated with the dependent variable, known as the explanatory or independent variables. An error term, which represents all other factors not accounted for by the set of explanatory variables, also is a fundamental component of the regression model. Regression analysis may be useful in determining whether a particular effect is present as well as in measuring the magnitude of a particular effect. As will be detailed below, regression analysis is a scientifically accepted methodology used to isolate whether a particular relationship exists between the dependent and explanatory variables and for measuring the magnitude of this relationship while controlling for other factors that could also influence the dependent variable.

37. The dependent variable used in the model that estimates the value of the labeling characteristic corresponds to the prices of the identified or challenged products as well as prices of comparable products. The type of regression methodology used to analyze how consumers value different product characteristics is known as hedonic price analysis.[8] With the use of this type of regression analysis, the supposition is that individual food

---

[8] Abere, A., 2010. "Using Economics to Measure Damages in Private Advertising Litigation," The Adviser, 1, 1: 14-17.

products are composed of various attributes. The bundle of attributes defines the unit price, which implies that product prices can be decomposed into implicit prices for individual attributes. These implicit prices are called hedonic prices. Intrinsic values of the various attributes may be recovered by specifying the prices of food products as a function of these attributes. In this litigation, to implement the hedonic regression approach, we must consider prices of the Defendant's products (with the labeling claim) as well as prices of comparable products (with or without the labeling claim). In this way, with the hedonic regression approach, we are in position to identify the impact of the labeling claim on the prices of food products. In the hedonic regression approach, we center attention on pooling prices of similar food products, some of which have labeling claims and some of which do not. Simply put, controlling for other attributes in the regression analysis (e.g., brand, package size, seasonality of prices, year-to-year fluctuations in prices attributed to economic conditions), we may ascertain the impact of the labeling claim on prices of particular food products.

38. The hedonic regression approach has been used extensively in economics, dating back to the work of Waugh in the 1928 *Journal of Farm Economics*. Waugh observed that prices of certain fresh vegetables varied considerably on the Boston wholesale market.[9] As such, Waugh regressed these prices on various physical characteristics of the vegetables. The name "hedonic pricing method" generally is attributed to A.T. Court (1939).[10] Court applied this method to automobiles and included several technical characteristics of the car in the hedonic price analysis. Griliches (1961) revived the notion of the hedonic pricing method, and this revival initiated a vast body of empirical work.[11]

---

[9] Waugh, F.V., 1928. "Quality Factors Influencing Vegetables Prices," Journal of Farm Economics 10: 185-196.

[10] Court, A. T., 1939. "Hedonic Price Indexes with Automobile Examples" in The Dynamics of Automobile Demand, New York: The General Motors Corporation.

[11] Griliches, Z., 1961. "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change," in The Price Statistics of the Federal Government, New York: Columbia University Press

39.     Importantly, this methodology not only has been widely implemented in the economic literature, but also this methodology has been implemented in situations specifically related to labeling claims. To illustrate, Anstine (2007) used a hedonic regression analysis to estimate the premium associated with yogurt labeled "All Natural."[12] The estimated premium associated with this "All Natural" claim was statistically significant with the magnitude of the premium being approximately 34 cents per ounce controlling for all brand and other labeling attributes. In percentage terms, this premium was on the order of 40 percent. Li and Hooker (2009) investigated the use of food safety claims on new packaged food products. Based on hedonic price models, they identified a significant 5 cent premium per ounce for a "preservative free" claim in yogurts.[13] Muth, *et. al* (2012) estimated a semi-log hedonic price regression for five breakfast bar and cereal product categories using Nielsen Scantrack scanner data for 2004.[14] They found that labeling statements for these products often were associated with substantially higher prices. Xiao (2012) analyzed price differentials attributable to observable characteristics of retail milk and oatmeal using the hedonic pricing methodology.[15] Satimanon and Weatherspoon (2010) determined price premiums of sustainable attributes for fresh eggs by using hedonic analysis. Welfare-managed eggs had a notable premium equal to 3.57 cents per egg.[16] Combris, Lecoq, and Visser (1997) used the hedonic pricing methodology to study the price-

---

[12] Anstine, J., 2007. "Organic and All Natural: Do Consumers Know the Difference?," Journal of Applied Economics and Policy 26, 1: 15-27.

