EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX ANG and LYNN STREIT, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. ) 13 Civ. 1196 (WHO) |
| BIMBO BAKERIES USA, INC., | ) ) |
| Defendant. | ) ) ) |

VOLUME I

DEPOSITION of ALEX ANG

February 13, 2015

ANGELICA R. GUTIERREZ, CSR No. 13292
388328



SINCE 1972

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles   (415) 433-5777 San Francisco   (949) 955-0400 Irvine   (858) 455-5444 San Diego
(916) 922-5777 Sacramento    (408) 865-0550 San Jose          (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City     (347) 621-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains      (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
           00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4
ALEX ANG and LYNN STREIT,              )
5  individually and on behalf of         )
all others similarly situated,         )
6                                        )
                Plaintiffs,              )
7                                        )
vs.                                    )Case No.
8                                        )13 Civ. 1196 (WHO)
BIMBO BAKERIES USA, INC.,               )
9                                        )
                Defendant.               )
10  _____)

11

12

13              VIDEOTAPED DEPOSITION OF

14                    ALEX ANG

15                    VOLUME I

16              SAN FRANCISCO, CALIFORNIA

17                 FEBRUARY 13, 2015

18

19

20

21

22

23  Reported by ANGELICA R. GUTIERREZ, CSR No. 13292

24

25

2

BARKLEY
Court Reporters

11:49  1   seal on a lightbulb, so with that seal I assume they

2   tested the light bulb and rated it and it meets their

3   standards.

4       Q.   Do you know if the American Heart Association

11:49  5   tested Thomas' Bagel Thins and rated them?

6       A.   No.  But I believe they did, since they had

7   that label on the bag.

8       Q.   Do you know if when Energy Star rates a

9   product how it does that?

11:50  10      A.   Not specifically.  But I do know that they

11   test for the rate of light and they look at the energy

12   consumption of the bulb, so it meets a certain set of

13   standard.

14      Q.   Do you know who pays for that testing?

11:50  15      A.   Yeah, I believe it's the government, but I'm

16   not 100 percent.

17      Q.   Do you know who pays for the American Heart

18   Association to do testing on products?

19      A.   No.

11:50  20      Q.   Did you ever do any research into what it

21   takes for the American Heart to put a check mark on a

22   product?

23      A.   No.

24      Q.   Do you know what criteria go into the decision

11:50  25   for the American Heart Association to put a Heart-Check

82

ALEX ANG, VOL. I

11:52 1          MR. GOODMAN:  Q.  What's your understanding of

2  how the Heart-Check mark got onto the Thomas' Bagel

3  Thins?

4      A.    Can you repeat that?

11:52 5      Q.    Sure.  What is your understanding of how the

6  Heart-Check mark got onto Thomas' Bagel Thins?

7      A.    My understanding now or when I bought them?

8      Q.    Let's start with when you bought them.

9      A.    So I assumed the Heart Association looked at

11:52 10  the bagel, looked at the nutrition facts, and deemed

11  them worthy of that label.

12      Q.    And now what is your understanding?

13      A.    Now it's my understanding that the label was

14  paid for and they put on the bag.

11:52 15      Q.    Do you have that understanding from any source

16  other than Mr. Gore?

17      A.    Did I do research on it?

18      Q.    No.  Did you have that understanding from any

19  source other than Mr. Gore?

11:53 20      A.    No.

21      Q.    Have you done any research into whether a

22  company can pay to have a Heart-Check mark put on its

23  products?

24      A.    No.

11:53 25      Q.    Is it your understanding that a Heart-Check

BARKLEY
Court Reporters

11:53  1  mark can be put on a product no matter what the product

2  paid for?

3      A.   You know, I'm not really an expert.

4      Q.   I'm not asking for you to be an expert, I'm

11:53  5  asking you for your understanding.

6      A.   No.   'Cause I don't think they would put their

7  mark on like motor oil.

8      Q.   Why not?

9      A.   Because that has not anything to do with your

11:53 10  heart.

11      Q.   Okay.   If they put a Heart-Check mark on a box

12  of softies or donuts, do you believe that the American

13  Heart Association put their mark on that box of softies

14  that Entenmann's paid for it?

11:53 15      A.   If they paid for it, yeah, it's my

16  understanding.

17      Q.   Do you know whether there are any

18  requirements, other than payment, that a company has to

19  go through in order to get a Heart-Check mark on its

11:54 20  products?

21      A.   No, I do not.

22      Q.   Have you ever looked at the American Heart

23  Association website to determine how the Heart-Check

24  mark system works?

11:54 25      A.   No.

85

BARKLEY
Court Reporters

11:54  1      Q.    Have you ever read any documents that tell you

2      how the American Heart Association Heart-Check system

3      works?

4      A.    No.

11:54  5      Q.    You're just accepting what Mr. Gore told you?

6      A.    Yes.

7      Q.    Has anybody else told you how the American

8      Heart Association Heart-Check system works?

9      A.    No.

11:54 10      Q.    Do you know anybody who buys products because

11      they have the American Heart-Check mark on them?

12      A.    No.

13      Q.    When you were buying Thomas' Bagel Thins did

14      you buy the Bagel Thins because they had the

11:55 15      Heart-Check mark on them?

16      A.    I bought them compared to other bagels because

17      they had the Heart-Check mark on them.

18      Q.    Did the Safeway brand have the Heart-Check

19      mark on it?

11:55 20      A.    No.

21      Q.    So then why did you buy the Safeway brand?

22      A.    They were probably on sale.

23      Q.    Okay.  So you did buy bagels without a

24      Heart-Check mark on it?

11:55 25      A.    They weren't a requirement for me to purchase

86

BARKLEY
Court Reporters

11:57  1    Q.   How did you eat it?

2    A.   What do you mean by that?

3    Q.   Make a sandwich out of it, did you put jam on

4  it; how di you consume it?

1:57  5    A.   Oh, you know, we ate it the way we eat

6  crackers, eat them plain or if we had some kind of

7  spread, use spread on it.

8    Q.   Do you know whether you brought Bimbo's Toast

9  on more than one occasion, you personally, purchasing

11:58  10  it?

11    A.   Yes.

12    Q.   How many times, roughly?

13    A.   I'd say at least ten.

14    Q.   More than twenty?

11:58  15    A.   That would be hard to say.

16    Q.   And do you know whether you bought Bimbo's

17  Toast last in 2012?

18    A.   You know, I don't recall if I bought it that

19  year.

11:58  20    Q.   How about 2011?

21    A.   Possibly.  I don't remember.

22    Q.   How about 2010?

23    A.   It might have been.  I don't remember the last

24  time I bought it.

11:58  25    Q.   I'm asking you when you recall the last time

89

BARKLEY
Court Reporters

11:58  1    you bought it.  Do you know for sure you bought it in

2    2010?

3         A.   You know, I can't really recall.

4         Q.   Do you know whether you bought it in 2009?

11:59  5    A.   I don't know.

6         Q.   Do you know whether you bought any in 2008?

7         A.   You know, I'm not sure.  But between 2008 and

8    2010 was the last time.

9         Q.   Do you recall buying it between 2008 and 2010?

11:59 10    A.   Yes.

11        Q.   When?

12        A.   I don't remember.

13        Q.   Where did you buy it?

14        A.   I don't remember, either.

11:59 15    Q.   Did you buy it at Safeway?

16        A.   Might have been.

17        Q.   Anything is possible, Mr. Ang?

18        A.   It's not one of those everyday items.  It's

19   hard to recall that far back.

11:59 20    Q.   Do your roommates eat toasted bread?

21        A.   If it was in the house they would eat it.

22        Q.   Yeah.  How did they eat it?

23        A.   Same way, they would snack on it like

24   crackers.

12:00 25    Q.   Do you ever buy any other types of toasted

90

BARKLEY
Court Reporters

12:00  1   bread?

2          A.   No.

3          Q.   Ever buy any melba toast?

4          A.   I have bought that.

12:00  5   Q.   When was the last time you bought melba toast?

6          A.   It was probably in the last year.

7          Q.   How do you eat melba toast?  The same way,

8   like a cracker?

9          A.   Yeah.

12:00  10  Q.   Do you also buy crackers?

11         A.   Not typically.

12         Q.   Are you more likely to buy toasted bread than

13  crackers to use as a cracker?

14         A.   I probably most likely buy crackers.

12:01  15  Q.   What kind of crackers do you typically buy?

16         A.   Just regular saltine crackers.

17         Q.   Any other brand of crackers that you buy?

18         A.   No, not that I can recall.

19         Q.   When was the last time you bought saltine

12:01  20  crackers?

21         A.   Must have been in the last year.

22         Q.   Have you bought saltine crackers pretty

23  regularly since you were in college?

24         A.   Not regularly.  It's something that's usually

12:01  25  in the pantry.  We don't go through them that fast.

91

BARKLEY
Court Reporters

12:20  1    product and not consumed it, not eaten it?

2        A.    Possibly, if I bought it and brought it to my

3    parents' house.

4        Q.    Have you ever had any -- strike that.

12:20  5          The purpose of your buying Bimbo Bakery

6    products was to eat them, correct?

7        A.    Yes.

8        Q.    Somebody, whether it's your parents, your

9    roommates or you, the purpose was for them to be eaten,

12:20 10    correct?

11        A.    Yes.

12        Q.    You've never distributed any Bimbo Bakeries

13    products, have you?

14        A.    As a gift or something?  No.

12:20 15        Q.    Have you ever sold any?

16        A.    No.

17        Q.    Have you ever tried to sell any?

18        A.    No.

19        Q.    Have you ever had any Bimbo Bakeries products

12:20 20    seized from you by a federal or state agency?

21        A.    No.

22        Q.    Would it matter to you if you couldn't resell

23    the food products that you buy?

24        A.    No, I don't sell the food that we buy.

12:21 25        Q.    You buy food to eat it?

99

BARKLEY
Court Reporters

12:21   1          A.     Yes.

        2          Q.     Have you ever read the FDA's October 2009

        3    guidance for industry letter?

        4          A.     No.

12:21   5          Q.     And have you ever read the March 2010 open

        6    letter to industry from the FDA?

        7          A.     No.

        8          Q.     Have you ever read any FDA publications?

        9          A.     Not that I recall.

12:21  10          Q.     Are you familiar with food labeling

       11    requirements under federal law?

       12          A.     No.

       13          Q.     Are you familiar with food labeling

       14    requirements under California law?

12:21  15          A.     No.

       16          Q.     Have you familiar with any food labeling

       17    requirements under any state laws?

       18          A.     No.

       19          Q.     Do you know what a nutrient is?

12:22  20          A.     Yes.

       21          Q.     What is a nutrient?

       22          A.     A substance that would provide nutrients to

       23    your body.  So calcium, for example.

       24          Q.     Can you think of any other nutrients besides

12:22  25    calcium?

                                    100

BARKLEY
Court Reporters

12:43 1      A.    I don't know how that would be classified,

2     either.

3            Q.    Have you ever bought any products that were

4     labeled an excellent source of whole grains because

12:43 5     they were labeled that?

6            A.    Yeah.  If a product said that and a comparable

7     product didn't I would lean towards them.

8            Q.    Do you recall doing that?

9            A.    Yeah, I believe so.

12:44 10      Q.    Which products would you buy that said an

11     excellent source of whole grains on them?

12            A.    I believe it was Sara Lee bread.

13            Q.    Any others?

14            A.    Not that I can recall.

12:44 15      Q.    What product were you comparing the Sara Lee

16     bread to that made you choose the Sara Lee bread?

17            A.    I don't remember specifically, but it was

18     either the house brand bread or another brand.

19            Q.    So would you always pick the Sara Lee bread

12:44 20     that claimed to be an excellent source of whole grain

21     over the house bread if it didn't make that claim?

22            A.    I wouldn't say always, but it would sway me in

23     that direction.

24            Q.    What do you mean, it would sway you in that

12:44 25     direction?

116

BARKLEY
Court Reporters

01:19   1       Q.    In this document numbered 2, on page number 1,

2    it says:  Plaintiffs have in their possession, custody

3    or control packaging related to protects identified in

4    the second amended complaint.  Do you have any such

01:20   5    packaging in your possession, custody or control?

6       A.    No.

7       Q.    Your lawyer handed me, this morning, an

8    envelope stuffed -- I can't think of a better word,

9    show that to the camera, with -- it looks like labels

01:20  10    of various products packaged as -- it's addressed to

11    Pierce Gore at the address that we're at today, it says

12    it's from Alexander Ang on 20th Avenue, San Francisco,

13    California; do you recall sending this page to

14    Mr. Gore?

01:20  15       A.    Yes.

16       Q.    When did you do that?

17       A.    Must have been around March 2013.  I don't

18    know the exact date.

19       Q.    Why do you say it must have been March 2013?

01:21  20       A.    Because I sent it over when I first started...

21       Q.    Okay.  There's no postmark on this.  Did you

22    put it in the mail?

23       A.    Yes.

24       Q.    I assume you don't know why there's no

01:21  25    postmark on it.

142

BARKLEY
Court Reporters

02:34  1        A.    The thing is I didn't know it contained it

2    when I purchased it.

3        Q.    I'm asking you if you would have cared.

4        A.    If I knew?

02:34  5        Q.    Yes.

6        A.    If I knew I probably would care.

7        Q.    There was a way for you to know, right, you

8    could have read the ingredients.

9        A.    But I didn't.

02:34 10        Q.    Right.  So if you cared you could have read

11    the ingredients, right?

12        A.    Yes, I could have.

13        Q.    But you didn't?

14        A.    Right.

02:35 15        Q.    You see on the bottom it says in bold:

16    Contains wheat, soy and milk.  Do you see that?

17        A.    Yes.

18        Q.    Did you care that it contained wheat, soy and

19    milk at the time you purchased this product?

02:35 20        A.    Not at the time.

21        Q.    Do you care now?

22        A.    Yeah, I do care now.

23        Q.    Why?

24        A.    You know, I would try to stay away from

02:35 25    something with high fructose corn syrup in it.

165

ALEX ANG, VOL. I

02:36  1   lecithin in it would you have bought it?

2        A.   I don't know what it is.

3        Q.   Do you know what soy flour is?

4        A.   I'm assuming it's flour made out of soy.

02:36  5   Q.   If you knew that this product had soy flour in

6   it would you have bought it?

7        A.   Yeah, that wouldn't have stopped me from

8   buying it.

9        Q.   Next page.  Picture of the other side of the

02:36 10  bread bag where it says:  Facts based on two slices of

11  bread.

12            Do you recall seeing this information on the

13  Sara Lee Whole Wheat Bread label?

14       A.   No.

02:37 15  Q.   Are you looking at the same thing I am?

16       A.   No, I'm not.

17       Q.   Should be on the page that says:  Facts based

18  on two slices of bread.

19            Green with circles.

02:37 20  A.   Yeah.

21       Q.   What are -- those circles have the calories;

22  did you look at that?

23       A.   Yes.

24       Q.   Did you look at this circle with the calories?

02:37 25  A.   Yes.

167

BARKLEY
Court Reporters

02:39  1      Q.   Based on two slices, Mr. Ang, if you can see,

2    if you read the package.

3      A.   I'd say if it was over 20.

4      Q.   20 grams?

02:39  5      A.   Yeah.

6      Q.   Okay.  Are you familiar with any sandwich

7    bread that has over 20 grams of sugar per two slices?

8      A.   No.

9      Q.   How about the fiber content, is that enough

02:39  10   fiber for you to buy this product?

11     A.   That didn't determine whether I bought it or

12   not.

13     Q.   What about sodium, did that determine whether

14   you bought it or not?

02:39  15     A.   No.

16     Q.   What about the whole grain, did that determine

17   whether you bought it or not?

18     A.   No.

19     Q.   Do you know whether 28 grams of whole grain is

02:40  20   a lot?

21     A.   I don't know if that's a lot.

22     Q.   Is there a particular number of whole grains

23   that you're looking for in bread?

24     A.   Not in particular.

02:40  25     Q.   Is there a minimum amount of whole grain you

170

BARKLEY
Court Reporters

02:41   1    Q.   Did you read the label for these Thomas' Mini

2   Bagels other than just seeing if it was a Thomas' Mini

3   Bagel?

4    A.   You know, I can't recall if I did or not.

02:41   5    Q.   Okay.   Looking at the pictures does that

6   refresh any recollection you had of looking at any part

7   of that label?

8    A.   No.

9    Q.   Okay.   Next set of pictures is for Sara Lee

02:41   10   Classic 100 percent Whole Wheat.   Do you recognize this

11   label?

12    A.   Yes.

13    Q.   How do you recognize this label?

14    A.   I have purchased this product before.

02:41   15    Q.   And why did you purchase this product?

16    A.   'Cause I like the taste and it was wheat bread

17   as opposed to white bread.

18    Q.   And the price?

19    A.   And the price.

02:42   20    Q.   Were there any particular parts of this label

21   that you looked at before you bought it?

