1   Mark C. Goodman (Bar No. 154692)
    Ethan A. Miller (Bar No. 155965)
2   David W. Skaar (Bar No. 265377)
    HOGAN LOVELLS US LLP
3   3 Embarcadero Center, Suite 1500
    San Francisco, CA  94111
4   Telephone:   (415) 374-2300
    Facsimile:   (415) 374-2499
5   mark.goodman@hoganlovells.com
    ethan.miller@hoganlovells.com
6   david.skaar@hoganlovells.com

7

8   Attorneys for Defendant
    BIMBO BAKERIES USA, INC.

9

10                  UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14

15   ALEX ANG and LYNN STREIT, individually      Case No. 13 Civ. 1196 HSG (NC)
     and on behalf of all others similarly situated,
16                                                **EXPERT DECLARATION OF**
                  Plaintiffs,                     **DOMINIQUE M. HANSSENS, PH.D,**
17                                                **IN SUPPORT OF DEFENDANT'S**
           v.                                     **OPPOSITION TO PLAINTIFFS'**
18                                                **MOTION FOR CLASS**
     BIMBO BAKERIES USA, INC.,                    **CERTIFICATION**
19
                  Defendant.
20

21

22

23

24

25

26

27

28

\\LA - 064999/000013 - 1141881 v1

**Table of Contents**

I.      Qualifications ................................................................................................ 1

II.     Assignment and Materials Relied Upon ............................................... 2

III.    Introduction and Plaintiffs' Allegations ................................................ 3

IV.     Summary of Conclusions ............................................................. 5

V.      Consumers Were Not Uniformly Exposed to Bimbo Bakeries' Allegedly False
        and Misleading Statements during the Class Period ................................ 7

        A.      The Labels of Some of the Products At Issue Changed so They Did Not
                Contain the Allegedly False and Misleading Statements throughout the Entire
                Class Period .......................................................................................... 7

                1.      The Heart-Check Class ................................................. 9

                2.      The Whole Grain Class ................................................. 9

                3.      The Added Coloring Class ........................................ 10

                4.      The 100% Whole Wheat Class ................................... 11

                5.      Conclusion ................................................................ 12

        B.      Consumers Who Read the Ingredient List of the Products At Issue Would
                Have Known About the Presence of Soy Flour or Added Coloring ................... 13

        C.      Placement of the Allegedly False and Misleading Statements ................ 13

        D.      Availability of the Products At Issue in California ................................... 14

VI.     Many Factors Affect Consumers' Purchase Decisions and There Is Heterogeneity
        in the Factors Affecting Purchase Decisions across Individual Consumers ......... 16

VII.    The Evidence Does Not Support the Uniform Materiality of the Allegedly False
        and Misleading Statements on the Labels of the Products At Issue ..................... 26

        A.      Dr. Van Liere's Survey Did Not Find a Substantial Difference between
                Test and Control Groups as to Whether Certain Ingredients and Statements Affect
                Consumer Purchase Intentions .............................................................. 26

                1.      Oroweat Survey ........................................................ 27

                2.      Sara Lee Survey ........................................................ 28

                3.      Thomas' Survey ........................................................ 29

        B.      Plaintiff's Expert Dr. Caswell Has Not Shown that the Allegedly False and
                Misleading Statements on the Labels of the Products at Issue Were Material to the
                Putative Class Members' Purchase Decisions .......................................... 30

VIII.   Conclusion ............................................................................................. 33

## I.    Qualifications

1.      I am the Bud Knapp Distinguished Professor of Marketing at the UCLA Anderson School of Management, in Los Angeles, California, where I have served on the faculty since 1977.  I received my Licentiate from the University of Antwerp in Applied Economics and received my M.S. and Ph.D. degrees in Management from Purdue University.  At UCLA I have taught a variety of marketing courses, including Elements of Marketing, Marketing Strategy & Planning, and Customer Information Strategy.  I have received awards for distinguished teaching in the MBA and Executive MBA programs, including the UCLA Anderson School's Neidorf "Decade" teaching award.

2.      My research focuses on strategic marketing problems, to which I apply expertise in data-analytic methods such as econometrics and time-series analysis.  I am the co-author of "Market Response Models: Econometric and Time Series Analysis" and various book chapters.  I have served as an area editor for *Marketing Science* and an associate editor for *Management Science* and the *Journal of Marketing Research*.  My papers have appeared in the leading academic and professional journals in marketing, economics and statistics.  Five of these articles have won Best Paper awards, in *Marketing Science* (1995, 2001, 2002), *Journal of Marketing Research* (1999, 2007) and *Journal of Marketing* (2010), and eight were award finalists.

3.      From July 2005 to June 2007 I served as the Executive Director of the Marketing Science Institute in Cambridge, Massachusetts.  In 2007, I was the recipient of the Churchill Lifetime Achievement Award of the American Marketing Association (AMA), and in 2010 I was elected as a Fellow of the INFORMS Society for Marketing Science. In 2013 I received the AMA Mahajan Award for Career Contributions to Marketing Strategy Research.

4.      I have frequently consulted on marketing issues for companies in a variety of industries such as consumer products, software, entertainment, technology, information services, and retailing.  I am also a founding partner of MarketShare, a global marketing analytics firm headquartered in Los Angeles.  My complete CV is attached as Appendix A.

## II.      Assignment and Materials Relied Upon

5.      I was asked by counsel for Bimbo Bakeries to opine on the following issues based on my expertise in marketing and my review of materials in connection with this matter:

    a.  Evaluate whether consumers in the four proposed classes were uniformly exposed to the following statements ("alleged false and misleading statements") on the labels of Bimbo Bakeries' products at issue:[1]

        i.  "Excellent Source'" or "Good Source" of whole grains;[2]

        ii.  "Bread," for bread products that contain added coloring;[3]

        iii.  "100% Whole Wheat," for products containing non-whole wheat flour;[4]

        iv.  A "Heart-Check Mark" certification from the American Heart Association.[5]

    b.  Describe the various factors that may be considered by different consumers when deciding whether or not to purchase a food or beverage product, including the Bimbo Bakeries' products that plaintiffs allege contain false and misleading statements.

    c.  Evaluate whether the allegedly false and misleading statements had a material effect on consumer purchase decisions.  For this purpose I have reviewed the declaration of Dr. Kent Van Liere,[6] who has been retained by Bimbo Bakeries' in this matter.  I have also reviewed Plaintiffs' Motion for Class

---

[1] The products at issue are listed in ¶ 8 of this declaration.

[2] Plaintiffs' Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel and Supporting Memorandum, *Alex Ang and Lynne Streit, individually and on behalf of all others similarly situated, Plaintiffs, v. Bimbo Bakeries USA, Inc., Defendant*, 2/18/15 ("Plaintiffs' Motion for Class Certification"), p. 8.

[3] Plaintiffs' Motion for Class Certification, pp. 9-10.

[4] Plaintiffs' Motion for Class Certification, p. 10.

[5] Plaintiffs' Motion for Class Certification, pp. 8-9.

[6] Declaration of Dr. Kent D. Van Liere, 4/5/15 ("Van Liere Declaration").

Certification and the declaration of Dr. Julie A. Caswell,[7] and I respond to her declaration in this declaration.

6.     I am being compensated at my usual rate of $850 per hour.  A list of my prior testimony is attached as Appendix B.  My compensation is not contingent on the content of my opinions or on the outcome of this litigation.  I was assisted in my research by staff at Cornerstone Research who worked under my direction.  During the course of my analysis I reviewed a variety of materials, including documents and testimony produced in this litigation, public press, and academic articles.  Appendix C contains a list of materials that I have considered in forming my opinions.

7.     The facts set forth herein are within my own personal knowledge and, if called as a witness, I could testify competently thereto.  My opinions are based on currently available information.  I reserve the right to modify my opinions if new information and data become available.