[13] Li, J. and N.H. Hooker. 2009. "Documenting Food safety Claims and Their Influence on Product Prices," Agricultural and Resource Economics Review, 38,3: 311-322.

[14] Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere, 2013. "The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals," Journal of Food Products Marketing 19:279-298.

[15] Xiao, J. 2012. "A Hedonic Analysis of Retail Milk and Oatmeal Attributes in Quebec," Department of Agricultural Economics, McGill University, Montreal.

[16] Satimanon, T. and D.D. Weatherspoon, 2010. "Hedonic Analysis of Sustainable Food Products,"International Food and Agribusiness Management Review, 13, 4: 57-74.

quality relationship associated with Bordeaux wine.[17]

40. With the implementation of the hedonic regression model, the following null and alternative hypotheses can be tested statistically: (1) Null hypothesis: Labeling claims concerning the Heart-Check Mark no relationship to prices of Defendants' products that contain these labels; and (2) Alternative hypothesis: Labeling claims involving the Heart-Check Mark are positively associated with the prices of Defendant's products that contain these labels. This methodology is a revealed preference approach in that actual prices are used in the analysis rather than stated willingness-to-pay elicited from experiments or surveys of hypothetical purchase decisions.

41. Relevant to this litigation, several recent studies from the academic literature have dealt with the determination of consumers' willingness to pay ("WTP") for functional foods. The term functional food is used to describe a range of novel foods which are designed to deliver some other added benefit beyond those generally attributed to that type of food (The Institute of Food Technologies). Health attributes can be interpreted as a characteristic of any food. Moro, Sckokai, and Veneziani (2012) conducted a stated-choice experiment in June 2011 on a sample of 600 Italian consumers in order to elicit the WTP for yogurt enriched with catechines (natural phenolic compounds that are a source of antioxidants).[18] These researchers also found that the estimated average WTP was 40 percent. That is, this sample of Italian consumers was willing to pay on average a 40 percent price premium for yogurt enriched with catechines. Hirogaki (2013) surveyed the preferences of 270 students of economics in Hiroshima in April/May 2012 to determine their WTP for foods labeled with specified health uses.[19] He also found that this sample of

---

[17] Combris, P., S. Lecoq, and M. Visser, 1997. "Estimation of a Hedonic Price Equation for Bordeaux Wine: Does Quality Matter?," The Economic Journal, 107, 441: 390-402.

[18] Moro, D., P. Sckokai, and M. Veneziani, 2012. "Consumers' Willingness to Pay for a Functional Food," Paper Prepared for Presentation at the 1st AIEAA Conference, Towards a Sustainable Bio-Economy: Economic Issues and Policy Challenges

[19] Hirogaki, M, 2013. "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," International Journal of Innovation, Management, and Technology, 4,6: 541-546.

Japanese consumers were willing to pay on average a 20 percent price premium for foods labeled with specified health uses. Miskolci (2011) analyzed selected studies pertaining to WTP on the part of consumers in the Czech Republic for improvements in food quality, guaranteed food quality, and for functional food. Consumers from the Czech Republic were willing to pay on average an 11.2 percent premium for food quality improvement, a 12.3 percent to 15.4 percent premium for guaranteed food quality, and a 15.6 percent premium for functional foods.[20] Marosyan, Wahl, and McClusky (2007) measured consumers' response to apples with "naturally enriched antioxidant coatings" based on surveys conducted in grocery stores in Seattle, Washington and in Spokane, Washington. It was estimated that consumers, on average, were willing to pay a four percent to eight percent premium for apples with "naturally enriched antioxidant coatings."[21] Finally, Mayen (2013), using conjoint analysis based on surveys of the U.S. population, found that labeling packages of tree nuts (almonds, pecans, walnuts, and pistachios) with the language "High in Antioxidants" positively influenced consumer preferences.[22]