22    A.   I looked at the front label.

23    Q.   One on the first page?

24    A.   Yes.

02:42   25    Q.   Okay.   Any other parts?

172

BARKLEY
Court Reporters

02:42  1       A.    Not that I recall.

2       Q.    What on the front label in particular did you

3    look at?

4       A.    I looked at the entire front label.

02:42  5       Q.    Nothing in particular?

6       A.    No.

7       Q.    Did you check out the calories and

8    carbohydrates in this product?

9       A.    I don't remember if I did or not.

02:43 10       Q.    On the third page there's a 100 percent whole

11    grain sticker or mark; do you see that?

12       A.    Yes.

13       Q.    Do you recognize that sticker or mark?

14       A.    No.

02:43 15       Q.    Never seen that before, to your knowledge?

16       A.    Doesn't look familiar.

17       Q.    Do you know whether something that provides 28

18    or more grams per serving of whole grain is a good

19    source of whole grains if the Whole Grain Counsel

02:43 20    recommends 48 grams or more of whole grains in a day?

21       A.    No, I wouldn't know if you could classify that

22    as good.

23       Q.    Do you know whether, in your mind, as a

24    consumer, something that provides more than 50 percent

02:44 25    of a substance is a good source of that substance?

173

BARKLEY
Court Reporters

02:47  1    A.    Yes.

2    Q.    All right.  I already asked you about the

3    artificial color.  If you had known it had artificial

4    color you still would have bought that?

02:48  5    A.    Yes.

6    Q.    On the second to the last plage, Mr. Ang,

7    there's a red sticker that says:  Caution, do not

8    microwave.

9    A.    Okay.

02:48  10   Q.    Do you recall seeing that on Bimbo Toasted

11   Bread products?

12   A.    Yeah, I have seen that before.

13   Q.    Have you ever microwaved Bimbo Toasted Bread?

14   A.    No.

02:48  15   Q.    Why not?

16   A.    It's like do you microwave your crackers?

17   Q.    Do you know why you can't microwave Bimbo

18   Toasted Bread?

19   A.    I don't know.

02:49  20         Can you tell me, now that you brought that up?

21   Q.    I'll take you out for a beer some time.  I

22   don't answer questions in my own depositions.

23         Next set of pictures is Thomas' Bagel Thins,

24   Plain.  Do you recognize this package?

02:49  25   A.    Yes.

177

BARKLEY
Court Reporters

02:50   1          Do you recognize this product?

2     A.   Yes.

3     Q.   Okay.  And how do you recognize this product?

4     A.   I have brought this product.

02:51   5     Q.   You understand this to be white bread?

6     A.   Yep.

7     Q.   I don't think you identified any Sara Lee

8  white bread products in your previous identification of

9  numerous products that you bought.

02:51  10     A.   Yeah, it's not something that I purchase

11  regularly, but I have purchased it.

12     Q.   Okay.  Do you know when you purchased this

13  product?

14     A.   I don't recall.

02:51  15     Q.   Do you recall how much you paid for it?

16     A.   No.

17     Q.   Do you recall what store you bought this

18  product at?

19     A.   I don't know.

02:51  20     Q.   Do you recall in what year you might have

21  bought this product?

22     A.   I don't remember.

23     Q.   Why did you buy this product?

24     A.   You know, I've had this product before, so I

02:51  25  knew what it tasted like and -- I can't say for sure,

179

BARKLEY
Court Reporters

02:51  1    but it was probably a good deal at the time of

2    purchase.

3         Q.   Good deal, good price?

4         A.   Compared to something else.

02:52  5         Q.   You say you've had it before, you mean when

6    you were a kid?

7         A.   Yes.

8         Q.   Do you recall the first time you ever had Sara

9    Lee Soft and Smooth Bread?

02:52 10         A.   No.

11         Q.   When you bought this product do you recall

12    looking at any parts of the label other than the fact

13    that it was Sara Lee Soft and Smooth and you'd had it

14    before?

02:52 15         A.   I looked at the front of the label.  I can't

16    say that I really checked out the back.

17         Q.   But do you know if you looked at any

18    particular parts of the front label?

19         A.   Not in particular, I just looked at the whole

02:52 20    front label.

21         Q.   You mean you just saw it?

22         A.   No, I read it.

23         Q.   What were you reading, in particular?

24         A.   I mean there's not a lot here, so everything,

02:52 25    you know, from Sara Lee moving down to excellent source

180

BARKLEY
Court Reporters

02:53  1    A.    No.

2    Q.    Do you remember comparing this to Safeway's

3  bread and determining whether it was a better source of

4  whole grain?

02:53  5    A.    No.   I just took it for face value on the

6  front of the package.

7    Q.    Do you know what made with 35 percent whole

8  grain means?

9    A.    No.   I would assume it just means 35 percent

02:54 10  of the flour they use is whole grain flour.

11    Q.    35 percent of the wheat flour they use is

12  whole grain flour?

13    A.    The flour in general is whole grain.

14    Q.    Any flour in general?   What other flour goes

02:54 15  into wheat bread?

16    A.    In the 100 percent whole wheat bread there's

17  actually soy flour in it.

18    Q.    That's not a grain though, is it?

19    A.    No.

02:54 20    Q.    Do you know what other grain flour goes into

21  wheat bread?

22    A.    No.

23    Q.    You can see in this set of pictures on the

24  second page, first ingredient is enriched bleached

02:54 25  wheat flour.   Do you know if that is whole wheat flour?

182

ALEX ANG, VOL. I

BARKLEY
Court Reporters

02:55  1      A.   I don't know.

       2      Q.   Do you know if that's a type of flour?

       3      A.   I would assume so.

       4      Q.   On the next page it says whole grain.  If it's

02:55  5  whole wheat flour, whole barley flour, do you know what

       6  whole wheat flour is?

       7      A.   I'm assuming it's flour made out of whole

       8  wheat.

       9      Q.   Do you know what barley flour is?

02:55 10      A.   Flour made from barley.

      11      Q.   Do you know if barley is a grain?

      12      A.   I believe it is.

      13      Q.   If this didn't have any whole grain would you

      14  still have bought it?

02:55 15      A.   For this, yes, I was looking for white bread.

      16      Q.   Do you recognize the last set of pictures as

      17  Entenmann's Soft Wheat Bread?

      18      A.   I've seen it before.

      19      Q.   You've never bought it, though?

02:56 20      A.   Not that I recall.

      21      Q.   You seen it before, but there's box sitting in

      22  front of you, right?

      23      A.   I've seen in the store, though.  I guess

      24  people bring it into work.

02:56 25      Q.   Right.  Have you ever eaten an Entenmann's

                                  183

BARKLEY
Court Reporters

02:59   1        A.    I reviewed the front part of the bag.

        2        Q.    And you're gesturing toward the -- can you

        3    just hold it up and point to it, please?   Thank you.

        4              So basically this corresponds to the second

03:00   5    and third pages of Exhibit 20; is that fair?

        6        A.    Yes.

        7        Q.    And, again, other than the fact that it says

        8    Sara Lee 100 Percent Whole Wheat Bread, was there

        9    anything that you relied on in making a purchase of

03:00  10    this product?

       11        A.    Not in terms of making my purchasing decision.

       12        Q.    Before we move on, did any of the Sara Lee

       13    100 Percent Whole Wheat Bread that you bought have this

       14    labeling on it?

03:01  15        A.    Yes.

       16        Q.    You looked at the bag and made sure that it's

       17    the same bag that you purchased?

       18        A.    Yes.

       19              MR. GOODMAN:   I'm trying to keep this stuff in

03:02  20    order here.

       21              Mark that one next, please.

       22              COURT REPORTER:   This is 21.

       23               (Exhibit 21 was marked for

       24               identification.)

03:02  25              MR. GOODMAN:   Q.   We've marked as Exhibit 21 a

                                       185

BARKLEY
Court Reporters

03:05 1    Q.   Okay.  One difference I can tell you between

2    the weapon the two labels is in the ingredients; one

3    has soy flour and one doesn't.

4    A.   Okay.

03:05 5    Q.   Do you remember whether the bread you bought

6    had an ingredient of soy flour versus not having an

7    ingredient of soy flour?

8    A.   No.  Like I said, when I was purchasing it I

9    wasn't going through the ingredient list.

03:05 10   Q.   So you're not sure which label the bread that

11   you bought had?

12   A.   Yes.

13            MR. GOODMAN:  I'll take that back.

14            Is that 23?

03:06 15            COURT REPORTER:  Yes.

16             (Exhibit 23 was marked for

17             identification.)

18            MR. GOODMAN:  Q.  And with regard to

19   Exhibit 23, another label, this one for 16 Ounce Sara

03:06 20   Lee Classic 100 Percent Whole Wheat.  Did you ever buy

21   any product with this particular label on it?

22   A.   Again, this looks pretty similar to Exhibit

23   21, so I couldn't tell you for certain if it was this

24   label or that label.

03:06 25   Q.   And by this label you mean what we've marked

188

BARKLEY
Court Reporters

03:14  1      Q.    Okay.  So Exhibit 21 is a Sara Lee 100 Percent

2    Whole Wheat Bread, correct?

3      A.    Correct.

4      Q.    This one is Sara Lee Soft and Smooth 100

03:14  5    Percent Whole Wheat, correct?

6      A.    Correct.

7      Q.    Okay.  Those are two different labels, would

8    you agree with me on that one?

9      A.    I think they are pretty similar.

03:15  10     Q.    Okay.  I'm not asking if they are similar, I'm

11   asking if they are different labels.

12     A.    Yeah, they are different.

13     Q.    So my question to you is not -- again, I'm

14   trying to make it clear, not whether you've seen these

03:15  15   statements or these colors or these words before, but

16   whether you've seen this exact label on the product

17   that you brought.

18     A.    Yeah, I've seen this label.

19     Q.    So you've bought Sara Lee Soft and Smooth 100

03:15  20   Percent Whole Wheat Bread, correct?

21     A.    I'm not sure if I bought this package, but I

22   have seen this label.

23     Q.    Okay.  When you've seen this label where did

24   you see it?

03:15  25     A.    On a loaf of bread.


                              194

BARKLEY
Court Reporters

03:15  1     Q.   Where was the loaf of bread?

2     A.   In a grocery store.

3     Q.   Which store?

4     A.   I don't recall exactly.

03:15  5     Q.   Do you remember when you saw it?

6     A.   No.

7     Q.   Do you remember what year it was?

8     A.   No.

9     Q.   Do you remember if it was in the last two

03:15  10   years?

11    A.   No, I don't remember.

12    Q.   Do you have a specific recollection of looking

13   at the label that we've marked as Exhibit 25?

14    A.   No.

03:16  15    Q.   Do you have a specific recollection of looking

16   at any particular parts of the label that we've marked

17   as Exhibit 25?

18    A.   No.

19    Q.   Do you have any proof of purchase of any Sara

03:16  20   Lee Soft and Smooth Bread?

21    A.   Not that I can think of.

22    Q.   Do you have any proof of purchase of any Sara

23   Lee bread product at all?

24    A.   No, 'cause I haven't bought them since 2013.

03:16  25    Q.   And you haven't saved any proof of purchase

195

BARKLEY
Court Reporters

03:38  1      Q.    Do you know whether Bimbo Bakeries has ever

2  represented its goods as having a sponsorship that it

3  did not have?

4      A.    No, not that I know of.

03:39  5      Q.    Do you know whether Bimbo Bakeries has ever

6  represented any of its good to have approval that it

7  did not have?

8      A.    No, not that I know of.

9      Q.    Do you know whether Bimbo Bakeries has ever

03:39 10  represented that its goods had characteristics that it

11  did not have?

12      A.    Yeah, it was the 100 percent whole wheat claim

13  on bread.

14      Q.    And how do you know that the characteristic

03:39 15  was not true?

16      A.    I found that out through Mr. Gore.

17      Q.    Have you ever undertaken to determine whether

18  that characteristic was untrue, other than what

19  Mr. Gore told you?

03:39 20      A.    No, not independently.

21      Q.    Do you know why that characteristic is untrue?

22      A.    It's because it doesn't have 100 percent whole

23  wheat flour, it also contains soy flour.

24      Q.    So your understanding is that the bread does

03:40 25  not have 100 percent whole wheat flour in it?

206

ALEX ANG, VOL. I

BARKLEY
Court Reporters

03:42  1    aware of that Bimbo sells that make that quantity claim

2    that is not actually accurate?

3         A.   No.

4         Q.   So my next question was are you aware that

03:42  5    Bimbo ever represented their goods were of a particular

6    standard?

7         A.   Yeah.   The Heart Association logo, you know, I

8    was under the assumption that the American Heart

9    Association had, you know, reviewed the product and put

03:42  10   a seal of approval on it.

11        Q.   Do you know if the American Heart Association

12   did not review a Bimbo product and yet the Bimbo

13   product still has a seal of approval on it?

14        A.   I was told that the seal was actually, you

03:43  15   know, something that Bimbo did purchase.

16        Q.   That's not my question, Mr. Ang.   My question

17   is do you know whether Bimbo's products have a seal of

18   approval on them from the American Heart Association

19   but do not meet the standards of the American Heart

03:43  20   Association?

21        A.   They have the American Heart Association seal,

22   but I don't know what the standards are.

23        Q.   That's not my question either.

24             Do you know whether they have a -- any of the

03:43  25   Bimbo products that have an American Heart Association

                                209

BARKLEY
Court Reporters

03:43  1    check mark, mark on them, do not actually meet the

2    American Heart Association standards to have such a

3    mark on them?

4        A.   I don't know that.

03:43  5        Q.   Do you know whether Bimbo has ever represented

6    any of its goods as having a quality that they do not

7    have?

8        A.   The toasted bread is more of a cracker, it's

9    not really toasted bread.

03:44  10       Q.   Did you think it was toasted bread when you

11    bought it?

12       A.   Yeah.

13       Q.   You thought you were buying toast?

14       A.   I didn't think I was buying toast, but I

03:44  15    thought I was buying something that started off light

16    colored, got toasted and got darker.

17       Q.   You bought toasted bread because you ate it as

18    a kid, right?

19       A.   Yeah.

03:44  20       Q.   So you knew when you bought toasted bread that

21    you weren't buying toasted bread, you were buying a

22    cracker, right?

23          MR. GORE:  Objection.  Argumentative.

24          MR. GOODMAN:  I'm not arguing at all.

03:44  25          THE WITNESS:  What was the question again?

BARKLEY
Court Reporters

03:44  1        MR. GOODMAN:  Read it back, please.

2              (Record read.)

3              MR. GORE:  Same objection.

4              MR. GOODMAN:  You don't have to object to the

03:44  5  question when you read it back.

6              THE WITNESS:  I knew it wasn't toast, but I

7  assumed it was, you know, it started out soft and got

8  toasted and got hard, in the package.

9              MR. GOODMAN:  Q.  Why did you make that

03:45 10  assumption?

11        A.   Because it was called toasted bread.

12        Q.   Any other reasons?

13        A.   No.

14        Q.   Did you read the ingredients in the toasted

03:45 15  bread to determine how it got to be toasted bread?

16        A.   Not as a kid.

17        Q.   Did you read it as an adult?

18        A.   No, because I was familiar with the product.

19        Q.   When you were purchasing the product did you

03:45 20  believe that it was toasted bread or did you believe it

21  was a cracker?  Not when you were a kid but when you

22  were an adult?

23        A.   To be honest, I never really thought about it.

24  It was something that I already bought.

03:45 25        Q.   So you knew what the product was and you

211

ALEX ANG, VOL. I

BARKLEY
Court Reporters

03:58   1   something that is labeled with what it actually is.

2       Q.    Have you ever knowingly purchased a misbranded

3   food product?

4           MR. GOODMAN:   Calls for speculation.

03:59   5           THE WITNESS:   No, not knowingly.

6           MR. GORE:   Q.   How did the labels on the Bimbo

7   Bakeries products that you purchased affect your

8   purchase decision?

9           MR. GOODMAN:   Lacks foundation.

03:59  10           THE WITNESS:   You know, I figured they were

11   healthier, so it was down towards the, you know,

12   100 percent whole wheat, excellent source of whole

13   grains on the packaging, rather than the store brand.

14   It was a little bit more...

03:59  15           MR. GORE:   Q.   Were the portions of the label

16   that you're complaining about in this lawsuit, were

17   they a substantial factor in your purchase decisions?

18           MR. GOODMAN:   Vague and ambiguous.   Lacks

19   foundation.

03:59  20           THE WITNESS:   Yes, I would say so.

21           MR. GORE:   Q.   Can you briefly describe the

22   time period, to the best of your recollection, when you

23   stopped buying Bimbo Bakeries' products?

24       A.    That would be March of 2013.

04:00  25       Q.    And why did you stop buying Bimbo Bakeries'

221

ALEX ANG, VOL. I

BARKLEY
Court Reporters

04:06  1    label on this package did you read and rely on when you

2    were purchasing this product?

3         MR. GOODMAN:  Asked and answered, several

4    times.