### III.     Introduction and Plaintiffs' Allegations

8.     Bimbo Bakeries owns and distributes a number of bakery brands in the United States, including (but not limited to) Arnold, Ball Park, Bimbo, Brownberry, Earthgrains, Entenmann's, Oroweat, Sara Lee, Stroehmann, and Thomas'.  Bimbo Bakeries sells a number of products through these bakery brands, some of which Plaintiffs allege contain labels with false and misleading statements.[8]  Specifically, Plaintiffs allege that from March 18, 2009 to the present certain Bimbo Bakeries' products contained the following false and misleading statements, each defining one class of consumers:

a.     American Heart Association Heart-Check Mark ("Heart-Check Class").
Plaintiffs allege that the Heart-Check Mark is a paid endorsement and that labels bearing this mark must disclose that it is a paid endorsement.[9]  This class consists of consumers in the State of California who purchased the

---

[7] Declaration of Julie A. Caswell, 2/28/15 ("Caswell Declaration").
[8] Bimbo Bakeries sells dozens of other products which are not alleged to contain false and misleading labeling.
[9] Plaintiffs' Motion for Class Certification, p. 2.

following products during the class period: Thomas' Plain Bagel Thins, Thomas' 100% Whole Wheat Bagel Thins, Thomas' Everything Bagel Thins, Arnold's 100% Whole Wheat Bread, Arnold's 12 Grain Bread, or Arnold's Healthy Multi Grain Bread bearing the American Heart Association Heart-Check Mark on the label. [10]

b.  Excellent or good source of whole grain ("Whole Grain Class").  Plaintiffs allege that it is illegal to use these statements on food products. [11]  This class consists of consumers in the State of California who purchased the following products during the class period: Sara Lee Classic 100% Whole Wheat Bread, Sara Lee 100% Whole Wheat Bread, Sara Lee Soft & Smooth Whole Grain White Bread, or Sara Lee Soft & Smooth 100% Whole Wheat Bread with labels containing the phrases "excellent source of whole grain" or "good source of whole grain." [12]

c.  Bread products that contain added coloring ("Added Coloring Class"). Plaintiffs allege that under FDA regulations bread products cannot include added coloring. [13]  This class consists of consumers in the State of California who purchased the following products during the class period: Bimbo Original Toasted Bread, Bimbo Double Fiber Toasted Bread, Arnold Marble Jewish Rye Bread, Arnold Pumpernickel Jewish Rye Bread, Oroweat Dark Rye Bread, Oroweat Sweet Hawaiian Bread, Stroehmann Deli Soft Rye - No Seeds, Stroehmann Deli Soft Rye – Seeds, Thomas' Cinnamon Raisin Swirl Toasting Bread, or Thomas' Cranberry Swirl Toasting Bread containing added coloring. [14]

d.  Products labeled as "100% Whole Wheat" but contain non-whole wheat flour ("100% Whole Wheat Class"). [15]  Plaintiffs allege that federal and state law

---

[10] Plaintiffs' Motion for Class Certification, p. i.

[11] Plaintiffs' Motion for Class Certification, p. 3.

[12] Plaintiffs' Motion for Class Certification, p. i.

[13] Plaintiffs' Motion for Class Certification, p. 4.

[14] Plaintiffs' Motion for Class Certification, p. i.

[15] Plaintiffs' Motion for Class Certification, p. 4.

precludes these products from being labeled as "100% whole wheat."[16]   This class consists of consumers in the State of California who purchased the following products during the class period: Sara Lee 100% Whole Wheat Bread, Sara Lee Classic 100% Whole Wheat Bread, Arnold 100% Whole Wheat Pocket Thins Flatbread, Arnold Bakery Light - 100% Whole Wheat Bread, Bimbo 100% Whole Wheat Tortillas, Brownberry 100% Whole Wheat Pocket Thins Flatbread, Thomas' 100% Whole Wheat Bagels, Thomas' 100% Whole Wheat Bagel Thins, Thomas' 100% Whole Wheat Mini Bagels, Thomas' Sahara 100% Whole Wheat Pita Pockets, Thomas' Sahara 100% Whole Wheat Pita Pockets Mini Size, Thomas' 100% Whole Wheat English Muffins, or Tia Rosa 100% Whole Wheat Tortillas.[17]

9.     Plaintiffs claim that consumers in these four classes are harmed because they mistakenly believed the information on the labels and relied on this information for the purchase decisions of the products at issue.[18]   As a result, Plaintiffs claim that "class members received a product with no value," and that "[t]herefore, they are entitled to the return of their full purchase price."[19]   Plaintiffs also claim that the products commanded a price premium.[20]

## IV.    Summary of Conclusions

10.     I first evaluated whether consumers in the four proposed classes were uniformly exposed to the allegedly false and misleading statements throughout the entire class period.  I found that within each of the four classes some of the labels for the products at issue changed over time such that they were not false and misleading even according to

---

[16] Plaintiffs' Motion for Class Certification, p. 4.

[17] Plaintiffs' Motion for Class Certification, pp. i-ii.

[18] Plaintiffs' Motion for Class Certification, pp. 2-5.

[19] Plaintiffs' Motion for Class Certification, p. 19.

[20] Class Action and Representative Action Second Amended Complaint Jury Trial Demanded, *Alex Ang and Lynne Streit, individually and on behalf of all others similarly situated, Plaintiffs, v. Bimbo Bakeries USA, Inc., Defendant*, 11/4/13 ("Second Amended Complaint"), ¶¶ 253, 262, 274.  This claim is also implied by the Declaration of Dr. Donald M. May in Support of Plaintiffs' Motion for Class Certification, 2/18/15 ("May Declaration").  Specifically, Dr. May states that it will be necessary to analyze the "differences in prices and sales of products with and without the labeling claims at issue." (May Declaration, ¶ 17).

the Plaintiffs.  Specifically, during the class period some of the products at issue in the Heart-Check Class did not have the Heart-Check Mark during a portion of the period, and some of the products in the Whole Grain Class did not say "Excellent Source of Whole Grain" or "Good Source of Whole Grain" during a portion of the period.  Additionally, some products in the Added Coloring Class did not contain added coloring during part of the class period, and therefore even according to Plaintiffs it would have been appropriate to label them as "bread."  Similarly, some products in the "100% Whole Wheat Class" did not contain non-whole wheat flour during part of the class period.  Thus, not all products in the four proposed classes contained the alleged false and misleading statements throughout the entire class period.  As a result, any assessment of harm would have to be done at the product-level and would have to consider the time during which the allegedly false and misleading statements were present on the label of the products that were sold.  This would be impossible to ascertain given the variable time between when a label is created and when the product with that label is sold at a retail store.

11.     Even if consumers purchased a product with an allegedly false and misleading statement on the label, it may not have been seen by consumers because, for example, it was not located in a prominent position on the product package.

12.     Additionally, consumers who were exposed to the allegedly false and misleading statements may not have relied on this information if they placed greater weight on other product features or if external factors drove their purchase decision.  And the weight placed on the allegedly false and misleading statements will be different for different consumers.  The academic literature has found that a variety of factors influence consumer purchase decisions, and different consumers place different weights on different factors, including product labels.  This is true with regards to the purchase of food products, including breads.  This is also supported by Bimbo Bakeries' internal documents and is consistent with deposition testimony of the named plaintiffs in this matter.

13.     Dr. Kent Van Liere was asked to conduct a survey to assess, among other things, whether certain ingredients and statements influenced consumers' purchase intentions.[21]

---

[21] Van Liere Declaration ¶ 8.

Dr. Van Liere compared test and control groups as to whether and how the presence of added coloring in products labeled as "bread"; the presence of soy flour in products labeled as "100% Whole Wheat"; the statement "good" source of whole grain; and the disclosure of the payment to the American Heart Association for the Heart-Check Mark endorsement influence consumer purchase intentions.  He found little differences in the responses between the test and control groups.

14.     I have reviewed the declaration of Dr. Julie A. Caswell, who opines that the allegedly false and misleading statements "would be material to a reasonable consumer."[22]  Dr. Caswell's conclusions are unfounded because they are not based on any empirical analysis.  She simply assumes her conclusions without any evidence for them.  Contrary to Dr. Caswell's opinion, there is no evidence that the putative class members in any identified proportion actually relied on the allegedly false and misleading statements in making their purchase decisions.


**V.     Consumers Were Not Uniformly Exposed to Bimbo Bakeries' Allegedly False and Misleading Statements during the Class Period**

   **A.  The Labels of Some of the Products At Issue Changed so They Did Not Contain the Allegedly False and Misleading Statements throughout the Entire Class Period**

15.     Plaintiffs claim that consumers in the four classes were harmed because they mistakenly believed the allegedly false statements on the labels of the products at issue, and they relied on these statements for their purchase decisions.[23]  However, for that to be true it must be the case that consumers were exposed to the allegedly false and misleading statements on the label, *i.e.*, it must be true that the labels on the products at issue *contained the allegedly false and misleading statements.*

16.     According to Defendant's Responses to Plaintiffs' Third Set of Interrogatories and to the declaration of Kenneth W. Gerhart, the Director of BBU Packaging Graphics at Bimbo Bakeries USA ("Gerhart Declaration"), which describe the changes in the

---

[22] Caswell Declaration, ¶ 25.
[23] Plaintiffs' Motion for Class Certification, pp. 12-15.

Bimbo Bakeries product labels during the class period (March 18, 2009 to the present), some of the labels for the products at issue did not contain the alleged false and misleading statements.  Specifically, during the class period some of the products at issue in the Heart-Check Class did not have the Heart-Check Mark during some of the period, and some of the products in the Whole Grain Class did not say "Excellent Source of Whole Grain" or "Good Source of Whole Grain" during some of the period.[24]  In addition, some products in the Added Coloring Class did not contain added coloring during part of the class period, and therefore even according to Plaintiffs it would have been appropriate to label them as "bread."[25]  Similarly, some products in the "100% Whole Wheat Class" did not contain non-whole wheat flour during part of the class period.[26]

17.     Because of this, any calculation of damages would have to be done at the product-level and would have to consider the timing during which the allegedly false and misleading statements were present on the label.  Such a determination would be difficult if not impossible to ascertain on a class-wide basis given the variable time between when a label is created and when the product containing the label is sold.  Specifically, as explained in the Gerhart Declaration, "[o]nce BBUSA orders and approves the artwork for its products, it has no control over, does not monitor, and has no way to determine, the time it takes for the new artwork to appear in retail markets.  BBUSA understands that this period of time depends on several factors, including but not limited to how quickly each retailer sells its inventory of each product."[27]  Moreover, within each of the four proposed classes, different products contain the allegedly false and misleading statements on the label at different time periods, making an analysis at the product level necessary, *i.e.*, it is impossible to calculate damages on a class-wide basis.  This is described in more detail next.