42.     To invoke this methodological approach in measuring damages, it is necessary to collect information covering the period the class period concerning the prices of Defendant's products under question versus those from similar products but without the false and misleading misrepresentations. The source of the data to be used in the regression analysis is likely to be either Defendant of a third party vendor such as Information Resources, Inc., ("IRI"). The relevant IRI category in this litigation pertains to the specific products at issue in this matter. Weekly information by Universal Product Code ("UPC") and by brand for the relevant time period will provide metrics of dollar sales, unit

---

[20] Miskolci, S., 2011. "Consumer Preferences and Willingness to Pay for the Health Aspects of Food," Acta Universitatis Agriculturae et Silviculturae Mendelianae Brunensis, 54, 4: 167-175.

[21] Markosyan, A., T. I. Wahl, and J. J. McCluskey, 2007. "Functional Foods in the Marketplace: Willingness to Pay for Apples Enriched with Antioxidants," Selected Paper Prepared for Presentation at the AAEA Annual Meeting, Portland, OR.

[22] Mayen, P. D., 2013. "Influence of Antioxidant Information on Consumer Preference for Tree Nuts," Working Paper, New Mexico State University

sales, and volume sales. Volume sales take into account differences in product size, whereas unit sales refer simply to the number of units sold. In order to calculate prices for each of the UPCs in this analysis, dollar sales will be divided by volume sales to derive prices, expressed in terms of dollars per standardized unit.

43.     The IRI data contain information related to sales from multi-outlets exclusively in California. We plan to use such data to calculate a percentage of product value attributed to the allegedly illegal claims. Then using data obtained from the Defendant, we plan to apply the aforementioned calculated percentage change to net sales or gross profits of the Defendant to arrive at damages. Additional data outside the scope of IRI will be gathered concerning the consumer price index for California in order to make adjustments in inflation of prices.

44.     To operationalize the hedonic regression approach, similar to Muth, *et.al,* we plan to specify a semi-log regression of the subject product prices; the respective prices serve as the dependent variables in the hedonic regression. The blue print for action subsequently is described as follows: natural logarithm of price=f(package size, brand, presence or absence of labeling claim, inflation, seasonality, year-to-year effects, and product characteristics). Because the presence or absence of the labeling statement is a binary (dummy variable), the coefficient associated with this variable can be interpreted as the percentage change in the price of the product attribute to the labeling claims while controlling for all of the factors discussed above.[23] This model specification is not only consistent with the extant literature but also consistent with Rubinfeld's (2000) reference guide on multiple regression. Rubinfeld (p. 181) states that "multiple regression may be useful in measuring the magnitude of a particular effect." The effect in this litigation is the percentage of the price attributed to the alleged illegal labeling practices.[24]

---

[23] Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere, 2013. "The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals," Journal of Food Products Marketing 19:279-298.

[24] Rubinfeld, D. L., 2000. "Reference Guide on Multiple Regression," in Federal Judicial Center,

45.     The following variables corresponding to individual UPCs will be constructed for the hedonic regression analysis: (1) price—the dependent variable for the hedonic regression in dollars/standardized unit for each UPC in logarithmic form (constructed by dividing dollar sales by volume sales); (2) package size—in reference to product weight per package. The focus on package size represents allows the testable proposition of price discounts associated with larger packages. Package size has been shown in the economic literature previously discussed to impact prices of various food products; (3) seasonality—a set of quarterly dummy variables designed to capture effects on prices quarter-to-quarter within a year. The variables q1, q2, q3, and q4 take on two values, either 0 or 1. To illustrate, q1=1 if quarter=1; q2=1 if quarter=2, q3=1 if quarter=3, and q4=1 if quarter=4. The reference category for seasonality is the fourth quarter. This designation is arbitrary and does not affect the econometric results; (4) year—a set of dummy variables designed to capture effects on prices year-to-year over the sample period. The variables year_2009, year_2010, year_2011, year_2012, year_2013 and year_2014 take on two values, either 0 or 1. For example, year_2009=1 if year=2009.  The reference category for year is 2014.[25] This designation also is arbitrary and will not affect the econometric results; (5) the variable labeling claim corresponds to a dummy variable, 1 if the allegedly illegal statement appears on the label and 0 if not. The reference category is that the labeling claim does not appear on the label; (6) brand—dummy variables designed for the various brands to capture differences in prices based on brands; (7) product characteristics—various dummy variables constructed to capture qualitatively the impact of product characteristics on prices; and (8) the consumer price index for the state of California used to deflate or adjust for inflation the prices of all respective UPCs.