04:06  5         THE WITNESS:  The brand.  They were Bagel

6    Thins.  They were plain.  The package count and also

7    the Heart Association sticker.

8         MR. GORE:  Q.  And what is your specific

9    complaint in this case concerning the label on this

04:06 10    package?

11         MR. GOODMAN:  Vague and ambiguous.

12         THE WITNESS:  I was under the assumption that

13    the Heart Association actually did testing

14    in comparison -- testing and comparing it to other

04:06 15    similar products on the market; more heart-healthier

16    than others.

17         MR. GORE:  Q.  What understanding, if any, do

18    you have about whether the logo that appears on this

19    package is a paid endorsement?

04:07 20    A.    I understand now that it's a paid endorsement,

21    they did not go through any sort of certification.

22    Q.    Did can you point to any portion of the label

23    on this package that discloses that the Heart-Check

24    logo is a paid endorsement?

04:07 25    A.    No, I don't see that.

226

BARKLEY
Court Reporters

04:08  1   foundation.

2           THE WITNESS:  Yes.

3           MR. GORE:  Q.  Did you purchase this product

4   for your own consumption or because someone told you to

04:08  5   go out and buy it?

6           MR. GOODMAN:  Same objection.

7           THE WITNESS:  Personal consumption.

8           MR. GORE:  Q.  On approximately how many

9   occasions, between 2009 and 2013, did you purchase this

04:08  10  product for personal consumption?

11          MR. GOODMAN:  Asked and answered.  Lacks

12  foundation.  Calls for speculation.

13          MR. GORE:  Q.  Go ahead.

14      A.   I'd say close to thirty or forty.

04:08  15      Q.   Okay.  Could you please tell us the particular

16  section on this label, on this package, that you read

17  and relied on when you were purchasing this product?

18          MR. GOODMAN:  Lacks foundation.  Asked and

19  answered.

04:09  20          THE WITNESS:  Sara Lee brand and 100 percent

21  whole wheat.

22          MR. GORE:  Q.  What is your specific complaint

23  concerning the label on this package?

24          MR. GOODMAN:  Calls for speculation.  Lacks

04:09  25  foundation.  Vague and ambiguous.

228

ALEX ANG, VOL. I

BARKLEY
Court Reporters

04:16  1          MR. GOODMAN:  You can answer.

2          THE WITNESS:  Oh, those packages, those were

3     for personal consumption.

4          I did send him other packages.

04:16  5          MR. GOODMAN:  Q.  You sent him other packages?

6     A.    Yeah.  I sent him other food labels that are

7     not here right now.

8     Q.    Where are those food labels?

9     A.    I have no idea.

04:16  10    Q.    Okay.  Do you know what products those food

11    labels were for?

12    A.    I don't recall off the top of my head.

13    Q.    I'm showing you this Sara Lee Soft and Smooth

14    package that Mr. Gore showed you.  How do you know this

04:16  15    is the package that you sent to him?

16    A.    I don't know.  I can't verify.  I didn't

17    initial it or anything.

18    Q.    How about the Sara Lee Classic, how do you

19    know that this is the package that you sent to him?

04:17  20    A.    Same thing.  You know, I sent them all in a

21    package.  I didn't initial them so I can't really

22    prove --

23    Q.    Same thing for all of these, correct?

24    A.    Correct.

04:17  25    Q.    Do you recall buying this 100 percent whole

236

ALEX ANG, VOL. I

BARKLEY
Court Reporters

04:21  1     Q.    What did Mr. Gore tell you about how these

2     products are mislabeled?

3           MR. GORE:  Objection.  Attorney-client

4     privilege.  I will instruct you not to answer that

04:21  5     question.

6           MR. GOODMAN:  Q.  Will you take that

7     instruction, Mr. Ang?

8     A.    Yes.

9     Q.    Is there anything you can tell me about how

04:21  10    these products are mislabeled without revealing

11    Mr. Gore's advice to you?

12    A.    No.

13    Q.    Would you refuse to answer any questions about

14    how you know that these products are mislabeled?

04:21  15    A.    Yes.

16    Q.    You said that, in response to one of

17    Mr. Gore's questions, that you understand that the

18    heart Mark is a paid endorsement; how do you have that

19    enforcement?

04:21  20    A.    Through my talking with Mr. Gore.

21    Q.    And what is your understanding as to how the

22    AAH mark is a paid endorsement?

23          MR. GORE:  Objection.  Vague.  Calls for

24    speculation.

04:22  25          You can answer.


241

BARKLEY
Court Reporters

04:22  1          MR. GOODMAN:  Q.  I'm asking for his

2    understanding.

3          A.   My understanding is it's something that's paid

4    for, but not tested and certified by the American Heart

04:22  5    Association.

6          Q.   If the product were tested and certified,

7    would that change your understanding?

8          MR. GORE:  Objection.  Incomplete

9    hypothetical.  Calls for an expert opinion.

04:22  10          You may answer.

11          THE WITNESS:  Say that question again.

12          MR. GOODMAN:  Q.  Sure.  If the product were

13    tested and certified by the AHA would it change your

14    understanding that it's misbranded?

04:22  15          MR. GORE:  Same objection.

16          THE WITNESS:  Yes.

17          MR. GOODMAN:  Q.  I don't have anything

18    further.

19                    EXAMINATION

04:22  20          MR. GORE:  Q.  Just a few more.

21          Mr. Ang, on the package of the Bimbo Toasted

22    Bread, do you see a date that is identified on the

23    package as a best-before date?

24          A.   Yes.

04:23  25          Q.   And what is that date?

242

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF CONTRA COSTA  )

I, Angelica R. Gutierrez, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number 13292 issued by the Court Reporters Board of California and which is in full force and effect. (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3          Before completion of the deposition, review of

4    the transcript [ X ] was [  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated:    FEBRUARY 24, 2015

10

11          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

246

## SAFEWAY

```
STORE MGR 408-257-3070
THANK YOU FOR SHOPPING WITH US!!

            GROCERY

M/O DELI VEGE              6.79 F
2 QTY   SFWY PSTA PEN RGT  1.58 F
  RegPrice         2.98
  Card Savings      1.40-
2 QTY   SFWY PSTA FARFALE  1.58 F
  RegPrice         2.98
  Card Savings      1.40-
LAWRYS MARINADE            2.99 F
  RegPrice         3.69
  Card Savings      .70-

            PRODUCE

MEDIUM CELERY             1.50 F
  RegPrice         1.99
  Card Savings      .49-
  0.49 lb @ $0.99 /lb
WT    CARROTS               .49 F
ANDALIA OJ PASTEUR        5.99 F
  RegPrice         8.99
  Card Savings      3.00-

            DELI

DC PARMESAN WEDGE         3.99 F
CHEDDARD NY OV            5.71 F
**** TAX         .00 BAL 30.62
VF    DEBIT CARD        30.62
         CHANGE              .00
7/27/13 19:53 0767 02 0630 9883


    YOUR CASHIER TODAY WAS CHERYL

      EMERSON ANG        6969

          Your Savings
    Card Savings          6.99
    Total                 6.99
    Total Savings Value    19%

As of today, you have accumulated
1 of 7 toward your free
Signature Cafe Sandwich!
```

## Rotten City Pizza #1
Come back soon!
6813 Hollis Street
EVille, CA 94608
(510) 655-2489

```
Server: Saarawit        Station: 1
-----------------------------------
Order #: 182956         Dine In
-----------------------------------
        >> SETTLED <<

1 Pepperoni              23.85
1 Neopolitan Slice        2.98

Bar Subtotal:             0.00
Food Subtotal:           28.83
Tax 1:                    2.41
                       ========
TOTAL:                  $29.24

Visa Tendered:           29.24
5667 XX/XX
EDC Tran ID: 51595627
                       ==========
CHANGE:                   0.00

       >> Ticket #: 71 <<
  Created: 12/13/2013 2:20:01 PM
  SETTLED: 12/13/2013 2:20:43 PM

          THANK YOU!
```


## WHOLE FOODS
### MARKET


```
Whole Foods Market, Oakland California
230 Bay Place (510) 834-9800

 0 92 LB @ 8.49 /lb     TARE - 05
*WT   HOT BAR              7.81 T
                        ITEM # 95501

VF    Debit               8.51
        PIN USED
  Acct # ************7156
  Seq # 4451
**** TAX     .70 BAL      8.51
  Authorization #
  CHANGE                    .00

TOTAL NUMBER OF ITEMS SOLD - 1
12/16/13 12:05 PM 0460 14 0006 306

Your cashier today was KATHERINE
Leave the cooking to us, we cater!
www.wholefoodsmarket.com
```

## COSTCO
### WHOLESALE


```
   EL CAMINO   #475

   1600 EL CAMINO REAL
SOUTH SAN FRANCISCO, CA 94080
   LW Q ET 90-102232
   MEMBER #111781324132

E  41114 KSBUTTER WTR     6.99
E  33712 CHUCK ROAST      8.26
E  35059 FRYER THIGHS    11.31

        TOTAL
VF   American Express    26.56
XXXXXXXXXxXX2002          SW.PED
07/11/13 16:01
Seq#: 006278 App#:  525123
American Express   Resp: AA
Tran ID#: 319235100000
Merchant ID 99047511

APPROVED - PURCHASE
    AMOUNT: $38.56

0475 003 0000000056 0283

         CHANGE              .00

TOTAL NUMBER OF ITEMS SOLD - 3
CASHIER: OSCAR E.       REG# 3
7/11/2013 16:01 0475 03 0283 56
```



π EXHIBIT 13
Alex Ang
Deponent
2/13/15
Date Rptr
WWW.DEPOBOOK.COM

AA 0001

**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4566
THANK YOU FOR SHOPPING WITH US!

GROCERY

| | |
|---|---|
| COCA COLA CLASSIC | 1.79 B |
| CRV SFTDK SNGL TAX | .10 B |
| RegPrice | 1.99 |
| Card Savings | .20- |
| COKE ZERO CONTOUR | 1.79 B |
| CRV SFTDK SNGL TAX | .10 B |
| RegPrice | 1.99 |
| Card Savings | .20- |

REFRIG/FROZEN

| | |
|---|---|
| CREAM CHEESE | 2.99 F |
| LARGE GRADE AA | 2.69 F |
| CHALLENGE BUTTER | 3.29 F |
| O ORGNC HALF & HAL | 1.99 F |
| **** TAX    .33 | TAX 15.07 |
| VF    DEBIT CARD | 15.07 |

CHANGE    .00
7/05/13 12:07 0985 94 0074 8894

YOUR CASHIER TODAY WAS SELF

EMERSON ANG        6969

**Your Savings**

| | |
|---|---|
| Card Savings | .40 |
| Total | .40 |
| Total Savings Value | 3% |

As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!

HOW WAS YOUR SHOPPING EXPERIENCE?

---

**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4566
THANK YOU FOR SHOPPING WITH US!

GROCERY

| | |
|---|---|
| 2 QTY  CHICKEN CUBE | 2.50 F |
| RegPrice | 3.18 |
| Card Savings | .68- |
| 2 QTY  BEEF CUBES | 2.50 F |
| RegPrice | 3.18 |
| Card Savings | .68- |

REFRIG/FROZEN

| | |
|---|---|
| L CHEESE | 2.50 F |
| RegPrice | 2.99 |
| Card Savings | .49- |
| O ORGANIC HLF&HLF | 3.19 B |

MEAT

| | |
|---|---|
| FRYER THIGHS | 5.73 F |
| FRYER THIGHS | 4.92 F |

PRODUCE

| | |
|---|---|
| MEDIUM CELERY | 1.50 F |
| RegPrice | 1.99 |
| Card Savings | .49- |
| 0.69 lb @ $1.49/lb | |
| WT    W W SWT YLW ONION | .88 F |
| RegPrice | 1.06 |
| Card Savings | .18- |
| 0.71 lb @ $0.99 /lb | |
| WT    CARROTS | .70 F |
| **** TAX    .00 | BAL 24.42 |
| VF VS XXXXXXXXXXX5338 | 24.42 |

CHANGE    .00
7/06/13 18:54 0985 03 0257 8108

YOUR CASHIER TODAY WAS ADRIAN

EMERSON ANG        6969

**Your Savings**

| | |
|---|---|
| Card Savings | 2.52 |
| Total | 2.62 |
| Total Savings Value | 9% |

As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!

---

**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4566
THANK YOU FOR SHOPPING WITH US!

GROCERY

| | |
|---|---|
| SFWY PSTA FARFALE | 1.00 F |
| RegPrice | 1.49 |
| Card Savings | .49- |
| NBC CRACKERS OYSTE | 3.59 F |

GROC NONEDIBLE

| | |
|---|---|
| SFY ALUM FOIL | 7.99 T |
| **** TAX    .70 | BAL 13.28 |
| VF    DEBIT CARD | 13.28 |

CHANGE    .00
7/07/13 14:37 0985 02 0675 5584

YOUR CASHIER TODAY WAS PATRICIA

EMERSON ANG        6969

**Your Savings**

| | |
|---|---|
| Card Savings | .49 |
| Total | .49 |
| Total Savings Value | 4% |

As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!

HOW WAS YOUR SHOPPING EXPERIENCE?

---

**SAFEWAY**

STORE MGR DAVE        415-633-1001
THANK YOU FOR SHOPPING WITH US!

GROCERY

| | |
|---|---|
| TROLLIE SOUR BRITE | 1.59 T |
| LAYS CHN'S #FTL | 2.99 T |
| RegPrice | 4.29 |
| Card Savings | 1.30- |
| MNMS PEANUT | 3.50 T |
| RegPrice | 4.49 |
| Card Savings | .99- |
| COKE CLASSIC | 1.79 E |
| CRV SFTDK SNGL TAX | 1.05 E |
| COKE ZERO | 1.79 E |
| CRV SFTDK SNGL TAX | 1.05 E |

DE 1

| | |
|---|---|
| SC CRV WINGS BNLS | .76 |
| **** TAX    .76 | BAL 17.52 |
| VF VS XXXXXXXXXX5338 | 17.52 |

CHANGE    .00
7/26/13 18:25 0985 09 0263 8853

YOUR CASHIER TODAY WAS SELF

EMERSON ANG        6969

**Your Savings**

| | |
|---|---|
| Card Savings | 2.29 |
| Total | 2.29 |
| Total Savings Value | 12% |

As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!

HOW WAS YOUR SHOPPING EXPERIENCE?
PLEASE SHARE YOUR THOUGHTS ONLINE:
WWW GROCERY SURVEY NET
ENTER TO WIN A $100 GIFT CARD

AA 0002



**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4565
THANK YOU FOR SHOPPING WITH US!

```
                GROCERY
1ROLLIE STUF 4PTL         1   F
SFY OYSTER SAU.VLR        1   F
LAYS MSGT 4BJ K.          3   F
   RegPrice          3.49
   Card Savings       .49-
M&MS PEANUT                5.49 F
   RegPrice          6.59
   Card Savings      1.10
3 QTY  CHICKEN CUBE       2.75 F
   RegPrice          4.77
   Card Savings      1.02-
BEEF CUBES                1.26 F
   RegPrice          1.69
   Card Savings       .34-
COCA COLA SODA              F
CRV SFTDR 6 PK TAX         .30 B
   RegPrice          4.49
   Card Savings       .49
GRD AUTO DRPB.82            F

             REFRIG/FROZEN
LUC ICE CRM BR RIB        1.99 F
   RegPrice          2.49
   Card Savings       .50-
DRYRS CKY N CREAM         4.99 F
   RegPrice          5.99
   Card Savings      1.00-
HORZ ORG H/H PINT         2.29 F

             MISCELLANEOUS
HR    DSPSBL BAG CHARGE      .10
**** TAX        .38  BAL    47.11
VF    DEBIT CARD            47.11

        CHANGE              .00
8/25/13 14:37 0985 03 0230 3660

 ----------------------------------
     YOUR CASHIER TOO  ' WAS UMUS
 ----------------------------------
       EMERSON ANG       6969
       Your Savings
   Card Savings             4.94
   Total                    4.94
   Total Savings Value       10%
 ----------------------------------
As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!
```