---

[24] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, *Alex Ang and Lynne Streit, individually and on behalf of all others similarly situated, Plaintiffs, v. Bimbo Bakeries USA, Inc., Defendant,* 2/20/15 ("Defendant's Responses to Plaintiffs' Third Set of Interrogatories"),  pp. 3-6; Gerhart Declaration, pp. 3-4.

[25] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 4-5; Gerhart Declaration, p. 4.

[26] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 7-8; Gerhart Declaration, p. 5.

[27] Gerhart Declaration, ¶ 8.  For example, Mr. Gerhart explains old copies of the artwork could be on the market for longer periods of time in certain areas than in other areas. (Gerhart Declaration, ¶ 4).

### 1.     The Heart-Check Class

18.     By way of example, the labels of the following products within the Heart-Check Class changed during the class period, such that not all of the products at issue contained the allegedly false and misleading statements during the entire class period:[28]

>   a.   Thomas' Plain Bagel Thins:  Plaintiffs allege that purchasers of this product bearing the American Heart Association Heart-Check Mark on the label are part of the Heart-Check Class.  However, the Heart-Check Mark did not appear on the labels until May 2011.  (See Exhibit 1).
>
>   b.   Thomas' 100% Whole Wheat Bagel Thins:  Plaintiffs allege that purchasers of this product bearing the American Heart Association Heart-Check Mark on the label are part of the Heart-Check Class.  However, the Heart-Check Mark did not appear on the labels until May 2011.  (See Exhibit 1).
>
>   c.   Arnold's 12 Grain Bread:  Plaintiffs allege that purchasers of this product bearing the American Heart Association Heart-Check Mark on the label are part of the Heart-Check Class.  However, the Heart-Check Mark did not appear on the labels until January 2012.  (See Exhibit 1).

19.     Exhibit 1 shows the changes in the allegedly false and misleading statements for the products at issue in the Heart-Check Class for which the allegedly false and misleading statements were not observed throughout the entire class period, regardless of whether the product is sold in California.  As described above, there is variation over time in whether the label contained the allegedly false and misleading statement, and this variation is also specific to the product at issue.

### 2.     The Whole Grain Class

20.     The labels of the products at issue within the Whole Grain Class also changed during the class period such that not all product labels printed during the class period contained the allegedly false and misleading statements.  For example:[29]

---

[28] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 3-4; Gerhart Declaration, p. 2.

[29] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 5-6; Gerhart Declaration, pp. 2-4.

a.  Sara Lee Classic 100% Whole Wheat Bread:  Plaintiffs allege that purchasers of this product with labels containing "Excellent Source of Whole Grain" or "Good Source of Whole Grain" are part of the Whole Grain Class.  However, these allegedly false and misleading statements were not always present in the labels throughout the entire class period.  Specifically, the allegedly false and misleading statements did not appear on the labels until March 2008 and June 2008, respectively, for UPC 0-72945-60134 and UPC 0-72945-61103.  "[T]he phrase was removed from the labels for both products in November 2012." (See Exhibit 2).

b.  Sara Lee Soft & Smooth Whole Grain White Bread:  Plaintiffs allege that purchasers of this product with labels containing "Excellent Source of Whole Grain" or "Good Source of Whole Grain" are part of the Whole Grain Class.  However, these allegedly false and misleading statements were not always present in the labels throughout the entire class period for all five UPCs associated with this product name.  For example, the allegedly false and misleading statements did not appear on UPC 0-72945-61139 until September 2013 and then were removed "about July 2014."  In contrast, the phrase at issue appeared on "UPC 0-72945-61146 from September 2010 to about December 2012."  (See Exhibit 2).

21.     Exhibit 2 shows the changes in the allegedly false and misleading statements for the products at issue in the Whole Grain Class for which the allegedly false and misleading statements was not observed throughout the entire class period.

### 3.     The Added Coloring Class

22.     Plaintiffs allege that coloring may not be added to products labeled as "bread."[30] However, some products within the Added Coloring Class did not list any added coloring as an ingredient during part of the class period.  As such, for some products the label was consistent with the information on the ingredient list for some of the period.  This means

---

[30] Plaintiffs' Motion for Class Certification, p. 9.

that the allegedly false and misleading statements were not present throughout the entire class period.  For example:[31]

    a.   Oroweat Sweet Hawaiian Bread:  Plaintiffs allege that purchasers of this product are part of the Added Coloring Class when the product contains added coloring (*i.e.*, Red 40, Yellow 5, or caramel coloring).[32]  However, according to the ingredient list, this product did not always contain added coloring throughout the entire class period.  Specifically, coloring was not added to the product until November 2009.  It was then removed from the product in April 2010.  (See Exhibit 3).

    b.   Oroweat Dark Rye Bread:  Plaintiffs allege that purchasers of this product are part of the Added Coloring Class when the product contains added coloring (*i.e.*, Red 40, Yellow 5, or caramel coloring).[33]  However, this product did not always contain added coloring throughout the class period.  Specifically, coloring was not added to the product until September 2009.  (See Exhibit 3).

23.    Exhibit 3 shows the changes in the allegedly false and misleading statements for the products at issue in the Added Coloring Class for which the allegedly false and misleading statements were not observed throughout the entire class period, regardless of whether the product is sold in California.

### 4.    The 100% Whole Wheat Class

24.    Plaintiffs allege that the products labeled "100% Whole Wheat" and containing non-whole wheat flour (in particular, soy flour) were inappropriately labeled.[34,35] However, some products within the 100% Whole Wheat Class had an ingredient list that changed during the class period, containing soy flour in some time periods and not containing soy flour in others.  As such, for some products, the "100% Whole Wheat"

---

[31] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 4-5; Gerhart Declaration, p. 4.

[32] Plaintiffs' Motion for Class Certification, p. 4.

[33] Plaintiffs' Motion for Class Certification, p. 4.

[34] Plaintiffs' Motion for Class Certification, p. 10.

[35] I understand that there is a dispute as to whether the presence of soy flour renders the "100% Whole Wheat" statement untrue.  For the purposes of this analysis I take the Plaintiffs' assumption.  I have no opinion on this issue, however.

statement was consistent with the information on the ingredient list for some of the period, so that the allegedly false and misleading statements were not present throughout the entire class period.  I explain two examples below.[36]

a.  Sara Lee Classic 100% Whole Wheat Bread:  Plaintiffs allege that purchasers of this product with labels containing "100% Whole Wheat" are part of the Whole Wheat Class when the ingredients list included soy flour. [37]  However, according to the labels, these products did not include soy or soy flour in the ingredient list during the entire class period, specifically after November 2014.  Therefore, not all consumers who purchased Sara Lee Classic 100% Whole Wheat Bread during the class period were exposed to allegedly false and misleading statements.  (See Exhibit 4).

b.  Brownberry 100% Whole Wheat Pocket Thins Flatbread:  Plaintiffs allege that purchasers of this product with labels containing "100% Whole Wheat" are part of the Whole Wheat Class when the ingredients list included soy flour.[38] However, according to the label, soy or soy flour was not present until 2012 and was removed in 2014.  Therefore, not all consumers who purchased Brownberry 100% Whole Wheat Pocket Thins Flatbread during the class period were exposed to allegedly false and misleading statements.  (See Exhibit 4).

25.    Exhibit 4 shows the changes in the allegedly false and misleading statements for the products at issue in the 100% Whole Wheat Class for which a change in the presence of the allegedly false and misleading statements is observed, regardless of whether the product is sold in California.

### 5.    Conclusion

26.    In sum, my review of a collection of the Bimbo Bakeries product labels printed during the class period has shown that, for each one of the proposed four classes, some of

---

[36] Defendant's Responses to Plaintiffs' Third Set of Interrogatories, pp. 7-8; Gerhart Declaration, p. 5.
[37] Plaintiffs' Motion for Class Certification, p. 4.
[38] Plaintiffs' Motion for Class Certification, p. 5.

the labels for the products at issue did not contain the allegedly false and misleading statements.  This fact would have to be taken into account in any calculation of damages to Plaintiffs, a determination that would be difficult if not impossible to ascertain on a class-wide basis given the product-specific variation in labels and the variable time between when a label is printed and when the product with the label is sold, as explained by Mr. Gerhart.[39]

### B.  Consumers Who Read the Ingredient List of the Products At Issue Would Have Known About the Presence of Soy Flour or Added Coloring

27.     Plaintiffs allege that the presence of soy flour in products labeled "100% Whole Wheat" and the presence of added coloring in products labeled as "bread" make the product labels false and misleading.[40]  This allegation appears to assume, however, that consumers are not aware of the presence of soy flour or added coloring in the products at issue.  However, as Plaintiffs themselves note, "[i]t is undisputed that the ingredient lists on the labels of each of these products list 'soy flour.'"[41]  Similarly, added coloring is also on the ingredient list of the products at issue labeled as "bread."[42]

28.     Although I would not expect every single consumer to read the ingredient list on the product package, I would expect some consumers to do so.  Such consumers would have been informed that the presence of soy flour or added coloring in the products at issue, and therefore, for these consumers the labels would not have been false and misleading even by Plaintiffs' own definition.  That is, these consumers would not have been misled by the allegedly false and misleading information because they would have known the correct information about the products' ingredients.