46.     The subsequent task is to assess damages associated with the misbranding of the challenged products over the class period and for the state of California. To carry out

Reference Manual on Scientific Evidence, pp. 179-227.
[25] The year dummy variables also act as a control in part for income because any purchases associated with changes in income for consumers in a particular year will be captured by this variable.

this assessment, for each UPC corresponding to the Defendant's products, we will multiply the respective percentage changes attributed to the labeling claims by the sum of the corresponding Defendant sales.

47.     The use of hedonic regression as well as before and after regression will permit the test of the hypothesis that the percentage of the price associated with the label claims at issue is positive and statistically significant. Moreover, from the review of the academic literature previously described concerning the use of conjoint analysis, we also know that indeed consumers are willing-to-pay a premium for health benefits attributed to food products.

48.     Importantly, the difference (or percentage difference) in representative prices between Defendant's products with the allegedly illegal labelling and defendant as well as comparator products without the allegedly illegal labelling, controlling for other factors, would not vary from one consumer to the next. Additionally in using the hedonic regression approach based on the retail data from Information Resources, Inc., mainstream vendors of scanner data, I can calculate class-wide damages over the class period.

49.     Once the value of the labeling claim is calculated, the total units sold over the class period can be used to calculate total damages over the entire class period.  For example if the value of the Heart-Check Mark is found to be 10% of the purchase price and total sales over the class period are $100 million for these products, then damages are $10 million.

50.     The above example also illustrates that damages calculated using the value of the labeling claim damages approach are equivalent to damages associated with incremental sales, however, with sufficient data an incremental sales calculation can also be performed directly as described below.

### Incremental Sales – Calculation Methodology

51.     To measure damages under the Incremental Sales Approach, regression methodologies will also be implemented.  The same scientifically accepted regression

analyses described above will be implemented.

52.     However, under this approach data on units sold before and after the labeling claim will be used to directly estimate incremental sales associated with each particular claim.

53.     Historical data on total sales before and after a particular labeling claims will be gathered and included in a regression equation that will then be used to determine the trend in sales for the particular products of interest over a sufficient time period that includes periods when the labeling claims existed and did not exist.

54.     This particular regression would have a measure of sales or sales growth as the dependent variable and include indicator or dummy variables to note the dates of labeling changes.

55.     With the implementation of the incremental sales regression model, the following null and alternative hypotheses can be tested statistically: (1) Null hypothesis: Labeling claims concerning the Heart-Check Mark no relationship to incremental sales of Defendants' products that contain these labels; and (2) Alternative hypothesis: Labeling claims involving the Heart-Check Mark are positively associated with the incremental sales of Defendant's products that contain these labels.

56.     Under this approach for example, if the regression equation shows that the trend in sales has increased by 10% as a result of the particular labeling claim and total sales of that product are $100 million then total damages under the incremental sales approach would be $10 million.

## Conclusion

57.     In my opinion, aggregate class-wide relief can be calculated using scientifically well-established economic and statistical principles and methodologies, using factual information and data that are readily available from the Defendant and/or third party sources.

58.     As I have detailed above, damages can be calculated under the full purchase

price restitution, restitutionary disgorgement, as well as partial restitution approaches using data that is common to all class members..

59.    Importantly, these proposed methodologies for calculating damages do not require any information specific to individual class members.  At the same time, they  are consistent with the notion of rigorous analyses. Additionally, these proposed methodologies represent scientifically accepted quantitative methods in the calculation of damages.