**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4565
THANK YOU FOR SHOPPING WITH US!

```
                GROCERY
SFY APPLE JUICE  *        2.79 F
QUAKER CHEWY CHOC         2.50 F
   RegPrice          3.99
   Card Savings      1.49-

             REFRIG/FROZEN
AMERICAN SNG              4.99 F
CHEDDAR BAR MED  *        3.99 F
EGGO HOMESTYLE VF         3.79 F

              BAKED GOODS
FRENCH BAGUETTE           1.79 F

                 MEAT
RK BF RND STRIPS          4.64 F
   RegPrice          6.67
   Card Savings       .93-
FRYER THIGHS             4.13 F
   RegPrice          4.47
   Card Savings       .34-

                PRODUCE
GREEN BELL PEPPER*        1.00 F
   RegPrice          1.50
   Card Savings       .50-
MEDIUM CELERY    *       1.50 F
   RegPrice          1.99
   Card Savings       .49-
  3.58 lb @ $1.29 /lb
UT       RUSSET POTATOES  4.62 F

RED BELL PEPPERS *        1.00 F
   RegPrice          1.50
   Card Savings       .50-
  1.13 lb @ $1.49 /lb
UT     JUMBO YLW ONIONS * 1.68 F
  0.83 lb @ $0.99 /lb
UT     CARROTS   *         82 F
    **** TAX        00  BAL  39.24
VF    DEBIT CARD           39.24

       CHANGE              .00
8/20/13 20:09 0985 04 0425 5947

 ----------------------------------
     YOUR CASHIER TODAY WAS EO
 ----------------------------------
       EMERSON ANG       6969
       Your Savings
   Card Savings             4.25
   Total                    4.25
   Total Savings Value       10%
 ----------------------------------
As of today, you have accumulated
1 of 7 toward your Free
Signature Cafe Sandwich!
```

**SAFEWAY**

STORE MGR JIM TRUONG    415-665-4565
THANK YOU FOR SHOPPING WITH US!

```
                GROCERY
SFKY BAY LEAVES           3.99 F
LAWRYS MARINADE           2.99 F
   RegPrice          3.69
   Card Savings       .70-

                PRODUCE
  1.72 lb @ $1.49 /lb
WT     JUMBO YLW ONIONS * 2.56 F
  1.09 lb @ $0.99 /lb
WT     CARROTS   *        1.08 F
    **** TAX        .00  BAL 10.62
VF    DEBIT CARD           10.62

       CHANGE              .00
7/12/13 17:19 0985 52 0122 8852

 ----------------------------------
     YOUR CASHIER TODAY WAS SELF
 ----------------------------------
       EMERSON ANG       6969
       Your Savings
   Card Savings             .70
   Total                    .70
   Total Savings Value        6%
 ----------------------------------
As of today, you have accumulated
```

AA 0003

EXHIBIT B

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ALEX ANG and LYNN STREIT,            )
Individually and on behalf           )
of all others similarly             )
situated,                            )
                                     )
         Plaintiffs,                 )
                                     )
    vs.                              )  Case No. 13 CIV. 1196
                                     )  (WHO)
BIMBO BAKERIES U.S.A.,               )
INC.,                                )
                                     )
         Defendant.                  )
_____        )

DEPOSITION OF LYNN STREIT

February 11, 2015

Hanna Kim, CLR, CSR No. 13083
   388327

 



barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco     (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento       (408) 885-0550 San Jose          (760) 322-2240 Palm Springs   (951) 686-0906 Riverside
(818) 702-0202 Woodland Hills   (212) 808-8500 New York City     (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City      (914) 510-9110 White Plains      (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
        00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   ALEX ANG and LYNN STREIT,    )
     Individually and on behalf   )
 6   of all others similarly      )
     situated,                    )
 7                                )
             Plaintiffs,          )
 8                                )
             vs.                  ) Case No. 13 CIV. 1196
 9                                ) (WHO)
     BIMBO BAKERIES U.S.A.,       )
10   INC.,                        )
                                  )
11           Defendant.           )
     _____)