### C.  Placement of the Allegedly False and Misleading Statements

29.     Another relevant consideration to evaluate exposure to the allegedly false and misleading statements is to consider the location of these statements on the product

---

[39] Gerhart Declaration, ¶¶ 4, 8.

[40] Plaintiffs' Motion for Class Certification, pp. 9-10.

[41] Plaintiffs' Motion for Class Certification, p. 10.

[42] *See, for example,* Label for Arnold Pumpernickel Jewish Rye Bread, p. 1, 4/10/08; Label for Oroweat Sweet Hawaiian Bread, p. 1, 1/23/10.

package.  For some of the products at issue, these statements were often not placed in a prominent position, and therefore they may not have been seen by consumers.[43]

30.     For example, the Heart-Check Mark appeared on the back of the packaging for some labels of Arnold's 100% Whole Wheat Bread, Arnold's 12 Grain Bread, and Thomas' Everything Bagel Thins.[44]  Additionally, some labels for Sara Lee Classic 100% Whole Wheat Bread and for Sara Lee Soft & Smooth Whole Wheat Bread include "excellent source" or "good source" of whole grains in relatively small print.[45]

31.     If consumers were not exposed to the allegedly false and misleading statements because they did not see them, they could not possibly have relied on them for the purchase decisions.

### D. Availability of the Products At Issue in California

32.     Beyond the demonstrated variations in product labels over time, Plaintiffs may not have been exposed to the allegedly false and misleading statements in the label of some of the products at issue because of distributorship zones.  Specifically, Stroehmann brand, which has two of the products at issue, were not sold in California during the class period.[46] The databases of national sales produced in this matter indicate that none of the California retailers sold any Stroehmann products.[47]  A document containing media recommendations for the Stroehmann brand stated as a marketing objective "[r]emind people that Stroehmann is a local Baker."[48]  This same document indicated that media budget to advertise the Stroehmann product would only be allocated through channels in Pennsylvania.  This includes sponsoring the Philadelphia Phillies baseball team and

---

[43] *See, for example,* Label for Thomas' Everything Bagel Thins, p. 1, 3/21/12; Label for Thomas' Everything Bagel Thins, p. 1, 11/13/13.

[44] Label for Thomas' Everything Bagel Thins, p. 1, 10/26/11; Label for Arnold's 12 Grain Bread, p. 1, 1/4/12; Label for Arnold's 100% Whole Wheat Bread, p. 1, 9/21/11.

[45] Label for Sara Lee Classic 100% Whole Wheat Bread, p. 1, 1/28/09; Label for Sara Lee Soft & Smooth Whole Wheat Bread, p. 1, 4/10/08.

[46] Only sales in California are part of the class.  Plaintiffs' Motion for Class Certification, p. i.  The products at issue bearing the Stroehmann brand are included in the Added Coloring Class:  Stroehmann Deli Soft Rye - No Seeds and Stroehmann Deli Soft Rye – Seeds.

[47] BBUSA_ANG000004.xlsx, Tabs "A," "B-D," "D-K," "R," "S," "T-W," "MASS," "TARGET," and "BJS," BBUSA_ANG000004.

[48] Harmelin Media presentation, "Stroehmann 2012 Preliminary Media Recommendation," 5/27/11, BBUSA_ANG0150604 – 29 at BBUSA_ANG0150605.

advertising at the Philadelphia Zoo.[49]  Furthermore, after reviewing the current Stroehmann website, I was unable to locate a retailer that carried Stroehmann product within an area around ten major California cities.[50]  Each Stroehmann product carries the tagline, "Pennsylvania Dutch Bakers," and it appears that Stroehmann bread was sold regionally during the class period, thus excluding California as a zone of distribution. This is also confirmed by the Declaration of John C. Lee, a Vice President at Bimbo Bakeries USA ("Lee Declaration").[51]  As such, based on the documents and information that I have reviewed, it is inappropriate for Plaintiffs to claim harm as result of any allegedly false and misleading statements on the Stroehmann product labels.

33.     In addition to the Stroehmann brand, I understand that the following products were also not available to California consumers during the class period:[52]  all products sold under the Arnold brand, Bimbo 100% Whole Wheat Tortillas, Brownberry 100% Whole Wheat Pocket Thins Flatbread, Thomas' Cranberry Swirl Toasting Bread, and Thomas' Sahara 100% Whole Wheat Pita Pockets Mini Size.  I reviewed the Arnold and Brownberry websites to locate retailers which carried Arnold or Brownberry products around ten major California cities.  Both websites indicated that their respective products were unavailable in those locations: "We invite you to try products from our sister brand, Oroweat."[53]  After analyzing the national sales databases produced in this matter, none of the products listed above were sold by California retailers.[54]  Therefore, it is

---

[49] Harmelin Media presentation, "Stroehmann 2012 Preliminary Media Recommendation," 5/27/11, BBUSA_ANG0150604 – 29 at BBUSA_ANG0150613.

[50] Stroehmann Website, "Find a Product," http://stroehmann.com/, accessed on 3/6/15.  This was determined by searching for a retailer that carried the Stroehmann product within 20 miles of a zip code of the 10 largest cities in California, by population.  The following zip codes were entered with a 20 mile radius specified, resulting in no products found:  90001, 92093, 95101, 94101, 93650, 94203, 90801, 94601, 93301, and 92801.  The zip codes above were selected as the first numeric zip code in each city.

[51] Declaration of John C. Lee 4/2/15, ¶ 6.

[52] Lee Declaration, ¶ 6.

[53] Arnold Bread Website, "Product Locator," http://arnoldbread.com/, accessed on 3/19/15; Brownberry Bread Website, "Product Locator," http://www.brownberry.com/, accessed on 3/19/15.  This was determined by searching for a retailer that carried Arnold or Brownberry products nearby zip codes of the 10 largest cities in California, by population.  The following zip codes were entered, resulting in no products found:  90001, 92093, 95101, 94101, 93650, 94203, 90801, 94601, 93301, and 92801.  The zip codes above were selected as the first numeric zip code in each city.

[54] BBUSA_ANG000004.xlsx, Tabs "A," "B-D," "D-K," "R," "S," "T-W," "MASS," "TARGET," and "BJS," BBUSA_ANG000004.

inappropriate for Plaintiffs to claim harm resulting from any allegedly false and misleading statements on the labels of the products listed above.

## VI.   Many Factors Affect Consumers' Purchase Decisions and There Is Heterogeneity in the Factors Affecting Purchase Decisions across Individual Consumers

34.    Even if consumers were exposed to the allegedly false and misleading statements, they may not have relied on them for their purchase decisions.  There are many factors affecting consumers' purchase decisions, these factors are weighted differently by different consumers.  This heterogeneity in the factors affecting consumers' purchase decisions, and in the weight given to those factors, would need to be considered for any assessment of harm resulting from the allegedly false and misleading statements.

35.    Marketing professionals understand and the marketing literature confirms that the consumer decision process is multi-faceted.[55]  Multiple marketing factors influence each potential buyer's decision, and these factors interact with both external factors and buyer-specific characteristics in a complex decision-making process.  Below I describe some of the more common factors that influence various individual consumers' purchase decisions and explain how these factors interact with individual characteristics as well as with external factors.  A comprehensive treatment may be found in *Consumer Behavior and Marketing Strategy*, by J. Paul Peter and Jerry C. Olson.[56]  These considerations apply to consumer products in the food and beverage industry, including bread products, as well as to the Bimbo Bakeries' products at issue.  The interaction between these factors and the products at issue is described below.

36.    Several marketing activities are understood to influence consumer decision making and the extent of their influence is determined by the individual characteristics of the consumer.  The marketing activities are usually organized in four categories called the "*thefour Ps* of marketing:  product, price, place, and promotion."  Taken together the

---

[55] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010, ch. 3.

[56] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th edition, McGraw-Hill, 2010.

Four Ps constitute the so-called "marketing mix."[57]  In addition to the marketing stimuli, there are a host of other factors that affect, to varying degrees, any individual purchase decision.  Below is a description of the marketing stimuli and other factors.