60.    In reaching my opinion, I relied on my education and experiences at various well-respected universities (namely the University of Chicago and the Massachusetts Institute of Technology), over 25 years of analysis that I have performed related to damages, the Second Amended Complaint, excerpts from the Defendant's website, and knowledge of the existence of data from the Defendant and from third-party vendors such as IRI.  I reserve the right to change my opinions should new information come to light in this litigation.

61.    I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed on the 18th day of February, 2015.

_____
Dr. Donald M. May

# Appendix A – References

Abere, A., 2010. "Using Economics to Measure Damages in Private Advertising Litigation," *The Adviser*, 1, 1: 14-17.

Anstine, J., 2007. "Organic and All Natural: Do Consumers Know the Difference?," *Journal of Applied Economics and Policy* 26, 1: 15-27.

Choinière CJ, Lando A. Health and diet survey, 2008. Retrieved May 2010, from Food and Drug Administration.

Combris, P., S. Lecoq, and M. Visser, 1997. "Estimation of a Hedonic Price Equation for Bordeaux Wine: Does Quality Matter?," *The Economic Journal*, 107, 441: 390-402.

Consumer Reports National Research Center Survey Research Report, Food Labels Survey 2014 Nationally-Representative Phone Survey.

Court, A. T., 1939. "Hedonic Price Indexes with Automobile Examples" in *The Dynamics of Automobile Demand*, New York: The General Motors Corporation.

Griliches, Z., 1961. "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change," in *The Price Statistics of the Federal Government*, New York: Columbia University Press.

Hartman, R. S. and M. J. Doane, 1987. " The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," *Journal of Law, Economics, & Organization*, 3, 2: 351-372.

Hirogaki, M, 2013. "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," *International Journal of Innovation, Management, and Technology*, 4,6: 541-546.

Li, J. and N.H. Hooker. 2009. "Documenting Food safety Claims and Their Influence on Product Prices," *Agricultural and Resource Economics Review*, 38,3: 311-322.

Markosyan, A., T. I. Wahl, and J. J. McCluskey, 2007. "Functional Foods in the Marketplace: Willingness to Pay for Apples Enriched with Antioxidants," Selected Paper Prepared for Presentation at the AAEA Annual Meeting, Portland, OR.

Mayen, P. D., 2013. "Influence of Antioxidant Information on Consumer Preference for Tree Nuts," Working Paper, New Mexico State University.

Miskolci, S., 2011. "Consumer Preferences and Willingness to Pay for the Health Aspects of Food," *Acta Universitatis Agriculturae et Silviculturae Mendelianae Brunensis,* 54, 4: 167-175.

Moro, D., P. Sckokai, and M. Veneziani, 2012. "Consumers' Willingness to Pay for a Functional Food," Paper Prepared for Presentation at the 1st AIEAA Conference, Towards a

Sustainable Bio-Economy: Economic Issues and Policy Challenges.

Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere, 2013. "The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals," *Journal of Food Products Marketing* 19:279-298.

Rubinfeld, D. L., 2000. "Reference Guide on Multiple Regression," in Federal Judicial Center, *Reference Manual on Scientific Evidence*, pp. 179-227.

Satimanon, T. and D.D. Weatherspoon, 2010. "Hedonic Analysis of Sustainable Food Products,"*International Food and Agribusiness Management Review*, 13, 4: 57-74.

Sloan, Elizabeth, A., "Top 10 Food Trends," *Food Technology Issues*, April 2011, Volume 65, No. 4.

Waugh, F.V., 1928. "Quality Factors Influencing Vegetables Prices," *Journal of Farm Economics*
10: 185-196.

Xiao, J. 2012. "A Hedonic Analysis of Retail Milk and Oatmeal Attributes in Quebec," Department of Agricultural Economics, McGill University, Montreal.