12

13

14

15           Videotaped deposition of LYNN STREIT,

16           taken on behalf of the Defendant, taken

17           at the law offices of Pratt & Associates,

18           located at 1871 The Alameda, San Jose,

19           California 95126, on Wednesday,

20           February 11, 2015, beginning at

21           10:20 a.m. to 5:49 p.m., before Hanna

22           Kim, CLR, CSR No. 13083.

23

24

25
```

LYNN STREIT

BARKLEY
Court Reporters

10:43  1    grain and you read the back of the label.  That's what

10:43  2    I --

10:43  3        A.  I can't say specifically.

10:43  4        Q.  As you sit here today, you recall ever doing

10:43  5    that with respect to any product other than Sara Lee

10:43  6    whole wheat bread?

10:43  7        A.  Looking at it, like looking at the back of the

10:43  8    label?

10:43  9        Q.  That's my question.

10:43  10       A.  Absolutely.

10:43  11       Q.  As you -- that made a claim that it was an

10:43  12   excellent source of whole grain?  That's what we're

10:44  13   narrowing the focus on.

10:44  14       A.  I see.  That I'm not sure of because everybody

10:44  15   uses different words.

10:44  16       Q.  You say "everybody uses different words."

10:44  17   What do you mean?

10:44  18       A.  Different brands say different things on the

10:44  19   front that tout their benefits, if you will.  So they

10:44  20   would all be worded differently.  So I can't say for a

10:44  21   fact that it's excellent source of whole grains.

10:44  22       Q.  Well, do you recall reading the back of a

10:44  23   label for any product that made a statement other than

10:44  24   it had no added sugar, was an excellent source of whole

10:44  25   grain or was low or no fat?

                                    25

BARKLEY
Court Reporters

12:49  1      Q.  Do you recall Sara Lee 100 percent whole wheat

12:49  2  bread ever being subject to a Safeway Club discount?

12:49  3      A.  Not specifically.

12:49  4      Q.  When you shopped at Safeway when your kids

12:49  5  were living with you -- there is banging going on out

12:49  6  there -- did you try to pick items that were subject to

12:49  7  a Safeway Club card discount when you were shopping?

12:49  8      A.  If there was something comparable, if it

12:49  9  didn't -- if it was something I would have chosen

12:49 10  anyway.

12:49 11      Q.  If it was something you would have chosen

12:49 12  anyway, you would buy it if it was subject to a club

12:49 13  card discount?

12:49 14      A.  Yes.  It would be a bonus.

12:50 15      Q.  All right.  So you said that you bought Sara

12:50 16  Lee 100 percent whole wheat bread because it was

12:50 17  100 percent whole wheat, because it was soft and

12:50 18  because your children liked it and because you could

12:50 19  buy it at Safeway.  Were there any other reasons --

12:50 20      A.  Excuse me.

12:50 21      Q.  -- that you bought Sara Lee 100 percent whole

12:50 22  wheat bread?

12:50 23      A.  Because it said it was an excellent source of

12:50 24  whole grain.

12:50 25      Q.  Why was that important to you?

98

BARKLEY
Court Reporters

12:50  1      A.   It's healthier.

12:50  2      Q.   How do you know that?

12:50  3      A.   I just do.

12:50  4      Q.   Has anyone ever told you that something that's

12:50  5  an excellent source of whole grains is healthy for you?

12:50  6      A.   It's all over TV, magazine covers, it's...

12:50  7      Q.   Starting with has anybody told you that?

12:50  8      A.   No.

12:50  9      Q.   Have you read any articles that indicated that

12:50  10  something that's an excellent source of whole grains is

12:51  11  healthy for you?

12:51  12      A.   Maybe sitting in a doctor's office, but I,

12:51  13  again, can't cite anything specifically.

12:51  14      Q.   Yeah, I'm not interested in -- in something

12:51  15  that's theoretical.  I want to know whether you recall

12:51  16  as you sit here today --

12:51  17      A.   No.

12:51  18      Q.   -- whether you ever read any article that

12:51  19  indicated to you that something that was an excellent

12:51  20  source of whole grains was healthy for you.

12:51  21      A.   Are you asking me to cite an article?  I'm --

12:51  22  I'm confused, because this is the kind of information

12:51  23  that's just out there.  Unless you're living under a

12:51  24  rock, you know that whole grain is good for you.

12:51  25      Q.   Sure.  I'm not asking, at this point --

99

LYNN STREIT

BARKLEY
Court Reporters

12:51 1    let's --

12:51 2        A.  Okay.

12:51 3        Q.  -- establish that you actually remember seeing

12:51 4    an article, I would ask for information about it.  But

12:51 5    right now I want to find out where you got this

12:51 6    information from other than the fact that it's out

12:51 7    there.  So we already established that you can't recall

12:51 8    having anybody tell you that.  So now I'm wondering

12:51 9    whether you ever read it in an article.

12:52 10       A.  I can't recall.

12:52 11       Q.  Okay.  Can you recall seeing any television

12:52 12   programming about something that's an excellent source

12:52 13   of whole grain being healthy for you?

12:52 14       A.  Again, yes, but I can't say what program, news

12:52 15   programs, morning programs, yeah.

12:52 16       Q.  Do you recall, as you sit here today, any

12:52 17   particular program conveying that information to you?

12:52 18       A.  Specifically, no.

12:52 19       Q.  Do you know what constitutes something being

12:52 20   an excellent source of whole grain?

12:52 21       A.  No.

12:52 22       Q.  Do you know what amount of whole grain in a

12:52 23   particular product you want to eat?

12:52 24       A.  No.

12:52 25       Q.  When you were shopping for Sara Lee

                            100

BARKLEY
Court Reporters

12:52  1    100 percent whole wheat bread, was there a particular

12:52  2    amount of whole grain that you were hoping the bread

12:52  3    had?

12:53  4         A.   No.

12:53  5         Q.   When you were shopping for whole wheat bread,

12:53  6    between 2008 and 2012, was there any particular amount

12:53  7    of or type of whole grain that you wanted to eat?

12:53  8         A.   No.

12:53  9         Q.   What other foods with whole grains in them did

12:53  10   you purchase for your children?

12:53  11        A.   I think bread is the main source.  I can't

12:53  12   think of anything specifically.

12:53  13        Q.   Was Milton's an excellent source of whole

12:53  14   grains, to your knowledge?

12:53  15        A.   Probably.  That's my perception.  How it --

12:53  16   yeah, that's my perception.

12:54  17        Q.   Okay.  Why did you have that perception?

12:54  18        A.   It -- it has, like I said, all the nuts and

12:54  19   seeds and it just looks healthy.

12:54  20        Q.   I'm not asking whether it's healthy --

12:54  21        A.   And it tastes like it, too.

12:54  22        Q.   Why does it taste like it's healthy?

12:54  23        A.   I don't know.  That's a good question.  I

12:54  24   don't know.

12:54  25        Q.   I'm not asking whether it -- it was healthy.

101

LYNN STREIT

BARKLEY
Court Reporters

| 12:54 | 1 | I'm asking whether it was an excellent source of whole |
|---|---|---|

12:54  1   I'm asking whether it was an excellent source of whole

12:54  2   grains in particular.

12:54  3        A.  I'm not an expert, but I feel like it is.

12:54  4        Q.  Because it had the nuts and seeds on it --

12:54  5        A.  Mm-hmm, correct.  Oh.  Yes.

12:54  6        Q.  What nuts are whole grains, to your knowledge?

12:54  7        A.  I have no idea.

12:54  8        Q.  What seeds are whole grains, to your

12:55  9   knowledge?

12:55  10       A.  I would assume any seeds, but, again, I don't

12:55  11  know.

12:55  12       Q.  What do you understand a whole grain to be?

12:55  13       A.  A nut that's made into a flour.  That's -- and

12:55  14  I could be completely wrong, but that's my...

12:55  15       Q.  And so you understand a whole grain to be a

12:55  16  nut?

12:55  17       A.  No, that doesn't make sense.  I'm thinking of

12:55  18  the seeds on the outside of the bread.  No, because

12:55  19  wheat is not a nut.  So I don't know.

12:55  20       Q.  Do you have an understanding of what a whole

12:55  21  grain is, ma'am?

12:55  22       A.  Nope.

12:55  23       Q.  The bagels that you bought at Safeway, were

12:55  24  those Safeway bagels?

12:55  25       A.  At Safeway?  No, it was a variety.  It would

102

LYNN STREIT

BARKLEY
Court Reporters

01:22  1        Q.  -- Hill and then Target/Cos- -- Lucky.

01:22  2        A.  Yes.

01:23  3        Q.  Is that fair?

01:23  4        A.  Yes.

01:23  5        Q.  And, again, you don't have any estimate for me

01:23  6   with respect to how much you spent at all those stores

01:23  7   on any baked products, correct?

01:23  8        A.  No.

01:23  9        Q.  That's not correct?

01:23 10        A.  I mean -- oh, sorry.  No, I don't have an

01:23 11   estimate.

01:23 12        Q.  Thank you.

01:23 13            Did you ever return any of the Sara Lee

01:23 14   products that you purchased?

01:23 15        A.  I don't think so.

01:23 16        Q.  Did you ever return any of the Thomas'

01:23 17   products that you purchased?

01:23 18        A.  I don't think so.

01:23 19        Q.  Your family ate those products after you

01:23 20   purchased them?

01:23 21        A.  Until I threw away what was left, yes.

01:23 22        Q.  And you threw it away because it had become

01:24 23   stale --

01:24 24        A.  Yes.

01:24 25        Q.  -- or moldy or was otherwise --

                                126

BARKLEY
Court Reporters

02:11  1      Q.  Does anybody in your family, including

02:11  2   yourself, have a soy allergy?

02:11  3      A.  No, not that I know of.

02:11  4      Q.  What products have you bought, to your

02:11  5   knowledge, with soy in them?

02:11  6      A.  When I had the yogurt shop, there was a new

02:12  7   product out called Tofutti, and it was made from soy.

02:12  8      Q.  Other than Tofutti, have you ever purchased

02:12  9   any soy products or products in -- that include soy?

02:12 10      A.  Not that I recall.

02:12 11      Q.  Have you ever --

02:12 12      A.  Excuse me, fresh edamame.  That's soybeans,

02:12 13   right?  Okay.

02:12 14      Q.  Anything else?

02:12 15      A.  No.

02:12 16      Q.  Have you ever checked any label of any food

02:12 17   product that you've bought to make sure that it did not

02:12 18   have soy in it?

02:12 19      A.  No.

02:12 20      Q.  The Sara Lee bread products that you bought

02:12 21   when your kids were living with you, did you also eat

02:12 22   those or were those just for your kids?

02:12 23      A.  I ate a minimal amount compared to my kids.

02:12 24      Q.  Well, that's just necessarily true.  But what

02:12 25   do you mean by "minimal amount"?

140

BARKLEY
Court Reporters

02:32 1   positives.

02:32 2       Q.  What other statements led you to those

02:32 3   products?

02:32 4       A.  Baked fresh daily.

02:32 5       Q.  Any other statements?

02:33 6       A.  Not specifically.

02:33 7       Q.  Do you have any reason to believe that Sara

02:33 8   Lee 100 percent whole wheat bread is not 100 percent

02:33 9   whole wheat?

02:33 10      A.  Yes.

02:33 11      Q.  What is that based on?

02:33 12      A.  I have found out, since I brought this to

02:33 13  Pierce's attention, that there's other things in it.

02:33 14  There's soy and other products that make it not

02:33 15  100 percent whole wheat, in my opinion.

02:33 16      Q.  What about soy makes it not 100 percent whole

02:33 17  wheat?

02:33 18      A.  Just the very fact that it's in there.  It's a

02:33 19  soy flour, not a wheat flour.

02:33 20      Q.  Do you understand that soy is a grain?

02:33 21      A.  But it's not whole wheat.

02:33 22      Q.  That wasn't my question.

02:33 23      A.  Yes.  Sorry.  To answer your question, yes.

02:34 24      Q.  Do you -- do you understand that soy is a

02:34 25  grain?

156

**BARKLEY**
*Court Reporters*

| | | |
|---|---|---|
| 02:41 | 1 | A.   No. |
| 02:41 | 2 | Q.   Let's start with that. |
| 02:41 | 3 | A.   Okay. |
| 02:41 | 4 | Q.   Then we can get into why it was mislabeled. |
| 02:41 | 5 | A.   No. |
| 02:41 | 6 | Q.   So as you sit here today, you can't recall any |
| 02:41 | 7 | instance in which you refused to buy a product because |
| 02:41 | 8 | it was mislabeled, correct? |
| 02:41 | 9 | A.   Correct. |
| 02:41 | 10 | Q.   Okay.  What leads you to believe that Sara Lee |
| 02:42 | 11 | 100 percent whole wheat bread is not an excellent |
| 02:42 | 12 | source of whole grains? |
| 02:42 | 13 | A.   Since I brought this matter to the attention |
| 02:42 | 14 | of this office, I found out that it does not meet |
| 02:42 | 15 | certain FDA and other guidelines to be qualified as |
| 02:42 | 16 | 100 percent whole wheat. |
| 02:42 | 17 | Q.   My question is hundred -- is an excellent |
| 02:42 | 18 | source of whole grain. |
| 02:42 | 19 | A.   Excellent source of whole grain.  Sorry. |
| 02:42 | 20 | Wrong one. |
| 02:42 | 21 | Q.   So what led you to believe that the product |
| 02:42 | 22 | had -- was not an excellent source of whole grains? |
| 02:42 | 23 | A.   What led me to believe? |
| 02:42 | 24 | Q.   Yes. |
| 02:42 | 25 | MR. GORE:   I'm going to object to the question |

163

BARKLEY
Court Reporters

02:43  1      A.  Yes.

02:43  2      Q.  Okay.  Do you know what products do provide an

02:43  3  excellent source of whole grains?

02:43  4      A.  No.

02:43  5      Q.  Have you ever bought any products that are an

02:43  6  excellent source of whole grains?

02:43  7      A.  I would assume so, but I can't specifically

02:43  8  identify them.

02:43  9      Q.  And I asked you this before, but let's just be

02:44  10  clear.  You don't know what amount of whole grains

02:44  11  would constitute an excellent source of whole grains,

02:44  12  correct?

02:44  13      A.  No, I do not know.

02:44  14      Q.  Okay.  And you don't -- same questions for

02:44  15  good source of whole grain.  Have -- do you know what

02:44  16  constitutes a good source of whole grains?

02:44  17      A.  I do not.

02:44  18      Q.  Do you know whether you have purchased any

02:44  19  products that are a good source of whole grains?

02:44  20      A.  I would assume, but I do not know

02:44  21  specifically.

02:44  22      Q.  And those products would be the same products

02:44  23  you told me about earlier, which are the -- the bread

02:44  24  with the seeds on the outside?

02:44  25      A.  That's correct.

165

BARKLEY
Court Reporters

02:45  1          Q.  What bread would you have bought instead of

02:46  2    Sara Lee 100 percent whole wheat bread that would have

02:46  3    been a good source of whole grains?

02:46  4          A.  I don't know.

02:46  5          Q.  Do you know whether that product would have

02:46  6    been less expensive than the Sara Lee product?

02:46  7          A.  I have no idea.

02:46  8          Q.  How much did you pay for any Sara Lee bread

02:46  9    product?

02:46  10         A.  No idea.

02:46  11         Q.  How much did you pay for any Entenmann's

02:46  12   product?

02:46  13         A.  Don't know.

02:46  14         Q.  Do you have any documents that indicate that

02:46  15   you bought any Sara Lee products?

02:46  16         A.  No.  I don't save grocery receipts.

02:46  17         Q.  Do you have any documents that indicate that

02:46  18   you bought any Entenmann's products?

02:46  19         A.  Same thing; no.

02:46  20         Q.  Do you have any -- let's just try to shortcut

02:46  21   this.  Did you -- do you have any documents anywhere

02:46  22   that indicate that you ever purchased any Bimbo

02:47  23   Bakeries products?

02:47  24         A.  No.

02:47  25         Q.  Exhibit 1 lists a number of other products

                                    167

BARKLEY
Court Reporters

03:31 1      Q.  The first page of the classic 100 percent

03:31 2  whole wheat pictures shows a -- it says it's heart

03:31 3  healthy.  Do you have any reason to believe that this

03:31 4  isn't heart healthy?

03:31 5      A.  No.

03:31 6      Q.  Do you have any reason to believe that this

03:31 7  bread does not provide a good source of whole grain?

03:32 8      A.  Now I do.

03:32 9      Q.  What do you mean?

03:32 10     A.  Because you're asking -- you're asking what I

03:32 11  think now.

03:32 12     Q.  Okay.  I'm asking whether you have any reason

03:32 13  to believe that this bread does not provide a good

03:32 14  source of whole grain.

03:32 15         MR. GORE:  I'll object only to the extent --

03:32 16         THE WITNESS:  I'm so confused.

03:32 17         MR. GORE:  -- that your question calls for --

03:32 18         THE WITNESS:  Sorry.

03:32 19         MR. GORE:  -- communications protected by the

03:32 20  attorney-client privilege.

03:32 21         Otherwise, you may answer.

03:32 22         THE WITNESS:  I have come to find out that the

03:32 23  claims are not entirely true.

03:32 24  BY MR. GOODMAN:

03:32 25     Q.  Did you find that out from your lawyer?

196

BARKLEY
Court Reporters

03:32  1       A.   Yes.

03:32  2       Q.   Did you find that out from any other source?

03:32  3       A.   No.

03:32  4       Q.   Do you know how the claims made, that it's a

03:32  5   good source of whole grain, are not true?  That's just

03:33  6   a yes or no.

03:33  7       A.   No.  It's getting too scientific.

03:33  8       Q.   Do you know whether this classic 100 percent

03:33  9   whole wheat bread provides whole grains that are a --

03:33  10  less than a good source?

03:33  11      A.   Specific whole grain, no.

03:33  12      Q.   Do you know if this is a poor source of whole

03:33  13  grains?

03:33  14      A.   I do not know.

03:33  15      Q.   Do you know if it's an excellent source of

03:33  16  whole grains?

03:33  17      A.   Again, don't know.

03:33  18      Q.   The next set of pictures is for a Boboli

03:33  19  original crust.  Can you keep these in order, please?

03:33  20      A.   Well, I pulled out the ones that are

03:33  21  pertinent --

03:33  22      Q.   Yeah, I know.

03:33  23      A.   Sorry.

03:33  24      Q.   Can you put them back in order?

03:34  25      A.   Yes.  Yes.  Okay.  I can do that.  Okay.  Got

197

LYNN STREIT

BARKLEY
Court Reporters

03:39  1        A.  No.  There was not that expectation with

03:39  2   those.

03:39  3        Q.  Do you know whether any other donuts -- brand

03:39  4   named donuts sold in a store are baked fresh daily?

03:39  5        A.  I don't know.

03:39  6        Q.  Do you know whether any brand bakery goods

03:39  7   sold in a store are bake -- baked fresh daily?

03:39  8        A.  Brand bakery goods, meaning outside of the

03:39  9   internal bakery within the store?

03:39 10        Q.  Yes, ma'am.

03:39 11        A.  I do not know.

03:39 12        Q.  Have you ever sought out any brand bakery

03:39 13   goods -- those are brands that are outside of the store

03:39 14   brand -- that say "baked fresh daily" on them?

03:39 15        A.  Not specifically.

03:40 16        Q.  Other than the labels that you just identified

03:40 17   in these pictures, have you provided or do you have in

03:40 18   your possession, custody or control, any other

03:40 19   packaging related to Bimbo Bakeries products?

03:40 20        A.  No.

03:40 21        Q.  Other than the products that you purchased and

03:40 22   gave to Mr. Gore, did you ever purchase any Bimbo

03:40 23   Bakeries products that you did not actually use as a

03:40 24   consumer?

03:40 25        A.  Not that I know of.  And let me clarify one

202

LYNN STREIT

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 05:17 | 1 | products have been represented to have a characteristic |
| 05:17 | 2 | that they don't actually have? |
| 05:17 | 3 | A.   I believe so. |
| 05:17 | 4 | Q.   Okay.  What characteristic? |
| 05:17 | 5 | A.   One hundred percent whole wheat. |
| 05:17 | 6 | Q.   Anything else? |
| 05:17 | 7 | A.   Excellent source of whole grain. |
| 05:17 | 8 | Q.   Anything else? |
| 05:18 | 9 | A.   Good source of whole grain. |
| 05:18 | 10 | Q.   And we talked about your understanding about |
| 05:18 | 11 | those terms -- |
| 05:18 | 12 | A.   Right. |
| 05:18 | 13 | Q.   -- before.  Is there anything else you want to |
| 05:18 | 14 | add to your testimony about that? |
| 05:18 | 15 | A.   About? |
| 05:18 | 16 | Q.   Your understanding of what a hundred percent |
| 05:18 | 17 | whole wheat is or should be. |
| 05:18 | 18 | A.   I can't think of anything else. |
| 05:18 | 19 | Q.   What about source of whole grains?  Is there |
| 05:18 | 20 | anything you want to add to your testimony about that? |
| 05:18 | 21 | A.   Other than my confusion about what a grain is. |
| 05:18 | 22 | I think I inadvertently referred to soy as a grain. |
| 05:18 | 23 | It's a bean, soybean.  So I clarified buying soybeans. |
| 05:18 | 24 | So soy is not a whole grain. |
| 05:18 | 25 | Q.   Okay.  Anything else? |

272

BARKLEY
Court Reporters

05:27  1            MR. GOODMAN:  Same objections.

05:27  2            THE WITNESS:  Many years.

05:27  3     BY MR. GORE:

05:27  4        Q.  Approximately beginning when?

05:27  5            MR. GOODMAN:  Same objections.  Calls for

05:27  6     speculation.  Lacks foundation.

05:27  7            THE WITNESS:  When my kids were young, so say

05:27  8     2000.

05:27  9     BY MR. GORE:

05:27  10       Q.  Okay.  Now, when you purchased this product

05:27  11    for personal consumption, did you read and rely on any

05:27  12    parts of the label on this package?

05:27  13       A.  Yes.

05:28  14       Q.  What --

05:28  15       A.  The front.

05:28  16       Q.  Okay.  Did you read and rely on any specific

05:28  17    parts on the front of this package?

05:28  18       A.  Def-

05:28  19           MR. GOODMAN:  Overbroad.  Lacks foundation.

05:28  20    It's also leading.

05:28  21           THE WITNESS:  Definitely, 100 percent whole

05:28  22    wheat and good source of whole grain.

05:28  23    BY MR. GORE:

05:28  24       Q.  Okay.  I'm going to ask you to take my pen,

05:28  25    and I want you to circle the parts of the label on this

                                  280

                           LYNN STREIT

BARKLEY
Court Reporters

05:28  1    package that you read and relied on when making your

05:28  2    purchase decision, please.

05:28  3         Okay.  Thank you.  Now, what you've circled

05:28  4    here is a part of the label that says "100 percent

05:29  5    whole wheat.  My question is, when you read that on the

05:29  6    label, what did it mean to you?

05:29  7         MR. GOODMAN:  Asked and answered.

05:29  8         THE WITNESS:  That bread was made from

05:29  9    100 percent whole wheat flour.

05:29 10    BY MR. GORE:

05:29 11         Q.  You also circled "good source of whole grain."

05:29 12    When you read and relied on that part of the label,

05:29 13    what did it mean to you?

05:29 14         MR. GOODMAN:  Asked and answered.

05:29 15         THE WITNESS:  Exactly what it says, that it

05:29 16    was a healthy choice, good source of whole grain.

05:29 17    BY MR. GORE:

05:29 18         Q.  When you purchased this -- this product for

05:29 19    consumption by you and your family, did you turn it

05:29 20    over every time and read the ingredient list?

05:29 21         A.  No.

05:29 22         Q.  Why not?

05:29 23         A.  Because the front told me what I needed to

05:29 24    know.

05:29 25         Q.  How did reading these parts of the label

281

BARKLEY
Court Reporters

05:33  1    particular Bimbo product?

05:33  2            MR. GOODMAN:  Leading.

05:33  3            THE WITNESS:  No.

05:33  4    BY MR. GORE:

05:33  5        Q.  Are all of the products that are the subject

05:33  6    of your claims in this lawsuit products that you

05:33  7    purchased for years for consumption by yourself and for

05:33  8    your family?

05:33  9            MR. GOODMAN:  Leading.  Misstates testimony.

05:33 10            THE WITNESS:  Yes.

05:33 11    BY MR. GORE:

05:33 12        Q.  I want you to take my pen and I want you to

05:33 13    circle on Exhibit No. 12 the portions of the label that

05:33 14    you read and relied on when you purchased Sara Lee

05:34 15    100 percent whole wheat bread, please.

05:34 16            Okay.  Thank you.  And you've circled two

05:34 17    things.  One a "100 percent whole wheat."  When you

05:34 18    read and relied on that portion of the label -- strike

05:34 19    that.

05:34 20            Did you read and rely on that portion of the

05:34 21    label when you decided to purchase Sara Lee 100 percent

05:34 22    whole wheat bread?

05:34 23        A.  Yes.

05:34 24        Q.  When you read that portion of the label, what

05:34 25    did it mean to you?

285

LYNN STREIT

BARKLEY
Court Reporters

05:34 1       A.   That the bread was made with 100 percent whole

05:34 2   wheat flour.

05:34 3       Q.   And the other thing that you circled, that

05:34 4   it's an excellent source of whole grain --

05:34 5       A.   Yes.

05:34 6       Q.   -- did you read and rely on that portion of

05:34 7   the label?

05:34 8       A.   Yes.

05:34 9       Q.   What did that mean to you?

05:34 10      A.   That it's an even better source of whole grain

05:34 11  than the other bread, so that it's an excellent source.

05:34 12      Q.   Okay.  Do you know the difference between the

05:34 13  legal requirements for bread to be labeled "excellent"

05:34 14  or "good source of whole grain"?

05:35 15      A.   I have no idea.

05:35 16      Q.   Okay.  How did reading these portions of the

05:35 17  label affect your purchase decision?

05:35 18      A.   They affected greatly.

05:35 19           The -- these two also affected it.  However,

05:35 20  we're not -- I'm not arguing this.

05:35 21      Q.   Okay.  Okay.

05:35 22      A.   So...

05:35 23           MR. GOODMAN:  Anything else you want to point

05:35 24  her to?

05:35 25           THE WITNESS:  I couldn't hear that.

                                        286



05:41   1   lawsuit?

05:41   2       A.   For the packages to be corrected.

05:41   3       Q.   Are you seeking any money?

05:41   4       A.   No.

05:41   5       Q.   Are you seeking any money on behalf of the

05:41   6   class members in this case?

05:41   7       A.   I think that's part of -- I mean, I think

05:41   8   that's what happens.   I think people should get some

05:41   9   sort of a refund for the packages they purchased.

05:41   10       Q.   How much of a refund?

05:41   11       A.   That's not up to me.   I don't know.

05:42   12           MR. GORE:   That's all I have.

05:42   13                   FURTHER EXAMINATION

05:42   14   BY MR. GOODMAN:

05:42   15       Q.   I have some follow-up on that, Ms. Streit.

05:42   16       A.   Yes.

05:42   17       Q.   How do you know that Exhibit 13 is the Softees

05:42   18   box that you gave to Mr. Gore as opposed to some other

05:42   19   box of Softees?

05:42   20       A.   Well, I brought it in to him, so --

05:42   21       Q.   How do you know you brought in that box,

05:42   22   ma'am, is my question, as opposed to another box?

05:42   23       A.   Well, the expiration date looks like it's in

05:42   24   the right time frame, but I don't even know.   I mean,

05:42   25   any -- anything is possible.   Someone can break in here

                                292

                          LYNN STREIT

BARKLEY
Court Reporters



05:42  1   and take things out and replace it.

05:42  2       Q.  Ma'am, how do you know that that's the box

05:42  3   that you gave to Mr. Gore?  That's my question.

05:43  4       A.  Because I trust him.

05:43  5       Q.  Anything else?  Is there any other way that

05:43  6   you know that that's the box that you gave to Mr. Gore?

05:43  7       A.  Nope.

05:43  8       Q.  Okay.  When you say you trust him, what do you

05:43  9   mean?  Is he the one who's testifying today that that's

05:43 10   the box that you gave to him?

05:43 11       A.  I trust the things I give him and tell him are

05:43 12   treated honestly and respectfully.

05:43 13       Q.  How do you know that Exhibit 11 is the bag of

05:43 14   bread -- or the bag from the bread that you gave him,

05:43 15   as opposed to some other bag of Sara Lee 100 percent

05:43 16   whole wheat bread?

05:43 17       A.  Same reasons.

05:43 18       Q.  So you don't know that this is the actual bag,

05:43 19   other than you trust Mr. Gore, correct?

05:43 20       A.  It doesn't have my signature on it, so -- I

05:43 21   mean, I think that's just a weird question.  Sorry.

05:43 22       Q.  That's great, ma'am.  I'll move to strike that

05:43 23   as nonresponsive.

05:43 24       A.  Okay.

05:43 25       Q.  If you could just answer the question.  I'm

                               293

BARKLEY
Court Reporters

05:43  1    not asking for your opinion as to my question.  I'm

05:43  2    asking you whether you know that this bag, Exhibit 11,

05:43  3    is the bag of bread that you gave to Mr. Gore, as

05:44  4    opposed to a different bag from a loaf of 100 percent

05:44  5    whole wheat Sara Lee bread.

05:44  6        A.  Yes.

05:44  7        Q.  You know that that's the same bag?

05:44  8        A.  Same reasons.

05:44  9        Q.  How do you know?

05:44 10        A.  Same reasons.

05:44 11        Q.  How do you know, ma'am?

05:44 12        A.  Because I gave it to him.  I -- I'm sorry.

05:44 13    I'm finding this argumentative, too.

05:44 14        Q.  Are you objecting to my question, ma'am?

05:44 15        A.  Can I do that?

05:44 16        Q.  No.

05:44 17            Do you know -- did you make any markings on

05:44 18    the bag that you gave to Mr. Gore?

05:44 19        A.  I did not.

05:44 20        Q.  Did you make any note of the bag that you gave

05:44 21    to Mr. Gore to determine that this very bag is the bag

05:44 22    of bread that you gave to him?

05:44 23        A.  I did not.

05:44 24        Q.  Okay.  So other than the fact that you trust

05:44 25    Mr. Gore, how do you know that this is the very bag

                                  294

BARKLEY
Court Reporters

05:44  1    that you gave to Mr. Gore?

05:44  2        A.  Same thing.

05:44  3        Q.  You don't.  There's no other reason other than

05:44  4    you trust him, correct?

05:44  5        A.  I guess, yeah.

05:44  6        Q.  Okay.  Same answers --

05:45  7        A.  He can't lie.

05:45  8        Q.  -- for Exhibit 12?

05:45  9        A.  Yeah, yes.

05:45  10       Q.  Okay.  Is there any wheat flour in the bread

05:45  11   that was in either Exhibit 11 or Exhibit 12 that was

05:45  12   other than whole wheat flour?

05:45  13       A.  Yes.

05:45  14       Q.  Okay.  What wheat flour was in Exhibit 11 that

05:45  15   was something other than whole wheat flour?

05:45  16       A.  Soy flour.  Can I look at the label and make

05:45  17   sure it's the right one?

05:45  18       Q.  I'm asking you, ma'am --

05:45  19       A.  Okay.

05:45  20       Q.  If you'd listen to my question.  Is there any

05:45  21   wheat flour in Exhibit 11, the bread that was in

05:45  22   Exhibit 11, other than whole wheat flour --

05:45  23       A.  Oh.

05:45  24       Q.  -- to your knowledge?

05:45  25       A.  I do not know.

                                    295

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA     }
                        }     ss.
COUNTY OF CONTRA COSTA  }

I, Hanna Kim       , hereby certify:

I am a duly qualified Certified Shorthand

Reporter in the State of California, holder of

Certificate Number CSR 13083     issued by the Court

Reporters Board of California and which is in full force

and effect.  (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or

affirmations pursuant to California Code of Civil

Procedure, Section 2093(b) and prior to being examined,

the witness was first duly sworn by me.  (Fed. R. Civ.

P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, nor am I

financially interested in this action.  (Fed. R. Civ. P.

28).

I am the deposition officer that

stenographically recorded the testimony in the foregoing

deposition and the foregoing transcript is a true record

/ / /

300

BARKLEY
Court Reporters

1   of the testimony given by the witness.   (Fed. R. Civ. P.

2   30(f)(1)).

3        Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.   If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.   (Fed. R. Civ. P. 30(e)).

8

9   Dated: February 26, 2015,

10

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

301

EXHIBIT C

0401caswell

2