37.     Price is a factor that affects the sales of every product.  Basic economics and marketing tells us that, all else equal, as the price of a product goes up, lower quantities of the product will be sold and as price goes down, more of the product will be sold.[58] Indeed, according to an internal Sara Lee presentation, 47.1% of shoppers say that price is one of their first three considerations when purchasing a traditional loaf of bread.[59] Another Bimbo Bakeries presentation showed that 60% of consumers state that they are "paying more attention to prices."[60]  In addition, named plaintiff Alex Ang agreed that "it was basically price that was driving [his] purchasing decisions" in 2006-2007.[61]

38.     The way that price will affect a consumer's purchase decision will vary as a result of individual characteristics and preferences.  For example, a higher price will likely be less of a factor driving the purchase decisions for individuals with higher income. Indeed, a study exploring various methods of modeling consumer heterogeneity stated that "people differ … in their sensitivity to variables such as price."[62]

39.     The heterogeneous effect of prices will further be exacerbated by the heterogeneous prices that different consumers face.  This also implies that other factors, including the allegedly false and misleading statements, will have heterogeneous effects on consumer purchase decisions as well.

40.     I analyzed the heterogeneity in the prices faced by consumers by considering the retail prices for the products at issue across eight different retailers in California for the

---

[57] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th edition, Prentice Hall, 2012, ch. 1.

[58] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th edition, Prentice Hall, 2012, ch. 14.

[59] Sara Lee presentation, "Kroger Fresh Bakery Category Communication Priorities," 9/17/08, BBUSA_ANG1210852 – 66 at BBUSA_ANG1210858; *See also*, Mintel presentation, "Bread," 11/3/11, BBUSA_ANG0167992 – 8021 at BBUSA_ANG0168011.

[60] McKinsey & Company presentation, "Emerging from the Storm: Reigniting Growth with Winning Customer Management Strategies," 2010, BBUSA_ANG1199480 – 584 at BBUSA_ANG1199486.

[61] Deposition of Alex Ang, 2/13/15, p. 18.

[62] Greg M. Allenby and Peter E. Rossi, "Marketing models of consumer heterogeneity," *Journal of Econometrics* 89, 1999, pp. 57-78 at p. 76.

years 2010 through 2013.[63]  I found that the prices of the products at issue varied significantly across these different retailers.  (See Exhibits 5-10).  For example, the retail price of Bimbo Original Toasted Bread (7.4oz) ranged from approximately $1.91 to $3.09 in 2013 depending on the retailer (Exhibit 5A), a 61.7% difference.  The retail price of Sara Lee Classic 100% Whole Wheat Bread (16oz) ranged from approximately $1.75 to $4.08 depending on the retailer and on the year, a 133.1% difference.  Similar price heterogeneity can be seen with many of the other products at issue, as can be seen from Exhibits 5-10.  This heterogeneity in prices will affect how consumers at different retailers are affected by product prices as well as by other product features, which would need to be considered in any class-wide analysis.

41.    In addition to price, other product characteristics can affect consumer purchase decisions, and with different effects on different consumers.  For example, the characteristics of the products at issue include taste, smell, fiber content, fat content, sugar content, and caloric content; and different consumers are going to place different values on these characteristics.  Indeed, one study of consumer preferences for bread showed that taste, texture, nutrition, smell, convenience, and familiarity are some commonly cited reasons for preferring one type of bread over another. These factors were prioritized differently for people preferring refined bread than for people preferring whole wheat bread.[64]  This is consistent with a Sara Lee presentation to a wholesaler, which states that consumers purchase bread for a variety of reasons including flavor, price, nutrition, and brand.[65]

42.    Product characteristics can be communicated to consumers in many ways, including via the product label.  The academic literature shows that consumers' information-seeking behavior can depend on many factors, including how familiar consumers are with the product.  For example, Kiel and Layton (1981) and Beatty and Smith (1987) found that the greater the consumer's past experience and familiarity with

---

[63] These are the only retailers for which I obtained retail prices through discovery.  If data for other retailers becomes available I am prepared to consider the retail prices for these retailers as well.

[64] A. Bakke and Z. Vickers, "Consumer Liking of Refined and Whole Wheat Breads," *Journal of Food Science* 72(7), 2007, pp. S473-S480 at p. S478.

[65] Sara Lee presentation, "Kroger Fresh Bakery Category Communication Priorities," 9/17/08,, BBUSA_ANG1210852 – 66 at BBUSA_ANG1210858.

the product category, the less he or she seeks information about the product.[66]  A survey conducted by the International Food Information Council shows that less than one-third of consumers mentioned package label health statements when asked about their considerations for buying food and beverages.[67]  A study also found that, once buying habits are formed, advertising and new product information, *e.g.*, on labels, may not change some consumers' purchase behavior.[68,69]

43.     Packaging, independent of the label, is another product characteristic that influences consumers' purchase decisions.  Indeed, a presentation for Bimbo Bakeries by Integer, a retail marketing agency, reported that "sustainable packaging used to be a nice to have [feature], [but] it's now shifting to be the cost of entry."[70]  Packaging features can also influence customer purchasing decisions by offering convenience.  For example, Thomas' Bagel Thins is sold in a resealable bag to appeal to customers as a convenient solution to maintain product freshness.[71]  Finally, package size also influences consumers' purchase decisions.  For example, a large package size or amount was reported to be a "key barrier" for some shoppers who browsed but did not purchase bread at Sam's Club stores.[72]  The effect of package size on sales is evident in a Bimbo Bakeries' presentation showing the sales of Thomas' Original English Muffins in a

---

[66] Geoffrey C. Kiel and Roger A. Layton, "Dimensions of Consumer Information Seeking Behavior," *Journal of Marketing Research* 18(2), 1981, pp. 233-239 at p. 236; Sharon E. Beatty and Scott M. Smith, "External Search Effort: An Investigation Across Several Product Categories," *The Journal of Consumer Research* 14(1), 1987, pp. 83-95 at p. 83.

[67] Bimbo Bakeries presentation, "Premium Bread Innovation:  Strategic Growth Plan & 5 Year Vision," 6/1/12, BBUSA_ANG0024259 – 301 at BBUSA_ANG0024285.

[68] *See Consumer Insights: Findings from Behavioral Research*, edited by J. Alba, Marketing Science Institute, 2011, p. 91; Deighton, John et al., "The Effects of Advertising on Brand Switching and Repeat Purchasing, *Journal of Marketing Research* 31(1), 1994, pp. 28-43 at p. 28.

[69] Cowburn and Stockley found that the percentage of consumers who report that they read food labels is dependent on gender, education, and income. In addition, self-reported reliance on labels is significantly higher than actual comprehension of content. *See* Gill Cowburn and Lynn Stockley, "Consumer understanding and use of nutrition labelling: a systematic review," *Public Health Nutrition*, 8(1), 2004, pp. 21-28 at p. 24.

[70] Integer presentation, "Bimbo Bakeries USA: Competitive Review," 4/15/11, BBUSA_ANG0997854 – 8077 at BBUSA_ANG0997907.

[71] Bimbo Bakeries presentation, "Sam's Club Review," 5/24/12, BBUSA_ANG0212431 – 588 at BBUSA_ANG0212553.

[72] Bimbo Bakeries presentation, "Sam's Club Review," 5/24/12, BBUSA_ANG0192693 – 813 at BBUSA_ANG0192771.

particular region, for two different package sizes:  while the 12 ounce package had over $140 million in sales, the 24 ounce package had less than $20 million in sales.[73]

44.      In addition to its characteristics, a product purchase may be influenced by its "brand."  A brand is a set of associations that create the personality of a product, and can be established and communicated in different ways.[74]  For example, brand can be communicated through logos or symbols (such as Nike's "swoosh" or McDonald's golden arches), names (such as "Coke" or "Cheerios"), and sounds (such as Harley-Davidson's engine sound and NBC's chime).  The influence of a brand on purchase decisions can vary depending on each consumer's preferences and characteristics.  For example, some consumers tend to repeatedly purchase a brand's products once they determine which brand they prefer,[75] while others are not loyal to a particular brand and frequently switch brands.  A Bimbo Bakeries presentation identifies women between ages 25 and 54 as a segment of consumers that exhibit the tendency to generate brand loyalty.[76]  Mintel, a market research provider to Bimbo Bakeries, estimates that 15% of bakery product consumers are brand-loyal.[77]  Another Bimbo Bakeries' presentation quotes consumer statements such as "[w]hen I think of Sara Lee, I flash back to childhood" and "[i]t made it through the test of time so it has to be a good product."[78]  Indeed, both of the named plaintiffs in this matter testified that they have a long history of purchasing Bimbo Bakeries' products.  Specifically, Lynn Streit stated that she has purchased Sara Lee Classic 100% Whole Wheat Bread for herself and her family for "many years," since 2000.[79]  Alex Ang stated that he ate Sara Lee bread when he was "a

---

[73] Bimbo Bakeries presentation, "Breakfast Category: Mideast/Midwest Team Review," 6/6/12, BBUSA_ANG0919001 – 071 at BBUSA_ANG0919017.

[74] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th ed., (Prentice Hall, 2012), ch. 9.

[75] *See, e.g.*, Emma K. Macdonald and Byron M. Sharp, "Brand Awareness Effects on Consumer Decision Making for a Common, Repeat Purchase Product:  A Replication," *Journal of Business Research* 48, 2000, pp. 5-15 at p. 5.