**Appendix B**

**Curriculum Vita of Dr. Donald M. May**
# Donald M. May
DMA Economics LLC

Direct: (646) 862-0960
dmay@thinkbrg.com

**EDUCATION**

| | |
|---|---|
| PhD (Financial Economics) | University of Chicago, 1993 |
| MBA (Finance) | University of Chicago, 1987 |
| BSBA (Accounting) | Roosevelt University, 1985 |
| CPA (Illinois) | State of Illinois, 1985 |

**SUMMARY**

Don May is an independent consultant at the Berkeley Research Group and possesses over 25 years' experience in consulting, valuation and litigation support as well as researching, publishing and teaching at the university level. His experience includes implementing a broad range of damage analyses and valuations for businesses of various sizes and in numerous industries. Prior to joining Berkeley Research Group, Dr. May was the Principal in charge of valuation and litigation support services for a regional accounting firm and prior to that he had his own litigation consulting practice, was a managing director for PricewaterhouseCoopers, and a professor at the Massachusetts Institute of Technology - Sloan School of Management.

Dr. May has prepared expert reports and testified in federal and New York State courts as well as AAA and FINRA arbitration hearings and has also effectively worked as an expert witness consultant in several multi-million dollar cases.

Dr. May has been published in several distinguished academic and practitioner journals such as *The Journal of Finance* and is an editorial board member of *The Journal of Business Valuation and Economic Loss Analysis*.

Some examples of recent matters Dr. May has been asked to evaluate, analyze and/or opine on include:

- Damages related to leveraged buyout ("LBO") financing practices
- Fraudulent conveyance and solvency analysis related to the financing of an LBO
- Valuation of damages from alleged theft of trade secrets
- Assessment of the conclusions and methodologies used to calculate damages by opposing experts
- Valuations of intangible assets for the purpose of calculating damages from alleged theft
- Calculation of damages related to securities fraud under SEC 10b-5
- Valuation of over 200 closely held businesses across numerous industries for financial reporting and estate planning

**EMPLOYMENT HISTORY**

DMA Economics LLC – Managing Partner, 2015 to present, New York, NY

Berkeley Research Group – Managing Director and Independent Contractor, 2013 to present, Litigation and Corporate Financial Advisory Services New York, NY

Grassi & Company – Principal and Practice Leader in Charge of Forensic, Litigation Support and Valuation Services, 2012 – 2013, Litigation and Corporate Financial Advisory Services New York, NY

Marks Paneth & Shron LLP – Director, , 2010 – 2012, Litigation and Corporate Financial Advisory Services New York, NY

Experts-On-Experts LLC – Managing Partner, 2007 – 2009, Litigation Support, New York, NY

Analysis Group – Vice President, Inc., 2006-2007, Litigation Support and Expert Witness Testimony, New York, NY

NERA Economic Consulting – Senior Consultant, 2004-2006, Securities Practice, Complex Commercial Claims Valuation, New York, NY

Peripheral Vision LLC – Managing Partner, 2002-2004, New York, NY

PricewaterhouseCoopers LLP – Managing Director, 1998-2002 Financial Advisory Services, Corporate Value Consulting and Business Recovery Services, New York, NY

Massachusetts Institute of Technology Sloan School of Business – Assistant Professor of Management, 1993-1998, Cambridge, MA.

Loyola University of Chicago – Adjunct Professor of Finance, Econometrics, and Economics, 1991-1993, New York, NY

**PUBLICATIONS**

"Using Ex-ante and Ex-post Benchmarks in Estimating Damages" – *The Value Examiner*, May/June 2012

"Surviving Daubert: Bad Benchmarking Puts Cases at Risk Expert Witnesses Misstep by Using the Wrong Benchmarks to Calculate Damages", *Wall Street Lawyer*, December 2011

"Factors to Consider When Hiring an Expert" Claims Journal, May 26, 2011

"As Traditional Methods Fail in a Flood of Bad News, Courts Should Turn to Techniques Used by Investment Analysts to Calculate Shareholder Damages" *Securities Litigation Report*, January, 2011, Volume 8, Issue 1

"Strategies for Avoiding Valuation Disputes in Connection with Breakups of Hedge Fund General Partnerships", *Hedge Fund Law Review*, June 11, 2010, Volume 3, No. 23

"Wall Street Style Valuation Assumptions Are Popular & Often Wrong – Discounted Cash Flow Methodology Give Litigators the Upper Hand" *Securities Litigation Report*, May 2010, Volume 7, Issue 5