```
 1    This transcript has not been proofread or
 2    corrected.  It is a draft transcript, NOT a
 3    certified transcript.  This draft may contain
 4    computer-generated mistranslations of stenotype
 5    code, resulting in inaccurate or nonsensical
 6    word combinations, or untranslated stenotype
 7    symbols which cannot be deciphered by
 8    non-stenotypists.  Corrections will be made in
 9    the preparation of the certified transcript,
10    resulting in differences in page and line
11    numbers, punctuation and formatting.
12
13    YOUR REQUEST OF A ROUGH DRAFT CONSTITUTES AN
14    ORDER FOR THE FINAL CERTIFIED TRANSCRIPT AND IS
15    SUPPLIED TO YOU ON THE CONDITION THAT UPON
16    RECEIPT OF THE CERTIFIED TRANSCRIPT, THIS DRAFT
17    AND ANY COPIES THEREOF WILL BE DESTROYED.  THE
18    CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL
19    TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES
20    OF VERBATIM CITATION OF TESTIMONY.
21
22            Daria L. Romano
23        Registered Professional Reporter
24          Certified Realtime Reporter
25        UNITED STATES DISTRICT COURT
```

3

0401caswell

1          NORTHERN DISTRICT OF CALIFORNIA

2              SAN FRANCISCO DIVISION

3    Civil Action No. 13 Civ. 1196 HSG(NC)

4    - - - - - - - - - - - - - - - - - - - - -

5    ALEX ANG and LYNN STREIT, Individually and on

6    behalf of all others similarly situated,

7                    Plaintiffs,

8        v.

9    BIMBO BAKERIES USA, INC.,

10                   Defendant.

11   - - - - - - - - - - - - - - - - - - - - -

12        DEPOSITION OF DR. JULIE A. CASWELL, a

13   witness called by and on behalf of the

14   Defendant, taken pursuant to the applicable

15   rules of civil procedure, before Daria L.

16   Romano, Registered Professional Reporter,

17   Certified Realtime Reporter and Notary Public in

18   and for the Commonwealth of Massachusetts, at

19   O'Brien & Levine Court Reporting Services, 195

20   State Street, Boston, Massachusetts, on

21   Wednesday, April 1, 2015, commencing at 9:54

22   a.m. to 1:17 p.m.

23

24

25

                                              4

1    A P P E A R A N C E S:

2

3        BARRETT LAW GROUP, P.A.

4        (by Brian Herrington, Esq.)

Page 2

0401caswell

```
 5        404 Court Square North

 6        Lexington, MS 39095

 7        (662) 834-2488

 8        bherrington@barrettlawgroup.com

 9        for the Plaintiffs.

10

11        HOGAN LOVELLS US LLP

12        (by David W. Skaar, Esq.)

13        1999 Avenue of the Stars, Suite 1400

14        Los Angeles, California 90067

15        (310) 785-4600

16        david.skaar@hoganlovells.com

17        for the Defendant.

18

19

20

21

22

23

24

25
```

♀

                                                                5

```
 1                    I N D E X

 2     Deposition of:              Page

 3     DR. JULIE A. CASWELL

 4     By Mr. Skaar                    ^

 5

 6

 7                    E X H I B I T S
```

Page 3

0401caswell

22    Q.   But that's not my question.   I'm going

23  to make a motion to strike as nonresponsive.

24         You mentioned in your list of

25  nutrients things like fat, things like vitamins,

37

1  right?

2    A.   Mm-hmm.

3    Q.   Iron, fiber, whole grains are not on

4  that list, are they?

5    A.   That's true.

6    Q.   Let's go to paragraph 10 of your

7  declaration on page three.   You say consumers

8  are economically harmed if the information they

9  reline such as product labeling is false or

10  misleading.   Do you see that in the first

11  sentence?

12    A.   Yes.

13    Q.   So that sentence assumes that in order

14  to be harmed, you have to rely on product

15  labeling; is that right?

16    A.   Yes.

17    Q.   And so it follows that if someone does

18  not rely on products labeling, they are not

19  harmed, right?

20    A.   Yes.

21    Q.   And you'd agree generally that if you

22  eat a product, you do get some value from it,

23  right?

24         MR. HERRINGTON:   Object to the

25  form.

Page 32

0401caswell

38

```
 1        A.    How would you define value?
 2        Q.    I'll give you some examples.  You get
 3   the enjoyment of the products, the taste of the
 4   product?
 5        A.    Yes.
 6        Q.    You get certain nutrients from the
 7   product?
 8        A.    Yes.
 9        Q.    You get the feeling of satiety in your
10   appetite, right?
11        A.    Yes.
12        Q.    And those things have some value,
13   right?
14              MR. HERRINGTON:   Object to the
15   form.
16        A.    Yes.
17        Q.    So how when you have someone who in
18   your words is harmed by labels on a product, how
19   do you measure that?  How do you measure how
20   they're harmed?
21        A.    You measure how they're harmed by what
22   their alternative choice could have been.  So
23   are they buying a product that is not -- does
24   not have the quality characteristics or quality
25   attributes that they think it has, in which case
```

39

0401caswell

8      relied on these labels, right?

9          A.   Not these particular labels, but

10     there's much research showing that consumers use

11     labels.

12         Q.   I understand what the research shows,

13     what I'm asking is whether you've seen any

14     survey evidence or any other evidence that

15     specifically indicates that consumers in

16     California read and relied on these labels?

17         A.   I've not seen a specific study related

18     to these particular labels.

19         Q.   And you didn't do such a study in this

20     case, right?

21         A.   I did not.

22         Q.   Okay.  In the last sentence of

23     paragraph 10 you give an example of a consumer

24     who's following a specific diet.  Do you

25     understand -- do you have an understanding of

42

1      whether that is an issue for either of the two

2      named plaintiffs in this case?

3          A.   No.

4          Q.   You don't know specifically if either

5      one of them were on a specific diet, right?

6          A.   I do not.

7          Q.   Okay.  Do you know if any particular

8      consumers were unable to stay on a particular

9      diet because of the labels in this case?

10         A.   No.

11         Q.   And there's no -- you are not aware of

0401caswell

5      Q.   So let's go down to paragraph 21 which
6   begins on page five and goes over into page six.
7   In this paragraph you talk about how a
8   certification system can improve the information
9   that's available to consumers, right?
10     A.   Yes.
11     Q.   And you say it can do that if the
12  certification system is reliable, right?
13     A.   Yes.
14     Q.   Do you have any opinion regarding the
15  reliability of the AHA heart check certification
16  program?
17     A.   I haven't looked at it.  I presume
18  given the organization that it is a reputable
19  certification.
20     Q.   You don't have any reason to believe
21  it's not reliable, right?
22     A.   That's true.
23     Q.   And here reliability until this
24  context, you say it's particularly important for
25  credence attributes because consumers can't

                                              77

1   judge them for themselves, right?
2      A.   Yes.
3      Q.   And so its reliability is an issue
4   because here we are appropriate talking about
5   labeling that converts credence attributes into
6   search attributes, right?
7      A.   Yes.

                  Page 67

0401caswell

```
 5        A.   Yes, my general knowledge from the
 6   past being aware of this claim that it's a paid
 7   endorsement.
 8        Q.   Have you worked on other cases
 9   involving the American heart association heart
10   check mark?
11        A.   I think there were one or two, yes.
12        Q.   Do you remember what those were?
13        A.   I don't off the top of my head.
14        Q.   Were they cases in California?
15        A.   Yes.
16        Q.   Were they cases where you were
17   disclosed as an expert witness?
18        A.   Yes.
19        Q.   And did those cases involve whether
20   the AHA heart check mark was a paid endorsement?
21        A.   I don't recall.
22        Q.   Have you read any of the American
23   heart association's literature on the heart
24   check mark program?
25        A.   No.
```

86