[76] Bimbo Bakeries presentation, "2011 Strategic Brand Review," 10/18/11, BBUSA_ANG0104845 – 5011 at BBUSA_ANG0104865.

[77] Mintel Report, "Bread," 9/07, BBUSA_ANG1440268 – 368 at BBUSA_ANG1440281.

[78] Bimbo Bakeries presentation, "2012 Mideast Product News," BBUSA_ANG0131341 – 384 at BBUSA_ANG0131380.

[79] Deposition of Lynn Streit, 2/11/15, pp. 278-280.

kid" and that his parents purchase Bimbo Bakeries' products because "they are familiar with them."[80]

45.    Place, or the retail environment, also affects consumers' purchase decisions.  This is important for Bimbo Bakeries' products because it is estimated that 70% of all purchase decisions are made while the shopper is in the store. [81]  Retail environments vary widely and can significantly affect product sales.  Additionally, within physical retail environments, one retailer may offer a more upscale shopping experience compared to another retailer, and this difference can affect sales even though the product sold in the two environments is identical.  Product placement within a particular retail outlet can also affect sales volume and the types of consumers who buy the product.[82]  An internal Bimbo Bakeries presentation created by the Customer Marketing Team demonstrates typical spatial patterns of consumers during grocery shopping trips, and indicates that, "[p]erimeter displays [present in the retail environment] drive Fresh Bread category."[83] Placement within a display also affects consumers' purchase decisions, as an internal Sara Lee presentation notes that, "Consumers can't buy what they can't reach!"[84]

46.    Promotional aspects will also affect product sales.  Promotion generally captures the sum of communications that the marketer uses.[85]  Types of promotion that can impact purchase decisions include advertising (which can be product-specific or aimed at creating or reinforcing a broader brand image), sales promotions (point of purchase displays, coupons, rebates, and free offers), and public relations (the maintenance of an entity's public image).  The academic literature has found that, on average, promotions

---

[80] Deposition of Alex Ang, 2/13/15, pp. 74-75, 108.

[81] Bimbo Bakeries presentation, "Introducing Sara Lee Sliced Bread," 11/12, BBUSA_ANG1218583 – 699 at BBUSA_ANG1218639.

[82] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th ed., (McGraw-Hill, 2010), ch. 19.

[83] Bimbo Bakeries presentation, "Customer Marketing Overview," 12/11, BBUSA_ANG0159552 – 85 at BBUSA_ANG0159558.

[84] Sara Lee presentation, "Supervalu Bakery Aisle Optimization," undated, BBUSA_ANG0877698 – 717 at BBUSA_ANG0877704.

[85] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th ed., (McGraw-Hill, 2010), p. 407.

increase product sales.[86]  This also applies to Bimbo Bakeries.  An Bimbo Bakeries presentation attributed lower sales of Sara Lee bread to reduced promotions.[87]  However, there is significant heterogeneity in the impact of promotions on consumers. For example, one study observed that consumers who heavily use a perishable product are more impacted by price promotions, and that, following a promotion they "return to their normal purchase behavior in the product category sooner than [consumers who use the product relatively lightly]."[88]  Another study found that "older mothers" are most responsive to a price incentive upon shopping, while price incentives are less effective in "urban areas or [when] directed at younger mothers."[89]

47.     Both manufacturers and retailers may run promotions.  For example, a manufacturer may send coupons in the mail, while a retailer may have discounts at the point of purchase.  Also, some retailers employ loyalty programs that provide discounts based on purchase history.  Due to the myriad of communication channels available to marketers, the promotion environment can vary significantly from consumer to consumer.[90]  For example, a study presented internally at Bimbo Bakeries found that print is the "[h]ighest engagement vehicle reaching the female consumer."[91]  Another presentation defined seven consumer segments based on demographic and lifestyle factors and then linked each segment to preferred brands and a description of bread consumption habits.[92]

---

[86] *See, e.g.*, Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th ed., (Prentice Hall, 2012), p. 530; B.C. Cotton and Emerson M. Babb, "Consumer Response to Promotional Deals," *Journal of Marketing* 42(3), 1978, pp. 109-113 at p. 111.

[87] Bimbo Bakeries presentation, "2013 Premium Bread Annual Operating Plan," 10/23/12, BBUSA_ANG0153765 – 841 at BBUSA_ANG0153817.

[88] Jooseop Lim et al., "Consumer heterogeneity in the longer-term effects of price promotions," *International Journal of Research in Marketing* 22, 2005, pp. 441-457 at p. 454.

[89] Carrie M. Heilman et al., "The Evolution of Brand Preferences and Choice Behaviors of Consumers New to a Market," *Journal of Marketing Research* 37, 2000, pp. 139-155 at p. 153.

[90] Philip Kotler and Kevin Lane Keller, *Marketing Management*, 14th ed., (Prentice Hall, 2012), p. 518.

[91] Bimbo Bakeries presentation, "2011 Strategic Brand Review," 10/18/11, BBUSA_ANG0104845 – 5011 at BBUSA_ANG0104905.

[92] Bimbo Bakeries presentation, "Premium Bread Business Review," 6/1/11, BBUSA_ANG0154931 – 55222 at BBUSA_ANG0155198 – 5214.

48.      In addition to the above marketing stimuli, external factors can also influence consumers' purchasing behavior.[93]  Specifically, factors such as the economy, competition, technology, and culture may impact a given person's decision to purchase or not purchase a product.  IRI MarketWatch, a quarterly digest of key trends, indicates that the economic recession in particular had an effect on the shopping and buying behaviors of consumers.[94] In addition, Bimbo Bakeries' Strategic Growth Plan includes a survey where consumers cite the worsening of the economy as a reason for purchasing less bread.[95]  Time of year or seasonality can also be an external factor affecting purchases.  For example, a Bimbo Bakeries strategic brand review reported that "Back to School" displays were a "[g]reat success."[96]  The magnitude of any such external factors will vary depending on the purchaser and could also vary for a given purchaser over time.[97]

49.      The influences of the marketing mix and external factors also interact with consumers' individual characteristics.  For example, one internal Bimbo Bakeries presentation segmented consumers into eight groups including "wholesome eater," "health focused," and "indulgent eater."  These categories were understood by Bimbo to likely affect the value that consumers place on nutritional and other information communicated by the product.[98]  Additionally, a presentation to Bimbo Bakeries states that "Easy, Fun Craving" consumers purchase a product for the present situation (rather than eating an item previously purchased) 75% of the time, compared to "Portioned Just For Me" consumers who purchase a product for the present situation 59% of the time.[99]  These and other consumer-specific characteristics will vary based on individual

---

[93] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th ed., (McGraw-Hill, 2010), ch. 11.

[94] Symphony IRI Newsletter, "Retail MarketWatch," Q2/08, BBUSA_ANG0872283 – 94 at BBUSA_ANG0872283.

[95] Bimbo Bakeries presentation, "Premium Bread Innovation:  Strategic Growth Plan & 5 Year Vision," 6/1/12, BBUSA_ANG0024259 – 301 at BBUSA_ANG0024264.

[96] Bimbo Bakeries presentation, "2011 Strategic Brand Review," 10/18/11, BBUSA_ANG0104845 – 5011 at BBUSA_ANG0104877; Integer presentation, "AOB Sandwich Thins," 5/8/12, BBUSA_ANG0459997 – 60015 at BBUSA_ANG0459999.

[97] J. Paul Peter and Jerry C. Olson, *Consumer Behavior and Marketing Strategy*, 9th ed., (McGraw-Hill, 2010), ch. 11.

[98] McKinsey & Company presentation, "Finding growth opportunities in the Bread category," 9/12, BBUSA_ANG0206723 – 773 at BBUSA_ANG0206734.

[99] TNS Landis presentation, "Disruptive Innovation Roadmap: On-the-Go Innovation Opportunities," 12/13/10, BBUSA_ANG0514127 – 213 at BBUSA_ANG0514156, 177.

circumstances, even during a period where price and labeling of the product may stay constant.

50.     In short, not only are there multiple marketing factors that will influence (to varying degrees) an individual purchase decision, but such factors interact with both external factors and buyer-specific characteristics in a complex decision-making process. For a quantification of some of these buyer influence factors I refer to *Empirical Generalizations of Marketing Impact*, edited by D. Hanssens, and *Consumer Insights: Findings from Behavioral Research*, edited by J. Alba.[100]   As an example of quantification, brand-level price sensitivities (the sensitivity of demand for a brand to a change in price, which is measured as elasticity) are over twenty times higher in magnitude than advertising elasticities (that is, the sensitivity of demand for a product to changes in the advertising level).[101]   This suggests that the influence of price changes can be significantly greater than the influence of advertising on consumers' purchasing decisions viewed collectively.