"Getting the Most from Technology: Keys to Better Decision-Making," *American Banker*, March 28, 2003

Winter 2001 *PwC Retail Report* (referenced in the Wall Street Journal and CNBC), 2001

"The Performance of Firms Before and After They Adopt Accounting-Based Performance Plans" (with Raymond M. Brooks and Chandra S. Mishra), *The Quarterly Review of Economics and Finance*, vol. 41, issue 2 (2001)

"The Effectiveness of Long-Term Accounting-Based Incentive Plans" (with Chandra S. Mishra and David H. Gobeli), *Journal of Managerial Issues*, Volume XII, Number 1 (Spring 2000)

"Do Managerial Motives Influence Firm Risk Reduction Strategies?" *Journal of Finance* (1995)

"Federal Reserve Discount Rate Changes and Market Reaction*," Journal of Macroeconomics* (Spring 1992)

**GRANTS AND AWARDS**

University of Chicago, Graduate School of Business, PhD Fellowship, 1989-1993

Nanyang Technological University Teaching and Research Chair (first MIT Sloan School of Management junior faculty member to receive this endowed teaching and research chair), 1994-1997

MIT Leaders for Manufacturing Summer Teaching Award, 1995

Recipient, 1989 - 1992 University of Chicago PhD Grant and stipend

**AFFILIATIONS**

Editorial board for the Journal of Business Valuation and Economic Loss Analysis
American Finance Association
American Economic Association
American Accounting Association
Certified Public Accountant (CPA), State of Illinois, 1985

# Appendix C

## A List of Cases in which Dr. May Has Provided Expert Testimony at Trial or at Deposition over the Past Four Years

*TomTom International, B. V. v. Broadcom Corporation, In the United States District Court Central District of California, Southern Division, Case No. 8:14-CV-00475*

*Jared Gabriele, individually and on behalf of all others similarly situated v. Conagra Foods Inc., In the United States District Court for the Western District of Arkansas Fayetteville Division , Case No. 14-5183 TLB*

*Brenna Center, individually and on behalf of all others similarly situated, v. Ocean Spray Cranberries, Inc. The United States District Court For The Western District of Arkansas Fayetteville Division, Case No. 5:14-cv-05211-TLB*

*Blue Bank International N.V. formerly known as Premier Bank International, v. HSBC Securities (USA) Inc.; HSBC Bank USA N.A,; and Mark Richard Corbet Yale, Miami, Florida, FINRA Case No. 12-02582*

*Infini Communications LLC, v. Communication Service for the Deaf Inc., Circuit Court of Cook County, Illinois, Chicago Illinois, Case No. 12-L-4502*

*Edgar H. Bachrach, Sally B. Robinson, and Barbara B. James, v. Bachrach Clothing Holding Company, Sun Bachrach, LLC, Sun Capital Partners III QP, LP and Sun Capital Partners, Circuit Court of Cook County, Illinois, Chicago Illinois, Case No. 08-L-013712*

*Ronald M. Tate, Trustee of the Ronald M. Tate Trust Dtd 4/13/88, and George Avakian, v. E\*TRADE Financial Corporation, Mitchell H. Caplan, and Robert J. Simmons, United States District Court, Southern District, New York, Case No. 08 Civ. 7296 (JPO)*

*Liquid Realty Advisors III LLC et al. v. Jeffrey Giller et al., American Arbitration Association, San Francisco California, Case No. 74 166 00369 12 AMCH*

*Brandon Scott, individually and on behalf of all others similarly situated, v. Conagra Foods, Inc., In the Circuit Court of Washington County, Arkansas, Case No. CV 14-1119-7, filed June 20, 2014*

*Colby Center, individually and on behalf of all others similarly situated, v. Conagra Foods, Inc., In the Circuit Court of Washington County, Arkansas, 5th Division, Case No. CV 14-1118-5*

*ZBD Constructors Inc. f/k/a Zurn Balcke-Durr, Inc. v. Billings Generation Inc. and Yellowstone Energy Limited Partnership, United States Southern District of New York, Case No. - 1: 09 CV 6667 (NRB) (AJP) ECF)*