```
 1        Q.   Would it surprise you if the
 2   literature indicates that the payment is for an
 3   administrative fee to cover administrative costs
 4   for the program?
 5        A.   No.
 6        Q.   And it's not your opinion, right, that
 7   you can just give the American heart association
```

Page 75

0401caswell

8   money in exchange for putting this mark on your

9   product regardless of your product's nutrition

10  qualities, right?

11           MR. HERRINGTON:  Object to the

12  form.

13       A.   Right, yes.  So we've addressed that I

14  believe it's a reliable certification.

15       Q.   Which means that there are criteria

16  that your product must meet in order to qualify

17  for it, right?

18       A.   Yes.

19       Q.   Okay.  Do you know if there are any

20  products on the market that say that the

21  American heart association heart check mark is a

22  paid endorsement on the label?

23       A.   I don't know that.

24       Q.   Are you rendering an opinion in this

25  case regarding whether excellent source of whole

                                                87

1   grain or good source of whole grain are

2   misleading statements?

3        A.   My opinion is that they are material

4   to consumers.

5        Q.   So the answer is no, that you are not

6   rendering an opinion on whether those are false

7   and misleading, right?

8        A.   Right, correct.

9        Q.   Okay.  Are you rendering an opinion in

10  this case as to whether the 100 percent whole

11  wheat products contain false and misleading

Page 76

0401caswell

1      A.    No.

2      Q.    And a consumer's needs -- so a

3   consumer's needs would be a factor in

4   determining what part of the labels are material

5   to them, right?

6      A.    It's a factor in which what pieces of

7   information are important to them, but it's

8   material information because it's available to

9   them in making their purchase decision.

10      Q.    So how do you distinguish between

11   what's material and what's important?

12      A.    I don't.

13      Q.    They're the same, right?

14      A.    It's material if it is information

15   that's available to the consumer to be used in

16   evaluating and buying the product.

17      Q.    But you just testified that or correct

18   me if I'm wrong, but you just testified that

19   what is important to someone with respect to a

20   particular label will depend on that consumer's

21   needs for a particular product, right?

22      A.    Yes.

23      Q.    So it's material -- the same question,

24   really, what's material to a consumer will

25   depends on what their needs are for a particular

94

1   product, right?

2      A.    No.  The piece of information is

3   material because it is available on the label,

4   it's available to influence the decision and

Page 82

0401caswell

5  it's material because of its placement and its

6  availability to consumers and it's not --

7  whether it's important to you doesn't make it

8  material or not material.

9      Q.   So materiality has nothing to do with

10  what's actually influencing consumers to buy

11  products?

12      A.   It has to do with the set of

13  information that's available to consumers when

14  they're buying products.

15      Q.   So when you say that a statement on a

16  label is material, you are not rendering an

17  opinion that that statement is actually

18  contributing to people buying the products,

19  right?

20      A.   It's contributing -- I'm saying that

21  it's contributing to the information that they

22  have available to them in deciding whether to

23  buy the product.

24      Q.   But not whether anyone is actually

25  using the information to inform their buying

95

1  decisions?

2      A.   Not whether any particular person is

3  using that piece of information.

4      Q.   Or even groups of people?

5      A.   Well, several particular people would

6  make a group.

7      Q.   Right.  So the answer is no, that

Page 83

0401caswell

12      Q.   I think we just might have talked

13   about the opposite con September.  You talked

14   about an indication of materiality.  I'm more

15   focused on your definition of materiality and

16   how you come to the conclusion that something is

17   material, and I think you explained before that

18   materiality is based on the information that's

19   available to consumers on a label, right?

20      A.   That's correct.

21      Q.   So materiality does not tell us

22   whether an individual or group of individuals

23   actually read and rely on that label?

24      A.   That's correct.

25      Q.   So let's talk about consumer needs a


                                               97


 1   little bit more.  If a person doesn't have a

 2   particular need regarding, you know, the whole

 3   great content of their products, you wouldn't

 4   expect a statement such as good source of whole

 5   grains to factor into that person's decision to

 6   buy the product, would you?

 7      A.   I think that all consumers are

 8   potentially interested in the whole grain status

 9   of the product, so the labeling can communicate

10   to consumers who are particularly interested in

11   that quality attribute, but it can communicate

12   and does communicate to the general consumer,

13   the whole class of consumers.

14      Q.   What I've posed to you is a

                    Page 85

0401caswell

5      Q.   But the label does say that, right?

6      A.   On the back panel or side panel.

7      Q.   It says the product provides 14 grams

8  of whole grain, it says that on the panel right

9  below nutrition facts, right?

10     A.   Yes, on the side or back panel.

11     Q.   And we don't know which one, right?

12     A.   Well, it appears to be the side.

13     Q.   And we can't see based on this photo

14  on the first page, it doesn't appear that this

15  depicts the entire loaf of bread, right?

16     A.   I don't know what's down here, yeah.

17     Q.   Okay.  Are there any statements on

18  this label, going back to that classic

19  100 percent whole wheat label, are there any

20  statements on this label that you would consider

21  to be immaterial?

22     A.   No.

23     Q.   So is it your opinion that every

24  statement that we can see in these photographs

25  is material?

131

1      A.   Yes.

2      Q.   Is it your opinion that all statements

3  on all labels are material?

4      A.   Yes.

5               MR. HERRINGTON:  Object to the

6  form.

7  BY MR. SKAAR:

Page 115

0401caswell

8       Q.   So have you ever -- in any of the

9    cases that you've been disclosed as an expert

10   witness involving food labeling, have you ever

11   concluded that a food label is immaterial?

12       A.   No.

13       Q.   Can you imagine a situation in which

14   you would conclude that a label that appears on

15   a food product is immaterial?

16           MR. HERRINGTON:  Objection.  To

17   clarify soy we have a clear record, when you say

18   label, are you talking about the totality of the

19   label or particular label statement.

20           MR. SKAAR:  I'm talking about the

21   totality of a label.

22           MR. HERRINGTON:  Okay.  You can

23   answer.

24       A.   I have not seen one to date.

25       Q.   You've not seen any statement on a

                                                  132

1    food label that you would consider to be

2    immaterial; is that right?

3        A.   Correct.

4        Q.   Okay.  And it's your opinion that

5    people would compare products that say good or

6    excellent source of whole grain with products

7    that do not, right?

8        A.   Yes.

9        Q.   And, again, that would be products

10   within the same family, similar products, right?

11       A.   Not necessarily.  I mean, when people

                       Page 116

0401caswell

146

1      Q.   Have you ever seen Bimbo Original

2  Toasted Bread?

3      A.   No.

4      Q.   Have you ever seen any photos of it?

5      A.   No.

6      Q.   So you have no idea what it looks

7  like?

8      A.   No.

9      Q.   And you don't know how Bimbo toasted

10  bread is typically used by people, right?

11      A.   I don't.

12      Q.   All right.  How many cases -- in how

13  many cases have you rendered an opinion where

14  the opinion's been disclosed in court on the

15  materiality of food labels?  Do you know?

16      A.   Yes.  24.

17      Q.   Do you maintain a list of such cases

18  somewhere?

19      A.   Yes.

20      Q.   Have you provided it to us in this

21  case?

22      A.   No.

23      Q.   It's not part of your CV, right?

24      A.   No.

25      Q.   Okay.  Did any of those cases involve

147

Page 129

0401caswell

155

1    I'd like to mark that as the next exhibit in the

2    line?

3         A.   Okay.

4              (Exhibit 38 marked

5              for identification)

6         Q.   Dr. Caswell, looking at this now, I

7    see the first four pages appear to be

8    photographs and then the last three pages appear

9    to be a depiction of the labels for Thomas'

10   bagel thins, correct?

11        A.   Yes.

12        Q.   Where did you get the artwork

13   depictions of the labels?

14        A.   From Brian Herrington.

15        Q.   Okay.  Aside from these photographs

16   and artwork that we've just marked as exhibits

17   in this case, have you seen photographs or

18   artwork for any of the other Bimbo products at

19   issue in this case?

20        A.   No.

21        Q.   Okay.  So this is the totality of what

22   you've reviewed specific to the products at

23   issue in this case?

24        A.   Yes.

25        Q.   Other than the work that you've done

156

0401caswell

15 _____

16 _____

17 I have read the foregoing transcript of my

18 deposition, and except for any corrections or

19 changes noted above, I hereby subscribe to the

20 transcript as an accurate record of the

21 statements made by me.

22 Executed this_____day of_____, 2015.

23                 _____

24                     DR. JULIE A. CASWELL

25


                                                        161


1 COMMONWEALTH OF MASSACHUSETTS)

2 SUFFOLK, SS.                )

3

4       I, Daria L. Romano, RPR, CRR and Notary

5 Public in and for the Commonwealth of

6 Massachusetts, do hereby certify that there came

7 before me on the 1st day of April, 2015, at 9:54

8 a.m., the person hereinbefore named was duly

9 sworn by me and that such deposition is a true

10 record of the testimony given by the witness.

11       I further certify that I am neither related

12 to nor employed by any of the parties or counsel

13 to this action, nor am I financially interested

14 in the outcome of this action.

15       In witness whereof, I have hereunto set my

16 hand and seal this    day of April, 2015.

17

18

0401caswell

19                  _____

20                  Notary Public

21                  My Commission Expires

22                  February 20, 2020

23

24

25

# EXHIBIT D

# Certification Mark License Agreement
# Food Products

This Agreement is made between the American Heart Association. Inc. (hereinafter "AHA"), a New York not-for-profit corporation having its principal offices at 7272 Greenville Avenue. Dallas, Texas 75231, and BBU, Inc., and its US subsidiaries (hereinafter "Company"), a corporation organized under the laws of the State of Pennsylvania, whose principal place of business is 255 Business Center Drive, Horsham, Pennsylvania 19044.

WHEREAS, the AHA is a non-profit organization dedicated to the reduction of disability and death from cardiovascular disease and stroke; and

WHEREAS, Company desires to display on certain of its products and/or their packaging and related materials that such products comply with an applicable standard, guideline or criteria of the AHA.

NOW THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the parties agree as follows:

1    Term: This Agreement shall begin on, January 15, 2010, ("Effective Date") and shall continue in effect for a term of one year or until twelve (12) months following the expiration of all Product Schedule(s) executed under the terms of this Agreement, whichever later occurs, unless terminated earlier as set out in Section 9. On the Effective Date of this Agreement, any prior Certification Mark License Agreement or Retailer Agreement that may still be in effect are hereby terminated and all Product Schedules in effect under such prior agreement shall continue in effect and be subject to the terms and conditions of this Agreement.

2    Definitions:

   2.1  "Certification Mark" is defined as the American Heart Association's heart-check certification mark which is registered with the U.S. Patent & Trademark Office, registration no. 2,102,356, which is used to indicate that a product complies with an applicable AHA standard, guideline or criteria.

   2.2  "Food Certification Program Application Packet" or "program Application Packet" is defined as the collection of information, forms and application materials provided by the AHA to food companies to advise them of the AHA's Food Certification Program requirements relating to nutritional criteria, fees, graphic standards and other requirements.

   2.3  "Product" is defined as a specific food whose Product Name, Flavor, Nutrition Facts label, and/or Ingredient List combination represents product differentiation or uniqueness. Products with differences in Brand Name or Form only, where the Nutrition Facts label and the Ingredient List are the same, may qualify for the Branded Commodities or Brand/Form Variation Only rates.

   2.4  "Product Schedule(s)" are agreements, in the form of Attachment A, which identify the Product(s) on which Company may display the Certification Mark pursuant to paragraph 4.2 of this Agreement. Each executed Product Schedule forms a separate

AHA-BIMBO-00000258

agreement, with respect to the Product(s) listed therein, and is subject to the terms and conditions of this Agreement, lists the specific standard, guidelines or criteria which the Product(s) must meet, and any additional terms applicable to such Product(s).

3   Food Certification Program Requirements:  In addition to the requirements set out in this Agreement, Company and each of the Product(s) must comply with the AHA's Corporate Relations Policy, and with the nutritional criteria, fee, and graphic standards requirements set out in the Program Application Packet in effect when the Product Schedule for such product is signed.  The Corporate Relations Policy, nutritional criteria, fee and graphic standards requirements are incorporated by reference into the Product Schedule, and such requirements may be amended by the AHA at any time.  The AHA will give Company one hundred and twenty (120) calendar days' written notice of any change to these requirements.  Such requirements include, but are not limited to, the following:

3.1   The Product(s) must comply with nutritional criteria.

3.2   All Product packaging and promotional materials, including all package sizes and UPC and all revisions thereto, must be reviewed and approved by the AHA as required under this Agreement whether or not the heart check mark is displayed on the package.

3.3   Company must submit to the AHA, for its review and approval, revised nutritional values for each Product that is reformulated.

3.4   Company acknowledges and agrees that it is responsible for identifying the correct FDA or USDA food subcategory for each Product, or the main dish or meal designation, if applicable, and that the subcategory or designation will determine the AHA nutrition criteria to be applied to the Product.  The AHA reserves the right to terminate the Product Schedule, or require Company to resubmit a Product(s), and with all applicable fees should its subcategory or designation be found to be in error.

4   Certification Mark and License:

4.1   Company acknowledges the AHA's ownership of the Certification Mark.  No title to or ownership of the Certification Mark, or any part thereof, is hereby transferred to Company.  Company agrees that all uses of the Certification Mark shall inure to the benefit of the AHA and that Company shall acquire no rights, interests, or goodwill in the Certification Mark.  Company agrees to not contest the validity of the AHA's rights and interests in the Certification Mark, including after the termination of this Agreement.

4.2   Use of the Certification Mark:  The AHA hereby grants to Company a limited, non-exclusive, non-transferable license, only within the United States and its Territories and Possessions, to display the Certification Mark on the packaging of the Product(s) listed on a properly executed Product Schedule (a sample of the Product Schedule form is attached hereto as Attachment A) only so long as the Product(s) is in compliance with the applicable AHA nutritional criteria as set out in the then-current Program Application Packet, and to conduct promotions in radio, television, magazine and newspaper advertisements, billboards, direct mail, company-generated coupons, trade or business-to-business promotions, consumer brochures, point-of-purchase promotions, Web sites, e-mails, public relations and press materials, and other media customarily used to reach consumers,  excluding sweepstakes, contests, fund-raising and games of chance, featuring the AHA Certification Mark with those Product(s) listed

AHA-BIMBO-00000259

on the Product Schedule(s). The Certification Mark cannot be integrated into an educational message. The license for each Product shall be effective for the one (1) year period (twelve consecutive months) set out in the Product Schedule for that Product. Upon termination or expiration of the license, or upon the Product(s) ceasing to comply with the applicable AHA standard, guideline or criteria, Company shall cease any and all use of the Certification Mark. Provided however that, so long as Company's use of the Certification Mark meets the requirements of this Agreement, and the Product is in compliance with the applicable standard, guideline or criteria in effect immediately prior to termination, then Company may continue to distribute such Product bearing the Certification Mark that has already been packaged and warehoused, for a period of one hundred twenty (120) calendar days following the date of termination of the license. However, advertising and promotional materials bearing the Certification Mark may not be distributed, air or appear more than sixty (60) calendar days following the date of termination or expiration of the license. If Company makes any use of the Certification Mark outside of the allowed period(s), then in addition to all other remedies allowed under this Agreement, Company shall be obligated to pay $5,000 per month per infringing product, as liquidated damage and not as a penalty.

4.3 Any and all uses of the Certification Mark must conform to the "Packaging, Advertising, Promotions and Graphic Standards for the American Heart Association Food Certification Program" (hereinafter "Graphic Standards"), which are incorporated herein by reference. The Graphic Standards may be amended by the AHA from time to time and will become effective as to Company (i) upon one hundred twenty (120) calendar days written notice to Company, or (ii) when Company submits new promotions or packaging materials for review, whichever comes first.

4.4 Additional rules for grocery retailer print ads. These rules apply only to print newspaper ads and print newspaper circulars issued by retail grocers for Product(s):

4.4.1 Company will develop an ad slick, using the Graphic Standards that employs the Certification Mark in relation to the Product. The artwork is complete and boxed, so that the retailer may not use an entire unit of artwork and may not redesign or modify the artwork or text in the retail ad. The Certification Mark may not be floated on the ad slick – it must be incorporated with the Product elements, boxed and used in its entirety. Company must state clearly on the ad slick that an entire piece of art must be used as a unit and retailer cannot change copy or artwork. Company must obtain the AHA's written approval of the ad slick prior to distribution to retail grocers. Company may authorize retail grocers to issue print newspaper ads or print newspaper circulars that match the ad slick, so long as they do not redesign or modify the artwork or text. Company must state clearly on the ad slick that an entire piece of art must be used as a unit and the retail grocer cannot change copy or artwork.

4.4.2 Company will be fully responsible for any misuse of the Certification Mark by any third-party advertisers, including but not limited to retail grocers. If a retail grocer has violated any of these guidelines, including any applicable guidelines set out in the Program Application Packet, Company will revoke the retailer's authorization to issue print newspaper ads or issue print newspaper circulars based on the ad slick.

AHA-BIMBO-00000260

4.4.3 Company shall provide the AHA with tear sheets of all print ads that include the Certification Mark within thirty (30) calendar days following the date on which the ad was run.

5    Review and Approval by the AHA:  The parties acknowledge and agree that the placement and size of the Certification Mark, placement and size of text, use of recipes, as well as other matters regarding information conveyed to the public in conjunction with the Certification Mark and its graphics, must be consistent with the Graphic Standards and shall be subject to the prior review and written approval of the AHA.  Company shall not proceed with any printing or distribution of packaging containing the Certification Mark until approval by the AHA of the final text and graphics has been given in writing and Company's materials are stamped "Final Approval" by the AHA.  All other materials, including but not limited to Promotional Materials, must also be approved by the AHA prior to use. The AHA must review, prior to distribution, (i) any materials that reference a company's participation in the AHA Food Certification Program, whether or not the Certification Mark is used and (ii) all package sizes with UPC of certified Products, whether or not the Certification Mark is displayed on the package or there is a reference to the Food Certification Program.

The AHA may give or withhold its approval under this Agreement in its sole and unfettered discretion, and based upon the AHA's science or positions on science, education and public health.  Company acknowledges that the AHA shall have no liability to Company for costs and expenses resulting from the AHA's withholding of approval, or from its conditional approval. AHA's review of Company's materials does not relieve Company of Company's sole responsibility and liability for Company's advertising. All advertising prepared by Company in connection with this Agreement shall be in full compliance with Federal, state and local laws and regulations relating to the advertising, marketing and promotion of Company's products and shall in no respect be false, deceptive or misleading. If any such advertising, marketing or promotion should encounter any legal challenge or inquiry, Company shall defend the matter in question and shall pay any and all losses, liabilities, costs, actions, claims and other obligations, including attorneys' fees.

6    Costs/Fees:

6.1 Company shall be responsible for any and all of its costs associated with the subject matter of this Agreement, including but not limited to the cost associated with testing requirements and representative sample uses of the Certification Mark and their graphics for the AHA's review.

6.2 Fees:  Company shall pay a non-refundable annual fee per Product as set forth in the Fee Schedule(s) found in the Food Certification Program Application Packet.  The Fee Schedule(s) shall include, but not be limited to, fees for both new Product(s) and renewals.  These fees cover the AHA's costs of operating and promoting the Food Certification Program.  The AHA reserves the right to amend the Fee Schedule(s) described herein upon one hundred and twenty (120) calendar day's written notice to Company. All fees must be paid in advance of Product approval and execution of the applicable Product Schedule.  For a renewal Product(s), payment must be made by the due date stated on the Renewal Invoice.

7    Reservation of Rights:  The AHA reserves all rights not expressly granted in this Agreement.

8    Warranties, Indemnification and Insurance:

8.1 Company hereby represents and warrants to the AHA that (a) the display on the Product(s) and/or promotional materials of the Certification Mark and (b) the processing, packaging, labeling, distribution and sale of such Product(s), comply with all applicable federal, state and local laws, regulations and government agency rules, including, but not limited to, food labeling laws. The foregoing warranties shall be deemed made continuously during the term of this Agreement.

8.2 Company hereby represents and warrants to the AHA that it is not a tobacco company, a tobacco company corporate subsidiary or parent. "Subsidiary" and "parent" are defined for purposes of this paragraph as an entity in which there exists a 5% or greater ownership by, or of, a tobacco company.

8.3 Company hereby agrees to indemnify and hold harmless the AHA from and against any and all suits, actions, losses, damages, claims, or liability of any character, type, or description, including without limitation all expenses of settlement, litigation, court costs, and attorney's fees (collectively, "Liabilities"), directly or indirectly arising out of, or occasioned by, (a) Company's use or display of the Certification Mark, (b) any of the other activities contemplated by this Agreement, (c) the Product(s), their packaging, labeling, advertisements, related materials and activities, and including, without limitation, their design, formulation, manufacture, marketing and/or distribution, regardless of whether such were permitted or contemplated under this Agreement or approved by the AHA, (d) violations or alleged violations of applicable food labeling laws, regulations and government agency rules in connection with the use of the AHA's name or Certification Mark, and (e) any breach of Company's obligations, representations or warranties hereunder. Company further agrees to defend, at its own expense and on behalf of the AHA, any such Liabilities. For purposes of this paragraph, the parties indemnified shall include the AHA, its officers, directors, members, agents and employees.

8.4 Company shall obtain and maintain at its expense, commencing at least thirty (30) calendar days prior to the date of commencement of distribution of any Product bearing the Certification Mark, insurance designating the AHA as an additional insured party from a qualified insurance carrier in the amount of $5,000,000 for general liability, products liability and personal injury. This policy shall specify that it may not be modified or canceled by the insurer, except after thirty (30) calendar day's prior written notice by the insurer to the AHA. Prior to selling or distributing any Product bearing the Certification Mark, upon request, Company shall provide the AHA with a certificate of insurance. For purposes of this paragraph, the parties insured shall include the AHA, its officers, directors, members, agents and employees.

8.5 The AHA indemnifies Company and undertakes to hold it harmless against any final judgments arising from claims or suits arising from an infringement of any third party's rights within the United States in the Certification Mark if used by Company in a manner authorized hereunder, provided Company has given the AHA prompt written notice of all such claims or suits. The AHA shall have the option to undertake and control the defense and settlement of any such claim or suit and if, following reasonable notice and opportunity, the AHA fails to undertake such defense shall reimburse Company for reasonable counsel fees incurred by Company in defense of such a suit. No settlement of any such claim or suit may be made without the AHA's prior written consent.

8.6 **THE AHA'S LIABILITY FOR ANY AND ALL CLAIMS ARISING UNDER THIS AGREEMENT, UNDER ANY LEGAL THEORY, SHALL NOT EXCEED THE AMOUNT**

**OF MONIES, IF ANY, PAID BY COMPANY TO THE AHA DURING THE TWELVE (12) MONTHS PERIOD PROCEEDING THE DATE ON WHICH A CLAIM IS MADE. UNDER NO CIRCUMSTANCES WILL THE AHA BE LIABLE FOR ANY COSTS, DAMAGES, LIABILITY OR EXPENSES ARISING FROM COMPANY'S PRINTING OF PACKAGING, PRODUCING ADVERTISING, OR PROMOTIONAL MATERIALS, WHETHER OR NOT THE AHA APPROVED SUCH MATERIALS.**

9  Termination:

    9.1  AHA may terminate this Agreement and/or individual Product, or Product Schedules by written notice to Company:

        A.  Immediately, upon the breach of any term, condition, representation or warranty of this Agreement by Company, which is not cured within thirty (30) calendar days following receipt of written notice of the breach from AHA.

        B.  Immediately upon written notice by the AHA, without requirement for any cure period, if any three (3) test average of individual Product samples do not comply with the applicable AHA nutritional standard, guideline or criteria, and the discrepancy is in excess of twenty percent (20%) for any individual nutritional element.

        C.  Upon ninety (90) calendar days' prior written notice to Company, if any three (3) test average of individual Product samples do not comply with the applicable AHA nutritional standard, guideline or criteria and the discrepancy is equal to or less than twenty percent (20%) for any individual nutritional element.

        D.  Upon ninety (90) calendar days' prior written notice to Company, if a substantial portion (5% or more) of Company's voting common stock (or other equity ownership interest) is purchased or otherwise directly or indirectly acquired by a tobacco company or a tobacco company subsidiary, or if Company purchases, otherwise directly or indirectly acquires or otherwise becomes the owner of a substantial portion (5% or more) of the voting common stock (or other equity ownership interest) in a tobacco company.

        E.  Upon one hundred twenty (120) calendar days' prior written notice to Company in the event that the AHA elects to stop certifying products certified under the standard, guideline or criteria applicable to the Product.

    9.2  The AHA may terminate individual Products and/or Product Schedules at any time upon thirty (30) calendar days' prior written notice to Company if the AHA reasonably and in good faith determines that (i) the Product(s) is materially deficient in quality or packaged in a misleading or deceptive manner; or (ii) the Product(s) no longer complies with the applicable AHA standard, guideline or criteria.  Following termination under this subparagraph, Company may not make continued distributions under the provisions of subparagraph 4.2.

    9.3  The AHA may terminate individual Products and/or Product Schedules immediately, without further notice, if the Product(s) do not comply with revised nutritional criteria. During the term of this Agreement, the AHA will provide Food Certification Program Product participants with one hundred and twenty (120) calendar day's written notice of changes to nutritional criteria.  Upon expiration of the one hundred and twenty (120) calendar days, Company shall have three hundred and sixty (360) calendar days to

AHA-BIMBO-00000263

bring non-compliant certified Products into compliance with the changed nutritional criteria. Products submitted for certification after the mailing date of the notice letter, must comply with the changed nutritional criteria at the time of submission.

10   Miscellaneous Provisions:

10.1 Notices: Company shall send copies of all notices to the AHA, by either, fax, overnight delivery or certified mail, return receipt requested, to it as follows: AMERICAN HEART ASSOCIATION, INC., 7272 Greenville Avenue, Dallas, Texas 75231, Attention: Certification Manager (or such other person as the AHA may designate in writing). The AHA shall send copies of all notices to Company, postage prepaid, to its principal place of business (or such other business address that Company may designate to the AHA in writing).

10.2 Food Safety: Company shall promptly notify the AHA of any report of contamination, poisoning or any other food safety issue involving any certified Product(s).

10.3 Force Majeure: Neither party shall be in default by reason of any failure of its performance under this agreement, if such failure results, directly or indirectly, from fire, explosion, strike, freight embargo, act of God, or of the public enemy, war, civil disturbance, terrorism, act of any government, de jure or de facto, or agency or official thereof, labor shortage, transportation contingencies, unusually severe weather, quarantine restrictions, epidemic, or catastrophe. Any schedule or time for performance required under this Agreement shall be extended as necessary to overcome the effects of such force majeure.

10.4 Severability: If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other part or provision of this Agreement.

10.5 Assignment: Neither party may assign or transfer its rights or obligations under this Agreement without the prior written agreement of the other party.

10.6 Waiver: No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, shall be deemed to be, or shall constitute, a waiver of any other provision hereof; nor shall such waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

10.7 Parties Named: Nothing in this Agreement, whether express or implied, is intended to confer upon any person, other than the parties identified herein, any rights or remedies.

10.8 Applicable Law: This Agreement shall be performed in Dallas, Dallas County, Texas and governed by the laws of the State of Texas without regard to its conflict of laws provisions.

10.9 No Joint Venture: Company and the AHA are neither partners nor joint venturers hereunder, and neither shall have any power to obligate or bind the other to third parties in any manner whatsoever.

10.10 Approvals: No approval by the AHA under this Agreement shall operate or be construed as an acknowledgment by the AHA of Company's compliance with any/all applicable federal, state and local laws, regulations and government agency rules; nor

is such approval a guaranty or warranty on the part of the AHA as to the quality or character of the Product to which such approval relates. No such approval shall be deemed an authorization of any liability for indebtedness or claims of damage whatsoever by any third party against the AHA.

10.11 Entirety: This Agreement, along with properly executed Product Schedule(s), constitute the sale and only agreement of the parties and supersedes any prior understandings or written or oral agreements between the parties respecting this subject matter. In the event of any conflict between the terms of this Agreement and the terms of any Product Schedule or other attachment, the terms of this Agreement shall prevail. This Agreement may only be modified by a written amendment signed by authorized representatives of each party.

10.12 Survival; Subparagraphs 4.1, 8.3, and any other terms and conditions required for the interpretation of this Agreement or necessary for the full observation and performance by each party hereto, shall survive termination of this Agreement.

10.13 Company will conduct not less than four (4) promotions each year that highlight the heart-check mark.

AGREED:

AMERICAN HEART ASSOCIATION, INC.

By: _Dennis Milne_
Printed Name: Dennis Milne
Title: Director, Food Certification Program
Date: 4/21/10

BBU, INC.

By: _Anne K Bessey_
Printed Name: Anne K Bessey
Title: VP Business Development
Date: 4/8/10

Attachments:

A: Sample Product Schedule

EXHIBIT E

Page 1

# American Heart Association — Product Compliance System

**Product / Contact:** Thomas' Plain Bagel Thins
**Company / Mfr:** BBU, Inc.
**Product Status:** Pending
**Reason:** Pending - New Product Contact Pending
**Guideline:** FDA_STD_New_Trans
**Product Category / SubCategory:** BR-DB   **SubCategory Code:** bread
**Date Activated:**
**Date De-activated:**
**Review Date:** 3/17/2011 4:39
**UPC:** 048121135454
**Duplicate UPC?**
**Secondary UPC Product:** No
**Pass Test?** ☑  Yes, if checked

## Fats

| | | |
|---|---|---|
| A. 1. Total Fat (grams) (rounded): | 1.00 | |
| 2. Total Fat (grams) (actual): | -2.0000 | |
| 3. Total Fat (tested value): | 1.0000 | |
| B. 1. Sat Fat (grams) (rounded): | 0.00 | |
| 2. Sat Fat (grams) (actual): | -2.0000 | |
| 3. Sat Fat (tested value): | 0.0000 | |
| C. 1. Trans Fat (grams) (rounded): | 0.00 | |
| 2. Trans Fat (grams) (actual): | 0.0000 | |
| 3. Trans Fat (tested value): | 0.0000 | |
| D. Sodium (mg) (rounded): | 210.00 | |
| Sodium (mg) (actual): | -2.0000 | |
| Sodium (mg) (tested value): | 210.00 | |
| E. Mono Unsat. Fat (grams): | 0.00 | |
| F. Poly Unsat. Fat (grams): | 0.00 | |
| Cholesterol (mg): | 0.00 | |

## Addl Nutritional Info

| | |
|---|---|
| Serving Size: | 46.00 |
| Unit of Measurement: | Grams |
| Source of U of M: | Label |
| Total Calories (kcal): | 110.00 |
| Potassium (mg): | -2.00 |

## Jelly Bean Nutrients

| | |
|---|---|
| Vitamin A (%): | 0.00 |
| Vitamin C (%): | 0.00 |
| Calcium (%): | 4.00 |
| Iron (%): | 8.00 |
| Fiber (%): | 16.00 |
| Protein (%): | -2.00 |
| Protein (grams): | 4.00 |

## Carbohydrates

| | |
|---|---|
| Total CHO (grams): | 25.00 |
| Sugars (grams): | 3.00 |
| Added Sugars (g): | -1.00 |
| Natural Sugars (g): | -1.00 |
| Fiber (grams): | 4.00 |
| Soluable Fiber (grams): | -2.00 |

## Lab Analysis Info

**Lab Analysis Needed?** No
**Lab Analysis Received / Date:**

Marketing Results | History | Activities | Groups/Companies | FDA Certification Variances | Whole Grain / Sol. Fiber | Lab Results | UPC | Secondary Contacts | Contact Info | Documents | System Info | Web Info
Notes | Invoices | Payments Received

## RACC Adjusted Values: Main Nutritional Components

| | |
|---|---|
| RACC: | 50.00 |
| Adjusted Total Fat: | 1.09 |
| Adjusted Saturated Fat: | 0.00 |
| Adjusted Trans Fat (S.S.): | 0.00 |
| Adjusted Trans Fat (RACC): | 0.00 |
| Adjusted Sodium: | 228.26 |
| Adjusted Cholesterol: | 0.00 |

## Certification Test Variances

| | |
|---|---|
| Variance Total Fat: | -1.96 |
| Variance Saturated Fat: | -1.05 |
| Variance Trans Fat: | -0.50 |
| Variance Trans Fat at RACC: | -0.50 |
| Variance Sodium: | -251.74 |
| Variance Carbohydrate: | |
| Variance Cholesterol: | -20.05 |

## RACC Adjusted Values: Jelly Bean Components

| | |
|---|---|
| Adjusted Vitamin A: | 0.00 |
| Adjusted Vitamin C: | 0.00 |
| Adjusted Iron: | 8.70 |
| Adjusted Fiber: | 17.39 |
| Adjusted Calcium: | 4.35 |
| Adjusted Protein: | |

## Certification Test Variances

| | |
|---|---|
| Variance Vitamin A: | -9.95 |
| Variance Vitamin C: | -9.95 |
| Variance Iron: | -1.25 |
| Variance Fiber: | 7.44 |
| Variance Calcium: | -5.60 |
| Variance Protein: | |

Page 1

CONFIDENTIAL

AHA-BIMBO-00000476

EXHIBIT F

1

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE NORTHERN DISTRICT OF CALIFORNIA

4       SAN FRANCISCO DIVISION

5   --------------------------------x

6   ALEX ANG and LYNN STREIT,

7   individually and on behalf of all

8   others similarly situated,

9                       Plaintiffs,

10

11      -against-        13 Civ. 1196 (WHO)

12

13  BIMBO BAKERIES, INC.,

14                      Defendant.

15  --------------------------------x

16                      March 11, 2015

17                      10:07 a.m.

18

19          Deposition of DONALD M. MAY, taken by

20      the defendant, pursuant to Notice, at the

21      offices of Hogan Lovells US LLP, 875 Third

22      Avenue, New York, New York, before David

23      Levy, CSR, RPR, CLR, a Notary Public of the

24      State of New York.

25

                        1

DONALD M. MAY

BARKLEY
Court Reporters