51.     Plaintiffs' experts Dr. Caswell and Dr. May agree that many factors affect consumer purchase decisions, and that these factors may be weighted differently by different consumers.  Specifically, Dr. Caswell describes five categories of intrinsic attributes for food products:  food safety, nutrition, sensory/organoleptic, value/function, and process.[102]   Each of these categories contains many different attributes which may be considered by individual consumers.  Dr. Caswell states that "[c]onsumers receive product quality indicators and cues from a broad range of extrinsic sources including, for example, from labeling, price, and brand name."[103]   Moreover, Dr. Caswell does not dispute the fact that different consumers may weigh these attributes differently and some may consider only a subset of these factors in their purchase decision while ignoring

---

[100] *Empirical Generalizations of Marketing Impact*, edited by D. Hanssens, Marketing Science Institute, 2009; *Consumer Insights: Findings from Behavioral Research*, edited by J. Alba, Marketing Science Institute, 2011.

[101] *Empirical Generalizations of Marketing Impact*, edited by D. Hanssens, Marketing Science Institute, 2009, pp. 55, 83.

[102] Caswell Declaration, ¶ 14.

[103] Caswell Declaration, ¶ 20.

others.  Dr. May also cited studies showing that not all consumers read or rely on food labels when making their purchase decisions.[104]

52.     The variety of factors that influence consumer purchase decisions, and the different weights put on these factors by different consumers, means that there is a high degree of heterogeneity in the purchase decision process at the consumer level.  That is to say that two consumers exposed to the same factors may arrive at different purchase decisions for Bimbo Bakeries' products at issue based on each consumer's prioritization and valuation of these factors.  Even if these two consumers both purchase the product, their purchase decisions will frequently be driven by a different mix of factors.

53.     Given the heterogeneity in the purchase decision process, it is, at best, speculative to assume that the allegedly false and misleading statements on the Bimbo Bakeries' products at issue were a material factor in the purchase decision for all or many of the putative class members, absent evidence directly supporting that assumption.  To my knowledge, Plaintiffs have not conducted any empirical analysis that would reveal the factors that drove the purchasing decisions of the putative class members.  Instead, they rely on an unfounded conclusion by Dr. Caswell, as discussed below in Section VII. B.

54.     One potential way to determine if the allegedly false and misleading statements affect consumer purchase decisions is to conduct a survey of consumers. Dr. Kent Van Liere conducted a study, described in detail in the Van Liere Declaration, which aims to evaluate, among other things, the extent to which the allegedly false and misleading statements influence consumers' purchase intentions.  This is described below in Section VII.A.

---

[104] May Declaration, ¶ 12.

## VII.    The Evidence Does Not Support the Uniform Materiality of the Allegedly False and Misleading Statements on the Labels of the Products At Issue

### A.  Dr. Van Liere's Survey Did Not Find a Substantial Difference between Test and Control Groups as to Whether Certain Ingredients and Statements Affect Consumer Purchase Intentions

55.     Dr. Van Liere conducted a survey to analyze, among other issues, whether certain ingredients and statements affect consumer purchase intentions.[105]  In order to analyze the allegations in the Plaintiffs' four proposed classes, Dr. Van Liere created three different survey components: 1) the Oroweat Survey, which considered the product Oroweat Schwärtzwalder Dark Rye Bread and which analyzed the allegations in the Added Coloring Class; 2) the Sara Lee Survey, which considered Sara Lee Classic 100% Whole Wheat and which analyzed the allegations in the Whole Grain Class and in the 100% Whole Wheat Class; and 3) the Thomas' Survey, which considered Thomas' Plain Bagel Thins and which analyzed the allegations in the Heart-Check Class.[106]

56.     Each of the three component surveys had a test and a control group, whereby the test group showed survey participants an actual package while the control group used the same package but without the references that Plaintiffs allege are false and misleading.[107] Specifically, for the Oroweat Survey the word "Bread" was removed from the main product package wherever it was printed; for the Sara Lee Survey the package excluded "100%" and "Good" wherever there were mentions of "100% Whole Wheat" or "Good Source of Whole Grain"; and for the Thomas' Survey the package added the following disclaimer "THE AMERICAN HEART ASSOCIATION WAS PAID FOR THIS ENDORESEMENT."[108]

57.     There were a number of survey questions designed to evaluate, among other things, whether certain ingredients and statements influenced consumers' purchase intentions.[109]  Dr. Van Liere compared the test and control groups as to whether and how

---

[105] Van Liere Declaration, ¶ 8.
[106] Van Liere Declaration, ¶ 9.
[107] Van Liere Declaration, ¶¶ 28-30.
[108] Van Liere Declaration, ¶ 30.
[109] Van Liere Declaration, ¶ 8.

the presence of added coloring in products labeled as "bread"; the presence of soy flour in products labeled as "100% Whole Wheat"; the statement "good" source of whole grain; and the disclosure of the payment to the American Heart Association for the Heart-Check Mark endorsement influence consumer purchase intentions.  If the test and control groups showed similar responses, then Dr. Van Liere concluded that these ingredients and statements affected consumer purchase intentions similarly in the test and control groups.[110]

58.      Dr. Van Liere's survey was conducted through mall interviews with 604 respondents in California.[111]  Below are his main conclusions from each of the component surveys.

### 1.      Oroweat Survey

59.      Dr. Van Liere first analyzed whether the word "bread" influences consumers' beliefs about the presence of added caramel coloring in Oroweat Schwärtzwalder Dark Rye Bread.[112]  Dr. Van Liere found that around 45 percent of consumers (whether in the test or the control group) believe that Oroweat Schwärtzwalder Dark Rye Bread contains added caramel coloring, and that 21 percent believe it does not.[113]  That is, he concludes that consumers' beliefs about the presence of added coloring does not depend on whether the product says "bread" on the label.  Because this result does not change between the test and the control group, Dr. Van Liere concluded that the "allegedly misleading label is not causing consumers to form the belief that the product does not contain add caramel coloring due to labeling the product as bread."[114]

60.      Dr. Van Liere also evaluated whether the inclusion of added caramel coloring influences how consumers would use the product, and the responses from the test and control group were compared.[115]  Dr. Van Liere found that whether or not caramel

---

[110] Van Liere Declaration, ¶¶ 38-39, 40-43, 47-52, 56-57, 64-67.

[111] Van Liere Declaration, ¶ 9.

[112] Van Liere Declaration, ¶ 36.

[113] Van Liere Declaration, ¶ 36.

[114] Van Liere Declaration, ¶ 36.

[115] Van Liere Declaration, ¶¶ 37-39.

coloring is added does not affect how the majority of consumers would use the product.[116]  Because the results are similar in the test and in the control group, he concluded that "the use of the word 'bread' on the Oroweat label has no substantial impact on how consumers believe they would use the product given their knowledge of whether or not there was added caramel coloring."[117]

61.     Dr. Van Liere used a similar method to assess whether added coloring affects consumers' purchase intentions.[118]  He found that for the majority of consumers, added caramel coloring does not affect the likelihood that they will purchase the product over similar products, and there is little difference in these results between the test and control groups.[119]  Dr. Van Liere therefore concludes that "there is no evidence that the packaging using the allegedly misleading word 'bread' is leading consumers to believe that the product does not have caramel coloring, nor does this fact make them less likely to buy the product when compared to a product package label without the word 'bread'".[120]

### 2.     Sara Lee Survey

62.     In the Sara Lee Survey, Dr. Van Liere evaluated whether "100%" in the "100% Whole Wheat" influences consumers' beliefs about the presence of soy flour in Sara Lee Classic 100% Whole Wheat.  Dr. Van Liere found that around 26 percent of consumers in the test group and 23 percent of consumers in the control group believe that Sara Lee Classic 100% Whole Wheat contains soy flour.[121]  That is, he concluded that consumers' beliefs about the presence of soy flour do not depend on whether the product says "100%" (in relation to "100% Whole Wheat") on the label.

63.     Dr. Van Liere then evaluated whether the inclusion of soy flour influences how consumers would use the product.  The responses from the test and control groups were

---

[116] Van Liere Declaration, ¶ 38.

[117] Van Liere Declaration, ¶ 39.

[118] Van Liere Declaration, ¶¶ 40-42.

[119] Van Liere Declaration, ¶¶ 40-42.

[120] Van Liere Declaration, ¶ 42.

[121] Van Liere Declaration, ¶ 46.

compared to determine whether the inclusion of the "100%" would influence the way that consumers would use the product.[122]  Dr. Van Liere found that only about 14 percent of consumers in the survey indicated that soy flour does or would affect how they use the product, and the results are similar in the test and in the control groups.[123]  Similarly, fewer than 10 percent of consumers indicated that the addition of soy flour makes them less likely to purchase the product over similar products, and this result is similar in the test and control groups.[124]  Because these results are similar in the test and control groups, Dr. Van Liere concluded that "the phrase '100% Whole Wheat' on the label of Sara Lee Classic 100% Whole Wheat Bread does not cause consumers to be less likely to purchase [sic] over similar products at a rate different from those consumers shown the product without the allegedly misrepresented statement on the label."[125]

64.     Dr. Van Liere used a similar methodology with regards to the word "Good" in connection with "source of whole grain," and reached similar conclusions.[126]

### 3.     Thomas' Survey

65.     In the Thomas' Survey, Dr. Van Liere addressed the complaint that the Heart-Check Mark on Thomas' Plain Bagel Thins is a paid endorsement that was not disclosed.[127]  He found that payment for the certification has little influence on consumers' decision to purchase the product, and this is true in the test and the control groups.[128]  He concludes that "including a disclaimer on the Thomas' Plain Bagel Thins that the Heart-Check Mark is a paid endorsement does not seem to affect whether or not consumers are likely to purchase the product over similar products."[129]

---

[122] Van Liere Declaration, ¶¶ 47-48.
[123] Van Liere Declaration, Table 8, ¶ 49.
[124] Van Liere Declaration, ¶¶ 50-52.
[125] Van Liere Declaration, ¶ 51.
[126] Van Liere Declaration, ¶¶ 53-59.
[127] Van Liere Declaration, ¶ 60.
[128] Van Liere Declaration, ¶ 64.
[129] Van Liere Declaration, ¶ 66.