```
 1

 2    A P P E A R A N C E S:

 3

 4         THE FLEISCHMAN LAW FIRM, PLLC

 5         Attorneys for Plaintiffs

 6              565 Fifth Avenue, Seventh Floor

 7              New York, New York 10017

 8              (212) 880-9571

 9    BY:    BRADLEY F. SILVERMAN, ESQ.

10              bsilverman@fleischmanlaw.com

11

12         HOGAN LOVELLS US LLP

13         Attorneys for Defendant

14              3 Embarcadero Center, Suite 1500

15              San Francisco, California 94111

16              (415) 374-2300

17    BY:    MARK C. GOODMAN, ESQ.

18              mark.goodman@hoganlovells.com

19

20

21

22

23

24

25
```

2

BARKLEY
Court Reporters

```
 1                        May
 2   before you looked at the website?
 3        A.    The Thomas's, Sara Lee, some of the
 4   bread products.
 5        Q.    Were you familiar with those products
 6   because you've purchased them?
 7              MR. SILVERMAN:  Objection.
 8              You can answer the question.
 9        A.    In some cases, yes.
10        Q.    In which cases?
11        A.    Well, I guess the Thomas's I've
12   purchased, and I should add one more there,
13   Entenmann's.  It's been a while, but I purchased
14   those in the past.
15        Q.    Do you know why you purchased the
16   Thomas's products?
17              MR. SILVERMAN:  Objection.
18              You can answer the question.
19        A.    Most recently, it's because what my
20   wife buys for -- for the kids.  So she's -- she'll
21   send me out sometimes.
22        Q.    With a list?
23        A.    Yes.
24        Q.    Do you know why your wife puts
25   Thomas's on her grocery list?
```

25

DONALD M. MAY

BARKLEY
Court Reporters

```
 1                        May

 2            MR. SILVERMAN:  Objection.

 3            If you know the answer.

 4            MR. GOODMAN:  That's why I asked him

 5       if he knows.

 6       A.    She doesn't put it on the list.

 7  She'll put bagels, but, you know, from seeing them

 8  there, I've known, you know, seeing them in the

 9  past, that those are the ones I figured out was

10  Thomas's.

11       Q.    Those are the ones she wanted you to

12  buy?

13       A.    Correct.

14       Q.    Do you know why she wanted you to buy

15  those bagels?  That's my question.

16            MR. SILVERMAN:  Objection.  He's not a

17       fact witness.  He's an expert witness.

18            MR. GOODMAN:  I know what he is.

19       Thanks.

20       A.    Not specifically, no.

21       Q.    Has your wife ever told you to buy

22  Thomas's bagels?

23            MR. SILVERMAN:  Objection.

24            You can answer the question.

25       A.    My recollection is that she doesn't
```

26

DONALD M. MAY

BARKLEY
Court Reporters

```
1                        May
2        Q.    Sure.  What data would you consult in
3   order to determine whether there was a negative
4   impact for the "hundred percent whole wheat"
5   claim?
6        A.    Again, we're measuring the impact,
7   positive or negative, based on the data of, you
8   know, when the labels came on and off, when -- the
9   change in the products over time.  So we would be
10  able to identify whether that claim is zero,
11  statistically positive, or if it really was
12  negative.
13       Q.    Dr. May, if the product was always
14  called "a hundred percent whole wheat" during its
15  entire existence, how would you determine whether
16  any consumers did not buy the product because it
17  was called "a hundred percent whole wheat"?
18            MR. SILVERMAN:  Objection.
19       A.    I'm not sure why I would want to do
20  that.  Again, my -- the question I'm trying to
21  answer is, what incremental or proportion of the
22  total value of the product price is related to the
23  "hundred percent whole wheat" claim.
24       Q.    And you wouldn't look at whether
25  consumers would not buy a product because of that
```

97

DONALD M. MAY

BARKLEY
Court Reporters

```
 1                    May
 2   a legal standpoint, has no value."
 3            How do you have that understanding?
 4       A.    That's what I was informed by -- by
 5   counsel.
 6       Q.    And again, Dr. May, as a matter of
 7   economic principles, food has some value, correct?
 8            MR. SILVERMAN:  Objection.
 9       A.    Um -- yes.  To some -- yes.
10   Definitely, food has value.  I wouldn't argue with
11   that.
12       Q.    Further on in paragraph 19, toward the
13   middle of that paragraph, it says, "These
14   third-party vendors include Information Resources,
15   Inc. (IRI), and Nielsen, who provide point-of-sale
16   retail price data."
17            Do you know whether that, or those
18   data give you the actual price paid for the
19   product?
20       A.    My understanding is that they survey
21   and derive the total revenues and the units and
22   the size and then you would derive the price per
23   ounce or whatever unit you're looking at based on
24   that.
25       Q.    My question, Dr. May, is, do you know
```

102

DONALD M. MAY

BARKLEY
Court Reporters

```
 1                         May
 2   price, which is sort of capturing the price growth
 3   rate.  And therefore, the coefficients in the
 4   regression are capturing the percentage of that
 5   price within that.
 6              So I guess the shortest answer is, it's
 7   mathematically derived by the way you construct
 8   the model.  And it's -- you know, I cited other
 9   studies that had been scientifically approved that
10   had, sort of had done the same methodology.
11        Q.    Have you gone so far as to construct a
12   model in this case?
13              MR. SILVERMAN:  Objection.
14        A.    No.  Again, I would look at the data.
15   I need the data first.
16        Q.    So at this point, you're not sure how
17   the sales data would allow you to calculate the
18   percentage of product value attributable to
19   illegal claims, correct?
20              MR. SILVERMAN:  Objection.
21        A.    No, I know how it would.  I don't know
22   whether I'm going to find anything there, though.
23   It might show me that there was no value for this
24   claim.
25        Q.    I mean, you say you know how you would
```

205

DONALD M. MAY

BARKLEY
Court Reporters

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK       )

4                              : ss.

5    COUNTY OF KINGS          )

6

7              I, DAVID LEVY, CSR, a Shorthand

8        Reporter and Notary Public within and for

9        the State of New York, do hereby certify:

10             That DONALD MAY, the witness

11       whose deposition is hereinbefore set forth,

12       was duly sworn by me and that such

13       deposition is a true record of the testimony

14       given by the witness.

15             I further certify that I am not

16       related to any of the parties to this action

17       by blood or marriage, and that I am in no

18       way interested in the outcome of this

19       matter.

20             IN WITNESS WHEREOF, I have hereunto

21       set my hand this 25th day of March 2015.

22

23

24             DAVID LEVY, CSR, RPR, CLR

25

238

DONALD M. MAY

BARKLEY
Court Reporters