**B. Plaintiff's Expert Dr. Caswell Has Not Shown that the Allegedly False and Misleading Statements on the Labels of the Products at Issue Were Material to the Putative Class Members' Purchase Decisions**

66.    As I described earlier in this declaration, Dr. Caswell's declaration supports my opinion that different consumers can be influenced by many different factors in making their purchase decisions.[130]   However, she fails to provide any evidence on how different consumers weigh these factors in their purchase decisions or whether the label claims at issue were material to the purchase decisions of the putative class members.

67.    Dr. Caswell offers no empirical evidence addressing the relevance to putative class members of the allegedly false and misleading statements on the purchases of the Bimbo Bakeries' product at issue.  Dr. Caswell essentially assumes its conclusion, namely that the allegedly false and misleading statements "would be material to a reasonable consumer."[131]   Dr. Caswell's description of the various factors affecting consumer purchase decisions —for example labeling, price, and brand name[132]— is consistent with my analysis of the consumer decision making process described in Section VI.  However, Dr. Caswell chooses to ignore her own reasoning and instead implicitly assumes that the allegedly false and misleading statements will have more weight, for every single consumer, than any of the other factors that she states could affect purchase decisions.  She does not establish, nor proposes a method to establish, that the allegedly false and misleading statements in the product labels had any effect, let alone a material effect, on all or many putative class members' purchase decisions.

68.    The nature of the allegedly false and misleading statements makes it highly unlikely that they are material for all of the consumers in the class.  For example, the American Heart Association states that the Heart-Check is a widely-accepted certification that "makes it easy to spot heart-healthy foods in the grocery store,"[133] and a Mintel Group article states that the Heart-Check Mark "lets shoppers know that a food meets

---

[130] Caswell Declaration, ¶ 14.

[131] Caswell Declaration, ¶ 25.

[132] Caswell Declaration, ¶ 20.

[133] "Heart-Check Food Certification Program," *American Heart Association*, 2/3/15, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Program_UCM_300133_Article.jsp, accessed on 3/10/15

certain guidelines."[134]   Indeed, obtaining Heart-Check certification requires compliance with certain nutritional standards: grain-based products must not contain more than a certain amount of total fat, saturated fat, trans fat, cholesterol, sodium, and sugar and must be a good or excellent source of dietary fiber.[135]   For whole grain products, there are two additional requirements: a minimum percent of whole grain content (by weight) and a minimum level of dietary fiber from whole grain.[136]   The American Heart Association will not accept payment in exchange for a certification unless the product complies with the nutrition requirements.[137]   Plaintiffs' claim that Bimbo Bakeries was required to include a statement in the product package that a payment to the American Heart Association was made to obtain the Heart-Check certification.[138]   However, given the information conveyed by the Heart-Check Mark about the nutritional information of the products, I would expect that the disclosure of the payment would not have an effect on all of the class members' decisions to purchase the products.  Indeed, Dr. Van Liere's survey found that the fact that the certification is a paid endorsement has little influence on consumers' purchase intentions.[139]   Furthermore, a concerned customer could obtain knowledge that these fees exist by visiting the AHA website.[140]

69.     Plaintiffs also allege that the use of the statement "Excellent Source of Whole Grain" or "Good Source of Whole Grain" were false and misleading to consumers in the

---

[134] Mintel Group Ltd, "Insights and Opportunities," *Healthy Snacking – US*, 7/12, BBUSA_ANG145247 – 417 at BBUSA_ANG145271.

[135] "Heart-Check Food Certification Program Nutrition Requirements: Standard Certification (FDA-regulated products)," *American Heart Association*, 2/10/15, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Food-Certification-Program-Nutrition-Requirements_UCM_300914_Article.jsp, accessed on 3/10/15; "Heart-Check Food Certification Program Sodium Limits by Category," *American Heart Association*, 2/15, http://www.heart.org/idc/groups/heart-public/@wcm/@fc/documents/downloadable/ucm_461669.pdf, accessed on 3/10/15.

[136] "Heart-Check Food Certification Program Nutrition Requirements: Whole Grains with Required Levels of Whole Grain & Dietary Fiber," *American Heart Association*, 2/10/15, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Food-Certification-Program-Nutrition-Requirements_UCM_300914_Article.jsp, accessed on 3/10/15.

[137] "Heart-Check Mark for Food Manufacturers & Trade Associations," *American Heart Association*, 4/24/14, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Mark-for-Food-Manufacturers-Trade-Associations_UCM_300866_Article.jsp, accessed on 3/10/15.

[138] Plaintiffs' Motion for Class Certification, p. 8.

[139] Van Liere Declaration, ¶ 58.

[140] "Heart-Check Mark for Food Manufacturers & Trade Associations," *American Heart Association*, 4/24/14, http://www.heart.org/HEARTORG/GettingHealthy/NutritionCenter/HeartSmartShopping/Heart-Check-Mark-for-Food-Manufacturers-Trade-Associations_UCM_300866_Article.jsp, accessed on 3/10/15.

Whole Grain Class.[141]   However, I reviewed a collection of labels and found that for some products Bimbo Bakeries provided consumers with additional information on the label regarding the specific whole grain content of the product (*e.g.*, contains 25 grams of whole grain).[142]   I expect that some consumers would have read this information, so they would have been informed about the product's whole grain content.   As a result, such consumers may not have relied on the statements "Excellent Source of Whole Grain" or "Good Source of Whole Grain."   Moreover, some of the artwork for the labels of Sara Lee Soft & Smooth Whole Wheat Bread dated February 12, 2008 through January 12, 2011 and some of the artwork for the labels of Sara Lee Classic 100% Whole Wheat Bread dated January 28, 2009 included an asterisk next to the allegedly false and misleading statement.   On the back of the label, another asterisk appeared with the following note: "This product provides 25g of whole grain in a 2 slice serving. USDA recommends consuming 48g of whole grain every day."[143]   It is likely that some consumers who valued whole grain content would have followed the asterisk for more information and read the note.   These consumers would have information on the USDA recommendations for whole grain consumption, and therefore I expect that many would

---

[141] Plaintiffs' Motion for Class Certification, p. 3.

[142] Label for Sara Lee Classic 100% Whole Wheat Bread, 1/28/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 4/10/08, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 7/2/08, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/21/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 6/11/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/3/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/9/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/23/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 11/13/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 2/24/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 3/3/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 3/17/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/5/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/12/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 6/2/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 8/24/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/3/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 1/12/11, p. 1.

[143] Label for Sara Lee Classic 100% Whole Wheat Bread, 1/28/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 4/10/08, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 7/2/08, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/21/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 6/11/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/3/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/9/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/23/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 11/13/09, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 2/24/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 3/3/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 3/17/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/5/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 5/12/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 6/2/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 8/24/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 9/3/10, p. 1; Label for Sara Lee Soft & Smooth Whole Wheat Bread, 1/12/11, p. 1.

have continued to purchase the products absent the allegedly false and misleading statements.

70.     Dr. Caswell ignores all of the evidence provided in this declaration and in the Van Liere Declaration.  Her only support for the assertion that the label was material to consumers is her statement that "[c]onsumers would use Bimbo's labeling statements 'excellent source of whole grain' and 'good source of whole grain' as information in their purchasing decisions that these products have nutritionally significant levels of whole grains and in comparing Bimbo's products to the products of other companies that do not carry these claims."[144]  She makes similar statements for the other three allegedly false and misleading statements.[145]  In my opinion, this constitutes circular reasoning as she is essentially just defining what it means for a label claim to be material.  No support is offered for this statement, and I note that a similar assertion (*i.e.*, consumers would rely on a label to identify products consistent with that label) could be made for any claim on the product label, however inconsequential.  That does not mean that claim had an effect on the purchase decisions of all or many of the putative class members.  Dr. Caswell has constructed no analysis to evaluate whether the allegedly false and misleading statements are material.

## VIII.   Conclusion

71.     Taken together, these facts are consistent with the conclusion that the allegedly false and misleading statements were not a factor driving the purchase decisions for all or many of the consumers buying the products at issue in California during the class period.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Menlo Park, CA April 6, 2015.

---

[144] Caswell Declaration, ¶ 25.
[145] Caswell Declaration, ¶ 25.

Dominique M. Hanssens, Ph.D.