1
Mark C. Goodman (Bar No. 154692)
Ethan A. Miller (Bar No. 155965)
2
David W. Skaar (Bar No. 265377)
HOGAN LOVELLS US LLP
3
3 Embarcadero Center, Suite 1500
San Francisco, CA  94111
4
Telephone:   (415) 374-2300
5
Facsimile:    (415) 374-2499
mark.goodman@hoganlovells.com
6
ethan.miller@hoganlovells.com
david.skaar@hoganlovells.com
7

8
Attorneys for Defendant
BIMBO BAKERIES USA, INC.
9

10                     UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                       SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| 15 ALEX ANG and LYNN STREIT, individually and on behalf of all others similarly situated, | Case No. 13 Civ. 1196 HSG (NC) |
| 16 | **EXPERT DECLARATION OF DR. KENT D. VAN LIERE IN SUPPORT** |
| 17 Plaintiffs, | **OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS** |
| v. | **CERTIFICATION** |
| 18 BIMBO BAKERIES USA, INC., | |
| 19 | |
| Defendant. | |
| 20 | |

21

22

23

24

25

26

27

28

\\LA - 064999/000013 - 1141860 v1

# EXPERT DECLARATION OF DR. KENT D. VAN LIERE

In connection with

**Alex Ang and Lynn Streit v. Bimbo Bakeries USA, Inc.**

## Table of Contents

I.    Introduction ................................................................................................ 1

II.   Qualifications ............................................................................................. 1

III.  Documents Relied Upon ............................................................................ 3

IV.  Assignment and Summary of Findings ..................................................... 3

V.   Background ................................................................................................. 6

VI.  Survey Methodology ................................................................................. 7

A.   Definition of the Relevant Population ...................................................... 8

B.   Sampling of the Relevant Population ....................................................... 9

C.   Survey Questions and Interview Procedures ........................................... 12

D.   The Test and Control Stimuli ................................................................... 23

E.   Survey Results ........................................................................................... 25

i.    Oroweat Survey ........................................................................................ 25

    A.   THE LARGE MAJORITY OF RESPONDENTS DID NOT
        MENTION TOP OF MIND THAT THE PRODUCT DERIVED
        ITS COLOR FROM NON-COLOR ADDITIVE INGREDIENTS
        OR THE BAKING PROCESS ................................................................. 25

    B.   AROUND 45 PERCENT OF CONSUMERS BELIEVE THE
        PRODUCT CONTAINS ADDED CARAMEL COLORING
        WHILE 21 PERCENT SAY IT DOES NOT CONTAIN THIS
        INGREDIENT WHICH DOES NOT VARY BETWEEN TEST
        AND CONTROL ...................................................................................... 27

    C.   THE INCLUSION OF ADDED CARAMEL COLORING DOES
        NOT AFFECT THE WAY THE MAJORITY OF CONSUMERS
        USE OR WOULD USE THIS PRODUCT ............................................. 28

    D.   ONLY 15 PERCENT OF CONSUMERS INDICATE THAT THE
        FACT THAT THE PRODUCT CONTAINS ADDED CARAMEL
        COLORING MAKES THEM LESS LIKELY TO PURCHASE
        THE PRODUCT OVER OTHER SIMILAR PRODUCTS AND
        THIS RATE DOES NOT VARY BETWEEN TEST AND
        CONTROL ................................................................................................ 30

ii.   Sara Lee Survey ........................................................................................ 33

    A.   THERE IS NO DIFFERENCE BETWEEN TEST AND
        CONTROL IN THE RATES AT WHICH RESPONDENTS
        MENTION ELEMENTS RELATED TO PLAINTIFFS' CLAIMS ...... 33

B.   ONLY ABOUT 13 PERCENT OF RESPONDENTS INDICATE THAT THE SOY FLOUR IN THE PRODUCT DOES OR WOULD AFFECT THE WAY THEY USE THE PRODUCT AND THERE IS NO DIFFERENCE BETWEEN THE TEST AND THE CONTROL ........................................................................... 34

C.   FEWER THAN 10 PERCENT OF RESPONDENTS INDICATE THAT THE SOY FLOUR IN THE PRODUCT MAKES THEM LESS LIKELY TO PURCHASE THE PRODUCT OVER SIMILAR PRODUCTS AND THERE IS VERY LITTLE DIFFERENCE BETWEEN THE TEST AND THE CONTROL ........................ 37

D.   WHILE MORE THAN HALF OF CONSUMERS BELIEVE THAT THE SARA LEE PACKAGE INDICATES THAT THE PRODUCT HAS A SPECIFIC LEVEL OF WHOLE GRAIN THERE IS NO DIFFERENCE BETWEEN THE TEST AND THE CONTROL AS TO WHETHER THE SPECIFIC LEVEL OF WHOLE GRAIN IS MATERIAL ....................... 39

iii.   Thomas' Survey .................................................................................. 45

A.   ALMOST NO CONSUMERS MENTION THAT THE HEART-CHECK MARK IS A MESSAGE CONVEYED BY THE PRODUCT'S PACKAGING ................................................... 45

B.   WHEN ASKED DIRECTLY, MORE THAN HALF OF RESPONDENTS SAY THAT THE THOMAS' BAGEL THINS ARE CERTIFIED BY THE AMERICAN HEART ASSOCIATION ................ 45

C.   THE FACT THAT THE CERTIFICATION IS A PAID ENDORSEMENT HAS LITTLE INFLUENCE ON RESPONDENTS IN EITHER THE TEST OR THE CONTROL CONDITIONS AND LITTLE EFFECT ON THEIR LIKELIHOOD OF PURCHASING .................................................... 47

VII.   RESPONSES TO DR. JULIE CASWELL AND DR. DONALD MAY ........................ 49

i.   Dr. Julie Caswell's Claims are Unfounded, and Directly Contradicted by Empirical Evidence ......................................................................... 49

ii.   Dr. Donald May's Proposed Damages Models Fail to Address Key Shortcomings in the Proposed Models ............................................. 51

VIII.   Conclusions ......................................................................................... 53

I, Dr. Kent Van Liere, declare as follows:

## I.    INTRODUCTION

1.      In connection with the matter Alex Ang and Lynn Streit v. Bimbo Bakeries, USA, Inc., I was asked to conduct research to address issues related to consumer perceptions of the labels used on a variety of Bimbo baked goods.  Generally, I was asked to evaluate consumer perception and understanding of the following: 1) the presence of added coloring in a variety of products; 2) the presence of soy flour in breads made with whole wheat flour; 3) whether or not references to good or excellent source of whole grain on the packaging characterizes to consumers a specific level of whole grain; and 4) an endorsement on certain products by the American Heart Association.  I was also asked to evaluate the extent to which consumer perception of these ingredients or endorsements would influence consumers' purchasing intentions.

## II.    QUALIFICATIONS

2.      I am a Senior Vice President at NERA Economic Consulting (NERA) where I participate in the Intellectual Property, Antitrust, Product Liability, and Securities practices.  My business address is 999 18th Street, Suite 2700, Denver, Colorado, 80202.  NERA is a firm providing expert economic, financial, statistical, and survey research and analysis.

3.      Among my responsibilities, I conduct survey research, market analysis, and sampling analysis on a wide range of topics regarding consumer decision making, consumer choice, and consumer behavior.  Over the course of my 30 year career, I have conducted several hundred studies for leading corporations and government agencies involving studies of employees, consumers, and businesses.  I have published articles in leading peer-reviewed journals, as well as technical reports in which consumer attitudes, choices, and behavior have

1

been the focus.  Prior to joining NERA, I served as a Principal, President, or Director of the

market analysis and survey research practice for HBRS and Hagler Bailly for more than 15 years.

I also served as President and CEO of Primen, a market intelligence firm that was a joint venture

of the Electric Power Research Institute and the Gas Research Institute.  Earlier in my career, I

was a tenured Associate Professor at the University of Tennessee where I taught undergraduate

and graduate level courses in statistics, survey research methods, and social psychology.  I also

taught as a Visiting Associate Professor at the University of Wisconsin.  My courses were

regularly cross-listed or recommended for students in the business school as well as liberal arts.  I

hold a Ph.D. in Sociology from Washington State University.

4.  I have substantial experience conducting and using surveys to measure consumer

opinions and behaviors regarding products and services, including purchase processes, branding

and positioning, market segmentation, product attributes, new product research, and

communications strategies.  During my career in academic and commercial research, I personally

facilitated hundreds of focus groups and I have designed and analyzed hundreds of surveys on

marketing and consumer decision making.

5.  With respect to litigation, I have designed and reviewed studies on the application

of sampling and survey research methods in litigation for a variety of matters, including

misrepresentative/deceptive advertising, patent infringement, trademark/trade dress infringement,

as well as in matters related to antitrust, mass torts, labor and employment matters, and product

liability.  I have provided deposition testimony and testimony at trial related to issues of survey

research, sampling, and statistical analysis.  I completed a study and gave a declaration in a food

misbranding case filed in this district called *Astiana v. Ben & Jerry's Homemade, Inc*., No. 10-cv-

04387-PJH  in which Judge Hamilton denied class certification and cited my study.  I also

completed a study and gave a declaration in *Brazil v. Dole Food Company, Inc. et al*, No. 12-cv-01831-LHK in which Judge Koh decertified the class. A copy of my current résumé showing my publications in the past 10 years and testimony in the prior four years is attached as **Exhibit A.**

6.      NERA is being compensated for my services in this matter at my standard rate of $675 per hour. Other NERA consultants assisted me in this engagement and are being compensated at rates less than $675 per hour.  No part of NERA's compensation depends on the outcome of this litigation.  Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## III.    DOCUMENTS RELIED UPON

7.      As part of my work, I reviewed the Class Action and Representative Action Second Amended Complaint (hereafter, SAC); Order Granting in Part Motion to Dismiss Amended Complaint (hereafter, Order); Plaintiffs' Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel and Supporting Memorandum (hereafter, Motion); Declaration of Dr. Julie A. Caswell in Support of Plaintiffs' Motion for Class Certification (hereafter, Caswell Declaration); and the Declaration of Dr. Donald M. May in Support of Plaintiffs' Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel (hereafter, May Declaration).  The list of the specific materials I relied upon can be found in **Exhibit B**.

## IV.    ASSIGNMENT AND SUMMARY OF FINDINGS

8.      I was retained by counsel for Bimbo Bakeries USA, Inc. to conduct research to evaluate consumer perception of the presence of added coloring in a variety of products, the presence of soy flour in breads labeled as 100% whole wheat flour, whether or not references to good or excellent source of whole grain on the packaging characterizes to consumers a specific

level of whole grain, and consumer perception of an endorsement on certain products by the American Heart Association.[1]  I was also asked to evaluate the extent to which these ingredients and statements would influence consumers' purchasing intentions, and if so, how.

9.     My study was a carefully designed survey that involved conducting mall intercept interviews with 604 respondents from the relevant population at 12 malls across California. There were three basic study components referred to here as the Oroweat Survey, the Sara Lee Survey, and the Thomas' Survey.  Respondents were screened to qualify for one of these three different surveys, and each survey had its own test and control conditions.  The three different test stimuli were Oroweat Schwärtzwalder Dark Rye Bread (Oroweat Survey), Sara Lee Classic 100% Whole Wheat (Sara Lee Survey), and Thomas' Plain Bagel Thins (Thomas' Survey) with the allegedly misleading labels.  The control stimuli for the Oroweat Survey and the Sara Lee Survey were the same packages, but the labels were altered to remove any allegedly misleading references.  For the Thomas' survey, the control was similarly the same package but a disclosure was added to the control condition that the Heart-Check Mark endorsement was a paid endorsement.[2]  Respondents were randomly assigned to either a test or a control stimulus.  There were 199 respondents in the Oroweat Survey (99 in the test condition, and 100 in the control condition), 204 respondents in the Sara Lee Survey (101 in the test condition and 103 in the control condition), and 201 respondents in the Thomas' Survey (101 in the test condition and 100 in the control condition).  The survey questions and procedures followed generally accepted techniques for conducting this type of survey.

10.     Based on my research, the results show the following key findings:

---

[1] Motion, pp. 2-4.

[2] Images of the test and control packages can be found in **Exhibit D**.  Each test package had a corresponding control package.

Oroweat Survey

- In response to the first open-ended question, only one respondent out of 99 in the test condition and no respondents in the control condition mentioned that they thought the Oroweat bread had no added coloring.

- The large majority of consumers did not mention top-of-mind that the product derived its color from non-color additive ingredients and the baking process, and there was very little difference between consumers in the test and the control conditions.

- When asked directly, 46 percent of consumers in the test condition and 45 percent in the control condition believe the product contains added caramel coloring. The rate at which consumers believe the product does not contain this ingredient is 21 percent and there is no difference between the test and control.

- The inclusion of added caramel coloring does not affect the way the majority of consumers use or would use this product, and there is very little difference between consumers in the test and control condition in the rate at which they say it does or would affect the way they use the product.

- Fewer than 20 percent of consumers in both the test and control condition indicate that the fact that the product contains added caramel coloring makes them less likely to purchase the product over other similar products and this rate varies little between test and control.

Sara Lee Survey

- Respondents mention a variety of messages conveyed by the products' packaging. There is little difference between test and control in the rates at which respondents mention themes related to plaintiffs' claims that the product is healthy, or healthier than other products, or that it is a good or excellent source of whole grain.

- Only 14 percent of respondents in the test condition and 12 percent in the control condition indicate that the soy flour in the product does or would affect the way they use the product and there is very little difference between the test and the control.

- Fewer than 10 percent of respondents indicate that the soy flour in the product makes them less likely to purchase the product over similar products and there is very little difference between the test and the control.

- More than half of all consumers in my survey believe that the Sara Lee Package indicates that the product has a specific level of whole grain and slightly more consumers in the control condition believe there is a specific level of whole grain than in the test.

5

- Regardless of whether they are in the test or the control condition, around a third of respondents are more likely to purchase the product over similar products because of a specific level of whole grain. This suggests that the label with the phrase "Good Source of Whole Grain" is not causing respondents to purchase the product over similar products.

Thomas' Survey

- Almost no consumers mention top-of-mind any theme related to the Heart-Check Mark or an endorsement by the American Heart Association as messages conveyed by the product's packaging.

- When asked directly, more than half of respondents in the test condition think that the Thomas' Bagel Thins are certified by the American Heart Association and 13 percent of respondents in the test condition think it is not a paid endorsement, while 19 percent think that it is a paid endorsement.

- The fact that consumers think that the certification is a paid endorsement has little influence on respondents in either the test or the control conditions, and little effect on their likelihood of purchasing.

- Open-ended responses suggest that consumers are interested in purchasing the product independent of the American Heart Association Heart Check Mark endorsement.

I discuss my study in detail below.

## V.     BACKGROUND

11.     I understand that in February, 2015, Plaintiffs filed their Motion for Class Certification, for Appointment of Class Representatives, and for Appointment of Class Counsel and Supporting Memorandum which alleges that defendant "Bimbo Bakeries USA, Inc. " has engaged in a scheme to misbrand food products that it manufactures and sells by placing misrepresentations on labels that are explicitly barred under the Food, Drug and Cosmetic Act ("FDCA") regulations, and California's' Sherman Law.  These misrepresentations "falsely imply

that its products are healthier or of better quality than competing products."[3]  Specifically,

Plaintiffs claim four specific misrepresentations:

1) The use of the American Heart Association Heart-Check Mark on labels without disclosure that it is a paid endorsement;

2) The labeling of products as a "good" or "excellent" source of whole grain when the FDA and Sherman Law preclude the use of such representations;

3) The labeling of products as "bread" that do not conform to the standard of identity for bread mandated under federal and California law because they contain added coloring; and

4) The labeling of products as "100% whole wheat" when they are made with non-whole wheat flour.[4]

Plaintiffs further suggest that these allegedly misbranded product labels have had a material impact on consumers' decisions and thus caused them to purchase or pay more for the products than they otherwise would.[5]

12.     As a result of these allegations, Counsel for Defendant has asked me to conduct research to understand consumer perceptions of the allegedly misbranded packaging at issue in this matter.

## VI.     SURVEY METHODOLOGY

13.     The design of my research follows generally accepted principles for the design of surveys to be used as evidence in litigation.[6]  In general, the design of a reliable survey requires careful attention to the following key areas:

---

[3] Motion, p. 1.

[4] Motion, p. 1.

[5] Motion, pp. 2-5.

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used and interviewing procedures;

- The nature of the specific test and control stimuli shown to sampled consumers and;

- The protocol for calculating the results from the survey.[7]

The following discussion is organized around these key areas.

## A. DEFINITION OF THE RELEVANT POPULATION

14.     For a class action case testing consumers' understandings of the label or packaging of the product at issue, the relevant population can reasonably be understood as the group of consumers who have purchased a product in the specific market during the time period at issue. In this matter, the plaintiffs have claimed four separate putative classes relating to several products:

> Heart-Check Class – All consumers in California who purchased Thomas' Plain, 100% Whole Wheat, or Everything bagel thins, or Arnold's 100% Whole Wheat, 12 Grain, or Healthy Multi Grain breads bearing the American Heart Association Heart-Check Mark on the label from March 18, 2009 to the present.

> Whole Grain Class – All consumers in California who purchased Sara Lee Classic 100% Whole Wheat, 100% Whole Wheat, Soft & Smooth Whole Grain White, or Soft &

---

(Footnote continued from previous page.)

[6] Diamond, S. (2011) "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Third Edition,* Federal Judicial Center at: http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D09.pdf/$file/SciMan3D09.pdf, hereafter "Diamond"; Federal Judicial Center (2004); *Manual for Complex Litigation, Fourth.*  Section 11.493, p. 102.

[7] The *Manual for Complex Litigation, Fourth Edition* phrases these key areas as such:

• The population was properly chosen and defined;
• The sample chosen was representative of that population;
• The data gathered were accurately reported; and
• The data were analyzed in accordance with accepted statistical principles. p. 103.

8

Smooth 100% Whole Wheat breads with labels containing the phrases "excellent" or "good" source of whole grain from March 18, 2009 to the present.

Added Coloring Class – All consumers in California who purchased Bimbo Original Toasted or Double Fiber Toasted breads, Arnold Marble Jewish Rye or Pumpernickel Jewish Rye breads, Oroweat Dark Rye or Sweet Hawaiian breads, Stroehmann Deli Soft Rye – No Seeds or Stroehmann Deli Soft Rye – Seeds breads, or Thomas' Cinnamon Raisin Swirl Toasting or Cranberry Swirl Toasting breads containing added coloring from Mark 18, 2009 to the present.

100% Whole Wheat Class – All consumers in California who purchased Sara Lee 100% Whole Wheat or Classic 100% Whole Wheat breads, Arnold 100% Whole Wheat Pocket Thins Flatbread or Bakery Light – 100% Whole Wheat Bread, Bimbo 100% Whole Wheat Tortillas, Brownberry 100% Whole Wheat Pocket Thins Flatbread,[8] Thomas' 100% Whole Wheat Bagels, 100% Whole Wheat Bagel Thins, 100% Whole Wheat Mini Bagels, Sahara 100% Whole Wheat Pita Pockets, Sahara 100% Whole Wheat Pita Pockets Mini Size, or 100% Whole Wheat English Muffins, or Tia Rosa 100% Whole Wheat Tortillas from March 18, 2009 to the present.[9]

I limited respondents to those consumers 18 years or older residing in California who purchased any of the following products: Oroweat Hawaiian Sweet Bread or Schwärzwalder Dark Rye (to qualify for the Oroweat Survey), Sara Lee Classic 100% Whole Wheat Bread or 100% Whole Wheat Bread (for the Sara Lee Survey), or Thomas' Plain Bagel things, 100% Whole Wheat Bagel Thins, or Everything Bagel Thins (for the Thomas' Survey) during the approximate class period.[10, 11]

### B.  SAMPLING OF THE RELEVANT POPULATION

15.     For this study, I used a mall-intercept design to sample consumers from the relevant population and to allow consumers to view and hold the test or control stimuli

---

[8] It is my understanding this product is not sold in California. http://www.brownberry.com/products, accessed 3/17/2015.

[9] Motion, pp. i-ii.

[10] As Judge Orrick ruled that the products in each putative class were substantially similar, I screened in only respondents who had purchased a product in the same brand category as the stimulus shown. Order, p. 17

[11] As is standard practice in survey research, children under the age of 18 were excluded.

packaging.  The malls used for my study were selected to represent a broad cross section of California consumers across the state.  Consumers for this study were sampled from twelve different shopping malls, listed below:

- Puente Hills Mall, City of Industry
- Southland Mall, Hayward
- Mainplace Mall, Santa Ana
- Moreno Valley Mall, Moreno Valley
- Plaza Camino Mall, Carlsbad
- Stonewood Center, Downey
- Antelope Valley, Palmdale
- Great Mall, Milpitas
- Ontario Mills, Ontario
- Northridge Fashion Center, Northridge
- North County Mall, Escondido
- Chula Vista Center, Chula Vista

16.     Interviews were conducted by 3Q Global, a well-known, well-respected data collection firm that I have worked with in the past.  3Q Global uses trained professional interviewers to conduct both the screening and main interviews.  All facility supervisors attended a project briefing on February 23, 2015.  Interviewers working on the study were required to do at least one practice interview of each of the three surveys and to practice speaking the survey questions prior to administering any surveys.    The study instructions can be found in Exhibit C.

17.     The study was conducted between February 25, 2015 and March 18, 2015.  The sampling plan included general age and gender quotas to ensure that survey respondents

10

adequately represented a diverse cross-section of the relevant population.  The exact

demographics of my survey populations are shown below in Table 1.

**Table 1**
**Respondents' demographic distribution**

| Location | Male | | | Female | | | Total |
|---|---|---|---|---|---|---|---|
| | 18 - 34 | 35 - 54 | 55 or older | 18 - 34 | 35 - 54 | 55 or older | |
| Puente Hills Mall, City of Industry | 12 | 10 | 7 | 10 | 12 | 6 | 57 |
| Southland Mall, Hayward | 5 | 9 | 5 | 12 | 7 | 5 | 43 |
| Mainplace Mall, Santa Ana | 6 | 12 | 10 | 7 | 9 | 12 | 56 |
| Moreno Valley Mall, Moreno Valley | 13 | 9 | 10 | 10 | 10 | 9 | 61 |
| Plaza Camino Mall, Carlsbad | 9 | 10 | 6 | 6 | 8 | 10 | 49 |
| Stonewood Center, Downey | 6 | 9 | 8 | 9 | 7 | 9 | 48 |
| Antelope Valley, Palmdale | 13 | 6 | 5 | 6 | 12 | 6 | 48 |
| Great Mall, Milpitas | 6 | 6 | 10 | 11 | 5 | 6 | 44 |
| Ontario Mills, Ontario | 6 | 12 | 6 | 6 | 6 | 13 | 49 |
| Northridge Fashion Center, Northridge | 9 | 6 | 8 | 9 | 10 | 6 | 48 |
| North County Mall, Escondido | 9 | 9 | 7 | 6 | 6 | 12 | 49 |
| Chula Vista Center, Chula Vista | 7 | 12 | 6 | 11 | 7 | 9 | 52 |
| **Grand Total** | **101** | **110** | **88** | **103** | **99** | **103** | **604** |

Sources: Oroweat, Sara Lee and Thomas' Survey Data

Potential respondents were intercepted in the malls at different times of the day and days of the

week.  They completed a series of screening questions to determine if they were part of the

relevant population.  In order to qualify, respondents had to indicate that they had purchased one

of the accused Oroweat products for the Oroweat Survey, one of the accused Sara Lee products

for the Sara Lee Survey, or one of the accused Thomas' products for the Thomas' Survey.[12]

Respondents who qualified for the study were brought to the interviewing facility in the mall to

complete the main portion of the questionnaire.  As is standard in these studies, the survey was

conducted using a double-blind methodology such that neither the interviewer nor the respondent

---

[12] Additional questions were asked to ensure each respondent did not work for a company that produces baked goods products (such as bread, bagels, or pastries), a bakery or bakery department, a store in the mall, or a market research company, had not participated in a survey in the last three months, and, if necessary, had glasses or contacts to read and was willing to wear them.  For a complete copy of the screener, the main questionnaire, and facility instructions, see **Exhibit C.**

knew the purpose of the study.[13] Upon completion, respondents received $5 compensation for their time.  As we typically do, a member of my staff monitored interviews in the first week of interviewing.

### C. SURVEY QUESTIONS AND INTERVIEW PROCEDURES

18.     The surveying and interviewing procedures used for this study were as follows. Once a qualified respondent was identified and brought to the interviewing facility and seated in a private room, the interviewer re-asked all the screening questions.  This procedure is standard practice and allows the interviewer to enter all the screening information directly into the online CAPI survey program.  If a respondent no longer qualified for the survey, he or she was thanked by the interviewer and told they were no longer eligible to complete the study.

19.     After completing the re-screening, qualified respondents were then read the main questionnaire introduction.  In this introduction, each respondent was instructed by the interviewer,

> Thank you for participating in today's interview. If you do not know or do not have an opinion about any of the questions I ask, please say so. Do not guess. Today's survey is about packaged baked goods products, which you would find on store shelves. Please wait while I uncover the product.

The interviewer then uncovered the assigned product and asked the respondent to confirm the letter on the package.  If the incorrect product was shown, respondents were thanked and the interview terminated. Respondents were then told:

> Please look at this product as you would if you were considering making a purchase. Take as much time as you would like to review it. You may pick

---

[13] See, Diamond:  "To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible:  Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose."  pp. 410-411.

up the product but please do not open it. When you are finished looking at it, please let me know.

Interviewers were instructed not to remove the product from the respondent's view.  Then, as is typical in these types of studies, respondents were first asked:

Q1. What message or messages does this product's packaging convey to you?

Responses were recorded verbatim by the interviewer.  Next, the respondent was asked Q2: "What makes you say that?" and their answer again recorded verbatim.  From here, I describe the three studies separately.

**Oroweat Survey**

20.     After these first two open-ended questions, respondents were asked a series of closed ended questions about ingredients.  Multiple ingredients were included to avoid leading respondents by focusing on a single ingredient.  The stem of the question asked: If you have an opinion, please tell me whether you think a) this product DOES contain [ingredient], b) does NOT contain [ingredient] or c) there is not enough information to determine whether or not the product contains [ingredient]?[14]  The ingredients asked about were:

a)  High fructose corn syrup

b)  Added caramel coloring

c)  Riboflavin

21.     The ingredient of interest in this survey is the added caramel coloring. Depending on whether they reported that they thought the product did or did not have the added caramel coloring, respondents followed different questions sequences.  First, respondents who answered that the product did contain added caramel coloring were asked:

---

[14] Answer categories a) and b) were rotated. Respondents were also offered d) "Don't know/no opinion" option.

13

You mentioned this product does contain added caramel coloring.  If you have an opinion, does the added caramel coloring in this product…**?**

a.  Affect the way you use this product
b.  NOT affect the way you use this product
c.  Don't know/No opinion

And then:

Does the fact that this product does contain added caramel coloring… [15]

a.  Influence your decision to purchase this product
b.  Not influence your decision to purchase this product
c.  Don't know/No opinion

Respondents who selected b) or c) in this latter question were skipped to the end of the survey as they reported that the fact that the product had added caramel coloring would not influence their decision to purchase the product or they don't know or have no opinion on whether it would influence their decision.  Respondents who selected the first response (letter a - Influence your decision) were then asked:

Does the fact that this product does contain added caramel coloring make you… [16]

a.  More likely to purchase this product over similar products
b.  Neither more nor less to buy this product over similar products
c.  Less likely to purchase this product over similar products
d.  Don't know/No opinion

All respondents to this purchase question were then asked, "What makes you say that?" and answers were recorded verbatim by the interviewer.

22.  The second group of respondents was made up of respondents who stated that they thought that the product does NOT contain added caramel coloring, or there was not enough

_____

[15] Answer categories a) and b) for both questions above were rotated.

[16] Response categories a) and c) were rotated.

14

information to determine whether or not the product contains added caramel coloring, or they

didn't know or did not have an opinion.  This group of respondents were told:

> You mentioned this product does NOT contain added caramel coloring, or there is NOT enough information to tell, or you don't know.  Assume you learned the product DOES contain added caramel coloring.

And then asked:

> If you have an opinion, do you think the added caramel coloring in this product…**?**
>
> a.  Would affect the way you use this product
> b.  Would NOT affect the way you use this product
> c.  Not enough information to tell
> d.  Don't know/No opinion

All respondents in this group were then asked:

> Would the fact that this product does contain added caramel coloring…[17]
>
> a.  Influence your decision to purchase this product
> b.  Not influence your decision to purchase this product
> c.  Don't know/No opinion

Respondents who selected b) or c) were skipped to the end of the survey as the fact that the

product had added caramel coloring would not influence their decision to purchase the product.

Respondents who selected the first response (letter a - Influence your decision) were then asked:

> Would the fact that this product does contain added caramel coloring make you **…** [18]
>
> a.  More likely to purchase this product over similar products
> b.  Neither more nor less likely to purchase this product over similar products
> c.  Less likely to purchase this product over similar products
> d.  Don't know/No opinion

Finally, all respondents asked the purchase question were then asked:

> What makes you say that?

---

[17] Answer categories a) and b) for both questions above were rotated.

[18] Response categories a) and c) were rotated.

15

Their answers were recorded verbatim.  After answering the questions described above, the interview was complete and the respondent was asked to provide contact details for validation. As is typically done for mall intercept studies, the interviews were independently validated as a measure of quality control.  Validations were conducted by an independent telephone survey company.[19]

**Sara Lee Survey**

23.     Unlike the other two surveys, the Sara Lee Survey addresses two of the alleged misrepresentations: the "100% Whole Wheat" claim and the "Good or Excellent Source of Whole Grain" claim.  Half of the respondents were asked the "100% Whole Wheat" question series first and half were asked the "Good Source of Whole Grain" question series first.  I first describe the "100% Whole Wheat" question series.  Similar to the Oroweat Survey, the "100% Whole Wheat" question series first asked closed ended questions about ingredients.  The stem of these questions asked: If you have an opinion, please tell me whether you think a) this product DOES contain [ingredient], b) does NOT contain [ingredient] or c) there is not enough information to determine whether or not the product contains [ingredient]?[20]  The ingredients asked about were:

a)  High fructose corn syrup

b)  Soy flour

c)  Folic acid

24.     For this part of the survey the key ingredient was soy flour.  Again respondents answered different question sequences depending on whether they thought the product did or did

---

[19] Two interviews failed validation and were removed from the final Oroweat data.

[20] Answer categories a) and b) were rotated. Respondents were also offered d) "Don't know/no opinion" option.

not contain soy flour or whether they did not know.  Respondents who answered that the product

DID contain soy flour were asked:

> You mentioned this product does contain soy flour.  If you have an opinion, does the soy
> flour in this product…?
>
> a.  Affect the way you use this product
> b.  NOT affect the way you use this product
> c.  Don't know/No opinion

And then:

> Does the fact that this product does contain soy flour… [21]
>
> a.  Influence your decision to purchase this product
> b.  Not influence your decision to purchase this product
> c.  Don't know/No opinion

Respondents who selected b) or c) were skipped to the next section of the survey (or to the end if

they had already completed the other section) as the fact that the product had soy flour would not

influence their decision to purchase the product.  Respondents who selected the first response

(letter a - Influence your decision) were then asked:

> Does the fact that this product does contain soy flour make you…[22]
>
> a.  More likely to purchase this product over similar products
> b.  Neither more nor less to buy this product over similar products
> c.  Less likely to purchase this product over similar products
> d.  Don't know/No opinion

All respondents to this purchase question were then asked, "What makes you say that?" and

answers were recorded verbatim by the interviewer.  These respondents then went on to the

---

[21] Answer categories a) and b) for both questions above were rotated.

[22] Response categories a) and c) were rotated.

17

"Good Source of Whole Grain" questions, or were skipped to the end of the survey if they had already completed both questions series.

25.     Respondents who stated that they thought that the product does NOT contain soy flour, or there is not enough information to determine whether or not the product contains soy flour, or they didn't know or had no opinion were told:

> You mentioned this product does NOT contain soy flour, or there is NOT enough information to tell, or you don't know.  Assume you learned the product DOES contain soy flour.

And then asked:

> If you have an opinion, do you think the soy flour in this product…**?**

> a.  Would affect the way you use this product
> b.  Would NOT affect the way you use this product
> c.  Not enough information to tell
> d.  Don't know/No opinion

All respondents in this group were then asked:

> Would the fact that this product does contain soy flour…[23]

> a.  Influence your decision to purchase this product
> b.  Not influence your decision to purchase this product
> c.  Don't know/No opinion

Respondents who selected b) or c) were skipped to the "Good Source of Whole Grain" questions, or, if they had already completed the section, were skipped to the end of the survey as the fact that the product had soy flour would not influence their decision to purchase the product. Respondents who selected the first response (letter a - Influence your decision) were then asked:

> Would the fact that this product does contain soy flour make you **...** [24]

---

[23] Answer categories a) and b) for both questions above were rotated.

[24] Response categories a) and c) were rotated.

18

a. More likely to purchase this product over similar products
b. Neither more nor less likely to purchase this product over similar products
c. Less likely to purchase this product over similar products
d. Don't know/No opinion

Finally, all respondents asked the purchase question were asked:

What makes you say that?

Their answers were recorded verbatim.  After answering the questions described above, these respondents moved on to the "Good Source of Whole Grain" questions.  If they had already completed that question series, the interview was complete.

26.     The next question series I describe is the "Good Source of Whole Grain" questions.  As I previously mentioned, half of the respondents to the Sara Lee Survey were asked this question series first and the "100% Whole Grain" question series second.  After the first two open ended question, respondents were asked:

If you have an opinion, please tell me whether you think…?

a. This product HAS whole grain
b. This product does NOT have whole grain
c. There is not enough information to determine whether this product does or does not have whole grain
d. Don't know/no opinion

Respondents who selected b) through d) were finished with this question series, as the package did not convey to them that there was any whole grain and so there could be no representation regarding the amount of whole grain.  Those respondents who selected a) This product HAS whole grain were then asked:

You mentioned this product HAS whole grain. If you have an opinion, do you think that…?

a. The package indicates that the product HAS a <u>specific</u> level of whole grain
b. The package DOES NOT indicate that the product has a <u>specific</u> level of whole grain
c. There is not enough information on the package to determine whether or not the product has a <u>specific</u> level of whole grain

d. Don't know/ No opinion

Again, respondents who selected b) through d) were finished with this question series, as the

package did not convey to them a specific level of whole grain.  Those respondents who selected

a) The package indicates that the product HAS a specific level of whole grain were then asked:

Does the fact that the package indicates that the product HAS a <u>specific</u> level of whole grain…?[25]

a. Influence your decision to purchase this product
b. Not influence your decision to purchase this product
c. Don't know/No opinion

Those respondents who indicated that the fact that the package indicates that the product has a

specific level of whole grain were then asked:[26]

Does the fact that the package indicates that the product HAS a <u>specific</u> level of whole grain make you…[27]

a. More likely to purchase this product over similar products
b. Neither more nor less likely to purchase this product over similar products
c. Less likely to purchase this product over similar products
d. Don't know/No opinion

All respondents asked the purchase question were then asked, "What makes you say that" and

their answers recorded verbatim.  Then, only those respondents who mentioned that they were

more likely to purchase this product over similar products were asked:

Is the fact that the package indicates that the product HAS a <u>specific</u> level of whole grain… [28]

a. The sole reason you would purchase this product
b. A primary reason you would purchase this product

---

[25] Response categories a) and b) for these three questions were rotated.

[26] All others were either skipped to the "100% Whole Wheat" section or to the end of the survey.

[27] Response categories a) and c) were rotated.

[28] Response categories a), b), and c) were randomized.

c.  One of many reasons you would purchase this product
d.  Don't know/No opinion

And then:

What makes you say that?

If these respondents had already completed both question series, the interview was complete and the respondent was asked to provide contact details for validation.  Validations were conducted by an independent telephone survey company.[29]

**Thomas' Survey**

27.    The final survey that respondents could be assigned to was the Thomas' Survey. In this survey, respondents were asked the first two open ended questions about messages conveyed by the product's packaging, and then asked:

If you have an opinion, please tell me whether you think…?

a.  This product IS certified by the American Heart Association
b.  This product is NOT certified by the American Heart Association
c.  There is not enough information to determine whether or not this product is certified by the American Heart Association
d.  Don't know/ no opinion

Any respondent who mentioned that the product is NOT certified by the American Heart Association, there is not enough information to determine whether or not the product is certified by the American Heart Association, or they don't know or have no opinion were skipped to the end of the survey.  Any respondent who selected that they thought the product IS certified by the American Heart Association was then asked:

You mentioned this product IS certified by the American Heart Association. If you have an opinion, do you think …?

---

[29] No interviews failed this validation in the Sara Lee Survey.

    a.  This certification IS a paid endorsement
    b.  This certification is NOT a paid endorsement
    c.  There is not enough information to determine whether or not this is a paid endorsement
    d.  Don't know/ no opinion

Respondents who answered that the certification IS a paid endorsement were then asked:

    Does the fact that the certification is a PAID rather than NOT a paid endorsement?[30]

    a.  Influence your decision to purchase this product
    b.  Not influence your decision to purchase this product
    c.  Don't know/No opinion

Respondents whose decision to purchase the product was not influenced by the fact that the certification is a paid rather than not a paid endorsement, or they did not know or had no opinion were skipped to the end of the survey.  Those who said that it would influence their decision to purchase the product were then asked:

    Does the fact that the certification is a PAID rather than NOT a paid endorsement make you...[31]

    a.  More likely to purchase this product over similar products
    b.  Neither more nor less likely to purchase this product over similar products
    c.  Less likely to purchase this product over similar products
    d.  Don't know/No opinion

And then:

    What makes you say that?

These respondents were then done with the survey and skipped to the end.  Any respondent who said that they thought the certification is NOT a paid endorsement, there is not enough information to determine whether or not this is a paid endorsement, or they don't know nor have no opinion, was then told:

---

[30] For these three questions, answer categories a) and b) were rotated.

[31] Answer categories a) and c) were rotated.

> You mentioned you think the certification is NOT a paid endorsement, there is NOT enough information to tell, or you don't know.  Assume you learned the certification by the American Heart Association IS a paid endorsement.

Then these respondents were asked:

> Would the fact that the certification is a PAID rather than NOT a paid endorsement…?[32]
>
> a.  Influence your decision to purchase this product
> b.  Not influence your decision to purchase this product
> c.  Don't know/No opinion

Respondents whose decision to purchase the product was not influenced by the fact that the certification is a paid rather than not a paid endorsement, or they did not know or had no opinion were skipped to the end of the survey.  Those who said that it would influence their decision to purchase the product were then asked:

> Would the fact that the certification is a PAID rather than NOT a paid endorsement make you…
>
> a.  More likely to purchase this product over similar products
> b.  Neither more nor less likely to purchase this product over similar products
> c.  Less likely to purchase this product over similar products
> d.  Don't know/No opinion

All respondents were then asked "What makes you say that?" and their answers were recorded verbatim.  Then the interview was complete and the respondent was asked to provide contact details for validation.  These validations were conducted by an independent telephone survey company.[33]

### D.  THE TEST AND CONTROL STIMULI

28.     I used three test stimuli products in my study; Oroweat Schwärtzwalder Dark Rye Bread, Sara Lee Classic 100% Whole Wheat, and Thomas' Plain Bagel Thins.  I understand

---

[32] Answer categories a) and b) were rotated.

[33] Three interviews failed this validation and were removed from the final Thomas' data.

23

1
2   Plaintiff has alleged that these represent several other "Substantially Similar Products" produced
3   during the relevant period that have the alleged claims at issue.[34]  For the Oroweat Survey, the
4   package I used referenced "Bread" in the main graphic that was printed repeatedly on the
5   package.  The Sara Lee Classic 100% Whole Wheat package I used for the Sara Lee survey had
6   references to 100% Whole Wheat on the front, bottom, and back of the package and references to
7   "Good Source of Whole Grain" at two places on the front and once on the bottom of the package.
8   The Thomas' Plain Bagel Thins package had the Heart-Check Mark on the back of the package.
9   The Oroweat and Thomas' test packages are the same as the packages available on shelves today.
10  The Sara Lee was printed specially for the survey, and is a version of the Classic 100% Whole
11
12  Wheat package that was on the market in and around 2009.

13      29.     The possible existence of "background noise" (such as perceptions caused by
14  elements of the test that do not constitute allegedly misleading content, demand effects of the
15  survey instruments themselves, or guessing) may threaten the validity of the estimates made in
16  the test condition.  As a consequence, it is common for surveys used for litigation to test whether
17
18  specific advertising misled consumers to include a control to assess the level of background noise.

19      30.     In general, the control group stimulus should be as similar to the test stimuli as
20  possible but without the allegedly misleading or deceptive content.  In this case, the appropriate
21  controls are the same packages but without the references to the statements that Plaintiffs claim
22  are misleading.  For my study, the labels for each of the three test products were modified in the
23
24  following ways:

25          a)  the Oroweat package was modified to remove the word "Bread" from the main
26              graphic wherever it was printed;

27  _____

28  [34] Order, p. 17.

24

b) the Sara Lee Package removed "100%" and "Good" wherever there were mentions of "100% Whole Wheat" or "Good Source of Whole Grain"; and

c) the Thomas' package added the following disclaimer below the Heart-Check Mark endorsement: "THE AMERICAN HEART ASSOCIATION WAS PAID FOR THIS ENDORSEMENT."

These were used as the control stimuli.

**E. SURVEY RESULTS**

31.     Because my study involved essentially three different surveys which asked respondents different questions about different claims addressing the four putative classes, I will structure the results section of this report around each survey separately.

**I.     OROWEAT SURVEY**

**A.     THE LARGE MAJORITY OF RESPONDENTS DID NOT MENTION TOP OF MIND THAT THE PRODUCT DERIVED ITS COLOR FROM NON-COLOR ADDITIVE INGREDIENTS OR THE BAKING PROCESS**

32.     The Oroweat Survey includes several types of results.[35]  First, verbatim responses to the initial open ended questions (Q1 and Q2) regarding the message or messages conveyed by the packaging can be examined.  These verbatim responses can be coded to measure what respondents mention that the packages conveyed to them.  The results can be compared between the test and control conditions.

33.     As an initial matter, responses were coded for mentions of 'added color' or 'color derived from non-color additive ingredients and the baking process'[36] as a message or messages the product's packaging conveys to respondents.  Of all respondents in the test condition, only

---

[35] The data for the Oroweat, Sara Lee, and Thomas' Surveys can be found in **Exhibit E.**
[36] Motion, p. 4.

25

one mentioned that the product has no added coloring.  A total of six respondents (two in the test condition and four in the control condition) mentioned that a message conveyed by the products' packaging was that the color was derived from the baking process or from a non-color additive ingredient.  Thus, there is no evidence that a large majority of purchasers believe the allegedly misleading package conveys that there is no added color based on top of mind expressions.

34.     These verbatim responses were also coded for mentions that the product was bread, that it was healthy/good for you, that it was a good quality product, or that the color of the bread makes it more nutritious as relates to Plaintiffs' claims.  Those coded responses are below in Table 2.  Respondents could be coded into more than one category.[37]

## Table 2
### Responses matching Plaintiffs' Claims to "What message or messages does this product's packaging convey to you?" (including "What makes you say that?")

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Bread | 45 | 45% | 27 | 27% |
| Healthy/good for you | 40 | 40% | 42 | 42% |
| Good quality | 8 | 8% | 14 | 14% |
| Color of the bread makes more nutritious | 2 | 2% | 5 | 5% |
| **Total** | 99 | 100% | 100 | 100% |

Source: Oroweat Survey Data

35.     First, in the test condition 45 percent mention that a message that is conveyed is that the product is bread compared to 27 percent in the control condition.  This difference is not surprising since the test condition package label includes the word "bread."  However, in the control condition many respondents (27 percent) mention that a message conveyed to them by the

---

[37] Some respondents were not coded into any of these categories.

product's packaging is that it is bread even though the control label does not include the actual word "bread." With regard to being healthy, about 40 percent in both the test and control say that this is a message conveyed by the packaging. Thus the presence of the word "bread" does not cause consumers to report that the product is healthier at a different rate than when the word bread is not present. Finally, very few respondents mention that they think that the color of the bread makes it more nutritious in either the test or the control conditions.

**B.     AROUND 45 PERCENT OF CONSUMERS BELIEVE THE PRODUCT CONTAINS ADDED CARAMEL COLORING WHILE 21 PERCENT SAY IT DOES NOT CONTAIN THIS INGREDIENT WHICH DOES NOT VARY BETWEEN TEST AND CONTROL**

36.     The consumers' responses to specific closed ended questions about the contents of the packages can also be examined.  Specifically, respondents were asked after viewing the Oroweat test or control package whether the product DOES contain, does NOT contain, or there is not enough information to determine whether or not the product contains various ingredients.[38] The results show that 46 percent of respondents shown the allegedly mislabeled packaging (test condition) believed the product does contain added caramel coloring.  In the control condition in which respondents saw packaging that was not labeled as "bread," 45 percent reported that they thought the product contained added caramel coloring.  Similarly, 21 percent of respondents in both the test and the control condition believe the product does NOT contain added caramel coloring.

---

[38] Respondents could also answer that they did not know, or did not have an opinion.

**Table 3**

**If you have an opinion, please tell me whether you
think this product contains added caramel coloring**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| This product DOES contain added caramel coloring | 46 | 46% | 45 | 45% |
| This product does NOT contain added caramel coloring | 21 | 21% | 21 | 21% |
| There is not enough information to determine whether or not this product contains added caramel coloring | 11 | 11% | 19 | 19% |
| Don't know/no opinion | 21 | 21% | 15 | 15% |
| **Total** | 99 | 100% | 100 | 100% |

Source: Oroweat Survey Data

Thus, a substantial proportion of consumers who purchase these products believe the product contains added caramel coloring. And the fact that there is no difference in these rates between the test and control conditions shows that the allegedly misleading label is not causing consumers to form the belief that the product does not contain add caramel coloring due to labeling the product as bread.

**C.    THE INCLUSION OF ADDED CARAMEL COLORING DOES NOT
AFFECT THE WAY THE MAJORITY OF CONSUMERS USE OR
WOULD USE THIS PRODUCT**

37.    The survey also asked if the fact that the product contains added caramel coloring does or would affect how respondents use the product. This can be compared between both those who think the product does contain added caramel coloring and those who think it does not, think there is not enough information to tell, or don't know or have no opinion, and also between respondents in the test and control condition. Table 4 below shows those two comparisons.

28

**Table 4**
**Responses to if added caramel coloring affects the way respondents use the product by opinions about the presence of added caramel coloring**

| Responses | Test | | Control | | Total | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| **This product DOES contain added caramel coloring** | | | | | | |
| Affect the way you use this product | 9 | 20% | 8 | 18% | 17 | 19% |
| NOT affect the way you use this product | 33 | 72% | 33 | 73% | 66 | 73% |
| Don't know/No opinion | 4 | 9% | 4 | 9% | 8 | 9% |
| **Total** | 46 | 100% | 45 | 100% | 91 | 100% |
| | | | | | | |
| **This product does NOT contain added caramel coloring; There is not enough information to determine; Don't know/no opinion** | | | | | | |
| Would affect the way you use this product | 10 | 19% | 15 | 27% | 25 | 23% |
| Would NOT affect the way you use this product | 29 | 55% | 29 | 53% | 58 | 54% |
| Not enough information to tell | 10 | 19% | 6 | 11% | 16 | 15% |
| Don't know/No opinion | 4 | 8% | 5 | 9% | 9 | 8% |
| **Total** | 53 | 100% | 55 | 100% | 108 | 100% |
| | | | | | | |
| **Combined total** | | | | | | |
| Affect/would affect the way you use this product | 19 | 19% | 23 | 23% | 42 | 21% |
| Affect/would NOT affect the way you use this product | 62 | 63% | 62 | 62% | 124 | 62% |
| Not enough information to tell [1] | 10 | 10% | 6 | 6% | 16 | 8% |
| Don't know/No opinion | 8 | 8% | 9 | 9% | 17 | 9% |
| **Total** | 99 | 100% | 100 | 100% | 199 | 100% |

[1]  Asked only of respondents who say the product does NOT contain added caramel coloring, or said there was not enough information to tell, or don't know/no opinion.

Source: Oroweat Survey Data

38.     First, among respondents who are aware the product has added caramel coloring, the large majority in both the test and the control say this fact does not affect how they use the product (72 percent in test, 73 percent in control).  Second, among the group that is not aware the product contains added caramel coloring, 55 percent in the test and 53 in the control say it would not affect how the use the product if they were told it did contain added caramel coloring.  Thus, in both the case where consumers are aware of the added caramel coloring or where they are not aware of this but told about it, the majority of respondents indicate this fact does not affect how they use the product.

39.     Second, the results for these questions also show that the impact of the allegedly misleading packaging on consumer perceptions about whether the addition of caramel color affects how they use or would use the product is negligible.  As shown in Table 4 above, the proportion of consumers who respond that it would not affect how they use the product is nearly identical across the test and control conditions.  This shows that the use of the word "bread" on the Oroweat label has no substantial impact on how consumers believe they would use the product given their knowledge of whether or not there was added caramel coloring.

**D.     ONLY 15 PERCENT OF CONSUMERS INDICATE THAT THE FACT THAT THE PRODUCT CONTAINS ADDED CARAMEL COLORING MAKES THEM LESS LIKELY TO PURCHASE THE PRODUCT OVER OTHER SIMILAR PRODUCTS AND THIS RATE DOES NOT VARY BETWEEN TEST AND CONTROL**

40.     Lastly, the Oroweat Survey asked consumers about how their perceptions of the added caramel color does or would influence their decision to purchase the product.  These results are summarized in Table 5.  First, Table 5 shows the overall results with regard to whether the fact that the product contains added caramel coloring does or would influence consumers' decision to purchase the products.  Next, the results to the question asking if the fact that the product does contain added caramel coloring does or would make consumers more or less likely to purchase the product are shown.

**Table 5**

**Influence on decision to purchase the Oroweat product**

**over similar products because of the added caramel coloring** [1]

| | Test | | Control | |
|---|---|---|---|---|
| | **Count** | **Percent** | **Count** | **Percent** |
| **Does/Would the fact that this product does contain added caramel coloring …** | | | | |
| Influence your decision to purchase this product | 25 | 25% | 23 | 23% |
| Not influence your decision to purchase this product | 59 | 60% | 64 | 64% |
| Don't know/No opinion | 15 | 15% | 13 | 13% |
| **Total** | 99 | 100% | 100 | 100% |
| **Does/Would the fact that this product does contain added caramel coloring make you …** | | | | |
| More likely to purchase this product over similar products | 5 | 5% | 4 | 4% |
| Neither more nor less likely to purchase this product over similar products | 7 | 7% | 2 | 2% |
| Less likely to purchase this product over similar products | 12 | 12% | 16 | 16% |
| Don't know/No opinion | 1 | 1% | 1 | 1% |
| **Not asked the question** [2] | 74 | 75% | 77 | 77% |
| **Total** | 99 | 100% | 100 | 100% |

[1] The responses are combined for respondents who think this product does contain added caramel coloring and those who think
it does not, think that there is not enough information to determine, or who don't know or have no opinion.

[2] Includes respondents who answered it does/would not influence your decision to purchase this product or don't know/no opinion.

Source: Oroweat Survey Data

41.     The results show two key findings.  First, the majority of respondents in both the test and the control indicate that the presence of added caramel coloring does not influence their decision to purchase this product.  Second, there is little difference in these results between the test and control suggesting that the allegedly misleading packaging has no impact on whether consumers report that added caramel coloring does or would not influence their choice.  For instance, among the 99 respondents shown the allegedly mislabeled product with the references to "bread," 60 percent indicate that the added caramel coloring has no influence on their decision whether or not to purchase the product.  In comparison, 64 percent of the 100 respondents in the control condition who saw products with references to "bread" removed indicate that the added caramel coloring has no influence on their decision whether or not to purchase the product.

42.    The results further show that for respondents in the test condition as a whole only 12 percent report both that they believe that added caramel coloring would influence their decision to purchase the product and that this fact makes them less likely to buy the product over similar products.  And this result is also very similar for the respondents in the control condition where 16 percent of respondents both believe the presence of added caramel coloring would influence their decision and make them less likely to purchase the product over similar products. Thus there is no evidence that the packaging using the allegedly misleading word "bread" is leading consumers to believe the product does not have caramel coloring, nor does this fact make them less likely to buy the product when compared to a product package label without the word "bread."

43.    The results reported above lead to several key conclusions.  First, many consumers believe the product does have add caramel coloring.  Second, the fact that the product contains added caramel coloring does or would not affect the way respondents use the product whether or not they think there is added caramel coloring. Third, this is true regardless of if consumers are exposed to the word "bread" on the label or not.  Fourth , the presence of added caramel coloring influences only about 25 percent of consumers' decision to purchase, and only about 12 to 16 percent of consumers report that the fact that product contains added caramel coloring makes them less likely to purchase over other similar products.  Finally, these rates change very little between those consumers who saw the Oroweat product with the word "bread" on the label (test condition) and those in the control condition where the allegedly illegal and mislabeled word "bread" was removed. Thus, these results indicate that the allegedly misbranded label is not impacting consumers' perceptions of the product, their use of the product, or their purchase intentions when compared to packages without the allegedly misbranded references.

## II.     SARA LEE SURVEY

44.     Next, I will discuss the results from my Sara Lee Survey.

### A.     THERE IS NO DIFFERENCE BETWEEN TEST AND CONTROL IN THE RATES AT WHICH RESPONDENTS MENTION ELEMENTS RELATED TO PLAINTIFFS' CLAIMS

45.     The results of the Sara Lee Survey open ended questions were coded for mentions of messages that relate to Plaintiffs' "100% Whole Wheat" and "Good Source of Whole Grain" claims.[39]  Respondents mentioned these elements at very similar rates across the test and control conditions.  The results of this coding are shown below in Table 6.

## Table 6
## Responses matching Plaintiffs' Claims to "What message or messages does this product's packaging convey to you?" (including "What makes you say that?")

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Healthy/good for you | 47 | 47% | 57 | 55% |
| Healthier than other Products | 0 | 0% | 4 | 4% |
| "Good" or "Excellent" Source of Whole Grain | 15 | 15% | 16 | 16% |
| **Total** | 101 | 100% | 103 | 100% |

Source: Sara Lee Survey Data

Thus there is no evidence that the allegedly misleading packaging elements --"100% Whole Wheat" or "Good Source of Whole Grain"-- cause respondents to think that the products are healthy or good for you, healthier than other products or a good or excellent source of whole grain at a higher rate than a package without these elements.

---

[39] Complaint, pp. 15-16.

**B.    ONLY ABOUT 13 PERCENT OF RESPONDENTS INDICATE THAT THE SOY FLOUR IN THE PRODUCT DOES OR WOULD AFFECT THE WAY THEY USE THE PRODUCT AND THERE IS NO DIFFERENCE BETWEEN THE TEST AND THE CONTROL**

46.     The survey also asked consumers a series of closed ended questions about their understanding of certain contents of the product. These closed ended questions were split into two question series – the "100% Whole Wheat" questions and the "Good Source of Whole Grain" questions, and respondents were rotated such that half were asked the "100% Whole Wheat" questions first and the other half were asked the "Good Source of Whole Grain" questions first. I will describe the results for the "100 Whole Wheat" questions first.

In this question series, consumers were asked, if they have an opinion, to please tell whether they think the product DOES contain soy flour, does NOT contain soy flour, or if there is not enough information to determine whether or not the product contains soy flour.[40]  In the test condition, where respondents were exposed to a package of Sara Lee Classic 100% Whole Wheat bread with the allegedly misrepresented statement "100% Whole Wheat," 26 percent of respondents think the product DOES contain soy flour.  The rate at which respondents think that the product does contain soy flour is approximately the same proportion (23 percent) among those respondents shown the control package Sara Lee Classic bread with the 100% Whole Wheat removed. Inversely, only 24 percent of respondents in the test condition and 18 percent in the control condition think the product does NOT contain soy flour.  These results are shown below in Table

---

[40] Respondents could also respond that they don't know or have no opinion.

7.

**Table 7**

**If you have an opinion, please tell me whether you think …**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| This product DOES contain soy flour | 26 | 26% | 24 | 23% |
| This product does NOT contain soy flour | 24 | 24% | 19 | 18% |
| There is not enough information to determine whether or not this product contains soy flour | 26 | 26% | 35 | 34% |
| Don't know/no opinion | 25 | 25% | 25 | 24% |
| **Total** | 101 | 100% | 103 | 100% |

Source: Sara Lee Survey Data

47.     Consumers who knew the bread contained soy flour were asked if the soy flour in the product affects the way they use the product, does NOT affect the way they use the product, or if they don't know or have no opinion.  Consumers who thought the product does NOT contain soy flour, think there is not enough information to determine whether or not the product contains soy flour or don't know or have no opinion were first told that the product DOES contain soy flour.  They then were asked if the soy flour in the product would affect the way they use the product, would NOT affect the way they use the product, if there was enough information to tell, or if they didn't know or had no opinion.  These results are shown in Table 8 below.

**Table 8**

**Responses to if soy flour affects the way respondents use the product by opinions about the presence of soy flour**

| Responses | Test Count | Test Percent | Control Count | Control Percent | Total Count | Total Percent |
|---|---|---|---|---|---|---|
| **This product DOES contain soy flour** | | | | | | |
| Affect the way you use this product | 4 | 15% | 4 | 17% | 8 | 16% |
| NOT affect the way you use this product | 19 | 73% | 15 | 63% | 34 | 68% |
| Don't know/No opinion | 3 | 12% | 5 | 21% | 8 | 16% |
| **Total** | 26 | 100% | 24 | 100% | 50 | 100% |
| **This product does NOT contain soy flour; There is not enough information to determine; Don't know/no opinion** | | | | | | |
| Would affect the way you use this product | 10 | 13% | 8 | 10% | 18 | 12% |
| Would NOT affect the way you use this product | 36 | 48% | 45 | 57% | 81 | 53% |
| Not enough information to tell | 16 | 21% | 12 | 15% | 28 | 18% |
| Don't know/No opinion | 13 | 17% | 14 | 18% | 27 | 18% |
| **Total** | 75 | 100% | 79 | 100% | 154 | 100% |
| **Combined total** | | | | | | |
| Affect/would affect the way you use this product | 14 | 14% | 12 | 12% | 26 | 13% |
| Affect/would NOT affect the way you use this product | 55 | 54% | 60 | 58% | 115 | 56% |
| Not enough information to tell [1] | 16 | 16% | 12 | 12% | 28 | 14% |
| Don't know/No opinion | 16 | 16% | 19 | 18% | 35 | 17% |
| **Total** | 101 | 100% | 103 | 100% | 204 | 100% |

[1] Asked only of respondents who say the product does NOT contain soy flour, or said there was not enough information to tell, or don't know/no opinion.

Source: Sara Lee Survey Data

48.     Like the Oroweat Survey results, these results show two things.  First, we can compare the responses of consumers who think the product does contain soy flour to those who think it does not, think there is not enough information to determine, or don't know or have no opinion.  Among those who think the product DOES contain soy flour less than 20 percent in both the test and the control say the soy flour affects the way they use the product (15 percent in the test, 17 percent in the control).  Among those who think the product does NOT contain soy flour, think there is not enough information to determine, or who don't know or have no opinion, less than 15 percent say that the soy flour would affect the way they use the product (13 percent

in the test and 10 percent in the control).  Thus, in both the case where consumers are aware of the soy flour or where they are not aware of this but told about it, less than 20 percent of respondents indicate this fact affects how they use the product.

49.     Second, the responses for these questions also show very little impact of the allegedly misleading packaging on consumer perceptions. Overall, the majority of respondents report that knowing the product contains soy flour does or would not affect how they use the product (54 percent in the test and 58 percent in the control overall).  A substantially smaller proportion of the respondents report that this fact does or would affect how they use the product (14 percent in the test and 12 percent in the control overall).  There is no meaningful difference between these results in the test and control condition for those who were shown the Sara Lee package with references to "100%" as compared to those who were shown the Sara Lee package with the "100%" removed.  Thus the allegedly misleading packaging does not appear to have any impact on the rates at which consumers say the presence of soy flour would affect their use of the product.

**C.     FEWER THAN 10 PERCENT OF RESPONDENTS INDICATE THAT THE SOY FLOUR IN THE PRODUCT MAKES THEM LESS LIKELY TO PURCHASE THE PRODUCT OVER SIMILAR PRODUCTS AND THERE IS VERY LITTLE DIFFERENCE BETWEEN THE TEST AND THE CONTROL**

50.     Next, respondents were asked if the fact that the product does contain soy flour would influence their decision to purchase the product, and then, if it would influence their decision, if it would make them more or less likely to purchase over other similar products.  Of the 101 respondents in the test condition who were shown the Sara Lee with the allegedly misrepresented statement "100% Whole Wheat" on the label, 18 (18 percent) said that the fact that the product does contain soy flour would influence their decision to purchase the product,

1

2   and 7 (7 percent) said that it would make them less likely to purchase the product over similar

3   products.  Similarly, 18 respondents (17 percent) in the control condition, viewing a package with

4   the allegedly misrepresented statement "100%" removed said that the soy flour in the product

5   would influence their decision.  Of those, 4 respondents (4 percent) said that they would be less

6   likely to purchase over similar products because of the soy flour in the product.

7   See Table 9.

8

9                                    **Table 9**
                   **Influence on decision to purchase the Sara Lee product**

10                  **over similar products because of the soy flour [1]**

11

12

| | Test | | Control | |
|---|---|---|---|---|
| Does the fact that this product does contain soy flour … | Count | Percent | Count | Percent |
| Influence your decision to purchase this product | 18 | 18% | 18 | 17% |
| Not influence your decision to purchase this product | 61 | 60% | 64 | 62% |
| Don't know/No opinion | 22 | 22% | 21 | 20% |
| **Total** | 101 | 100% | 103 | 100% |
| Does/Would the fact that this product does contain soy flour make you … | | | | |
| More likely to purchase this product over similar products | 7 | 7% | 5 | 5% |
| Neither more nor less likely to purchase this product over similar products | 3 | 3% | 9 | 9% |
| Less likely to purchase this product over similar products | 7 | 7% | 4 | 4% |
| Don't know/No opinion | 1 | 1% | 0 | 0% |
| **Not asked the question [2]** | 83 | 82% | 85 | 85% |
| **Total** | 101 | 100% | 103 | 103% |

[1]  The responses are combined for respondents who think this product does contain soy flour and those who think it does not,
     think that there is not enough information to determine, or who don't know or have no opinion.
[2]  Includes respondents who answered it does/would not influence their decision to purchase this product or don't know/no opinion.

Source: Sara Lee Survey Data

23          51.      Overall, these results show first that the presence of soy flour in the Sara Lee

24  Whole Wheat bread makes no material difference to over 90 percent of consumers as they are not

25  less likely to buy the product. Second, they show that the phrase "100% Whole Wheat" on the

26  label of the Sara Lee Classic 100% Whole Wheat Bread does not cause consumers to be less

27

28

                                                                                    38

likely to purchase over similar products at a rate different from those consumers shown the product without the allegedly misrepresented statement on the label.

52.     The results of the "100% Whole Wheat" question series lead to three key conclusions. First, for the majority of respondents the soy flour in the product does not affect the way respondents use the product whether or not they think there is soy flour. Second, respondents do not differ in their perceptions about use of the product whether or not they are exposed to a product package that states "100% Whole Wheat" or not. Last, the soy flour in the product influences fewer than 10 percent of respondents to say that they are less likely to purchase the product over similar products because of the soy flour. Finally, all of these rates change very little between those consumers who saw the Sara Lee product with "100%" on the label and those in the control condition where the allegedly mislabeled "100%" was removed. Thus, these results show that the allegedly misbranded label regarding the "100% Whole Wheat claim" is not impacting consumers' perceptions of the product, their use of the product, or their purchase intentions when compared to packages without the allegedly misbranded reference.

**D.     WHILE MORE THAN HALF OF CONSUMERS BELIEVE THAT THE SARA LEE PACKAGE INDICATES THAT THE PRODUCT HAS A SPECIFIC LEVEL OF WHOLE GRAIN THERE IS NO DIFFERENCE BETWEEN THE TEST AND THE CONTROL AS TO WHETHER THE SPECIFIC LEVEL OF WHOLE GRAIN IS MATERIAL**

53.     Respondents in the Sara Lee Survey were also asked about their understanding of the amount of whole grain in the bread.  First, consumers in the "Good Source of Whole Grain" question series were asked if the product HAS whole grain, does NOT have whole grain, or if there is not enough information to determine whether the product does or does not have whole

grain.[41]  The results of this question are shown below in Table 10.  The results show that the large

majority of respondents (83 percent in the test and 83 percent in the control) believe the product

does contain whole grain. These results indicate that consumers perceive this product to have

whole grains but there is no difference between consumers who saw a package with the Good

Source of Whole Grain words on the label and those that did not.  Thus, there is no evidence that

the presence of the statement "Good Source of Whole Grain" appears to substantially increase the

rate at which consumers think the product has whole grain.

54.     There were 17 respondents in the test and 17 respondents in the control who think

that the product does NOT have whole grain, there is not enough information to determine

whether the product does or does not have whole grain, or they don't know or have no opinion.

These respondents were asked no more questions as they could not be misled about whether or

not the package indicates that there is a specific level of whole grain.

**Table 10**
**If you have an opinion, please tell me whether you think …**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| This product HAS whole grain | 84 | 83% | 86 | 83% |
| This product does NOT have whole grain | 4 | 4% | 5 | 5% |
| There is not enough information to determine whether or not this product does or does not have whole grain | 6 | 6% | 8 | 8% |
| Don't know/no opinion | 7 | 7% | 4 | 4% |
| **Total** | 101 | 100% | 103 | 100% |

Source: Sara Lee Survey Data

---

[41] Respondents could also state that they do not know or have no opinion.

55.     The respondents who believe the product contains whole grain were then asked if they think the package indicates that the product has a specific level of whole grain.[42],[43]  More than half of consumers in the Sara Lee Survey think the package indicates that the product has a specific level of whole grain (51 percent in the test condition and 57 percent in the control condition).  This result, shown in Table 11, is noticeable as my survey appropriately does not remove information about the grams of whole grain contained in the product from the packaging.  As Plaintiffs recognize, "food manufacturers are permitted under the law to make factual statements about whole grain on their food labels such as '10 grams of whole grains.'"[44] The fact that respondents think there is a specific level of whole grain at approximately the same rate in the test and control conditions suggests that the use of the phrase "Good Source of Whole Grain" does not imply to consumers "a particular level of the ingredient".

---

[42] Complaint, p. 17 mentions that "food manufacturers are permitted under the law to make factual statements about whole grains on their food labels **such as '10 grams of whole grains,'** the FDA has specifically ruled that they are only allowed to do so 'provided that the statements are not false or misleading…and do not imply a particular level of the ingredient.'" (Emphasis added.)

[43] I did not account in my survey for consumers' correct understanding that a slice of the Sara Lee Classic 100% Whole Wheat bread contains 14g of Whole Grain and Sara Lee is not prohibited by the FDA by stating so on its package.  My test removed ONLY the allegedly misleading word "Good" from the statement about the bread being a source of whole grain, and did not alter the statements on the package which indicate the grams of whole grain contained in the product.

[44] Complaint, p. 17.

**Table 11**
**You mentioned this product has whole grain.**
**If you have an opinion, do you think that …?**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| The package indicates that the product has a specific level of whole grain | 52 | 51% | 59 | 57% |
| The package DOES NOT indicate that the product has a specific level of whole grain | 17 | 17% | 12 | 12% |
| There is not enough information on the package to determine whether or not the product has a specific level of whole grain | 8 | 8% | 8 | 8% |
| Don't know/ No opinion | 7 | 7% | 7 | 7% |
| This product does not have whole grain, there is not enough information to determine whether this product does or does not have whole grain, don't know/no opinion | 17 | 17% | 17 | 17% |
| **Total** | 101 | 100% | 103 | 100% |

Source: Sara Lee Survey Data

56.    Moreover, when asked if the fact that the package indicates that the product has a specific level of whole grain influences or does not influence their decision to purchase, a bit more than a third of consumers in the Sara Lee Survey respond that the specific level of whole grain influences their decision to purchase. However, consumers report this at exactly the same rate whether or not they are shown a package with the allegedly misleading label (37 percent in the test condition and 37 percent in the control condition).

**Table 12**
**Influence on decision to purchase the Sara Lee product over**
**similar products because of a specific level of whole grain**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| **Does the fact that the package indicates that the product has a specific level of whole grain …** | | | | |
| Influence your decision to purchase this product | 37 | 37% | 38 | 37% |
| Not influence your decision to purchase this product | 13 | 13% | 17 | 17% |
| Don't know/No opinion | 2 | 2% | 4 | 4% |
| Not asked the question [1] | 49 | 49% | 44 | 43% |
| **Total** | 101 | 100% | 103 | 100% |
| **Does the fact that the package indicates that the product has a specific level of whole grain make you …** | | | | |
| More likely to purchase this product over similar products | 32 | 32% | 27 | 27% |
| Neither more nor less likely to purchase this product over similar products | 4 | 4% | 8 | 8% |
| Less likely to purchase this product over similar products | 0 | 0% | 2 | 2% |
| Don't know/No opinion | 1 | 1% | 1 | 1% |
| Not asked the question [2] | 64 | 63% | 65 | 65% |
| **Total** | 101 | 100% | 103 | 103% |

[1] Includes respondents who answered the package does not indicate that the product has a specific level of whole grain, there is not enough information to determine, or don't know/no opinion.

[2] Includes respondents who answered it does not influence their decision to purchase this product, don't know/no opinion or not asked the previous question.

Source: Sara Lee Survey Data

57.     When asked how the fact that the package indicates that the product has a specific level of whole grain would influence their decision to purchase, among all respondents approximately 30 percent say it would make them more likely to purchase the product over other similar products (32 percent in the test condition and 26 percent in the control condition).  Once again, as Table 12 shows, the use of the word "Good" in connection with "source of whole grain" has little impact on consumers' purchasing intentions.

58.     Finally, the approximately one-third of respondents who said that fact that the package indicates that the product has a specific level of whole grain would make them more likely to purchase the product over similar products were asked if it was the sole reason, a primary reason, or one of many reasons they would purchase this product.  These results are

43

shown below in Table 13.  Of this group of respondents only two in the test condition and four in

the control condition say that the specific level of whole grain is the sole reason they would

purchase the product.  This means that only two percent of all respondents shown the allegedly

misleading label with the phrase "Good Source of Whole Grain" think the product 1) has whole

grain, 2) that the package indicates a specific level of whole grain, 3) that the specific level would

make them more likely to purchase, and 4) that the specific level of whole grain is the sole reason

they would purchase the product.  Around half of respondents who were asked this question

replied that it was one of many reasons they would purchase the product with 17 out of 32 (53

percent) in the test condition answering this way, and 13 out of 27 (48 percent) in the control

condition answering this way.

**Table 13**
**Is the fact that the package indicates that the product HAS**
**a specific level of whole grain … [1]**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| The sole reason you would purchase this product | 2 | 6% | 4 | 15% |
| A primary reason you would purchase this product | 13 | 41% | 10 | 37% |
| One of many reasons you would purchase this product | 17 | 53% | 13 | 48% |
| **Total** | 32 | 100% | 27 | 100% |

1 Includes only the respondents who answered it makes them more likely to purchase this product over other similar products.

Source: Sara Lee Survey Data

59.    Thus, these results and the results of the "100% Whole Wheat" questions show

that the presence on the label of either the "100%" or the "Good" does not affect consumers'

opinions as related to the presence of soy flour in the bread, or their impressions about the

specific level of whole grain.

## III.   THOMAS' SURVEY

60.     This survey was designed to address the complaint that the Heart-Check Mark on the Thomas' Plain Bagel Thins is a paid endorsement and the fact that it is a paid endorsement is not disclosed.  I discuss the results of this survey below.

### A.   ALMOST NO CONSUMERS MENTION THAT THE HEART-CHECK MARK IS A MESSAGE CONVEYED BY THE PRODUCT'S PACKAGING

61.     To begin with responses to the open ended questions were coded for mentions that the bagel thins were healthy or good for you, and, if any health mentions were made, if those respondents also mention the American Heart Association's Heart-Check Mark.  Overall, 121 respondents out of 201 (33 in the test condition and 45 in the control condition) mentioned that the bagel thins were healthy or good for you.  However, of these respondents only three respondents in the control condition mention the American Heart Association Heart-Check Mark endorsement. None of the respondents in the test condition who mentioned that the bagel thins were healthy or good for you mention the Heart-Check Mark. Overall, one respondent in the test condition and six respondents in the control condition mention this.  This suggests that the Heart-Check Mark is not a main message conveyed by the product's packaging, and it is not a consumers' top-of-mind association with the belief that Thomas' bagel thins are a healthy product.

### B.   WHEN ASKED DIRECTLY, MORE THAN HALF OF RESPONDENTS SAY THAT THE THOMAS' BAGEL THINS ARE CERTIFIED BY THE AMERICAN HEART ASSOCIATION

62.     When asked directly if they think the product is certified by the American Heart Association, the majority of respondents indicate that the product is certified by the American Heart Association.  Specifically, 67 consumers out of 101 in the test condition and 56 out of 100

45

in the control condition think that the product is certified.  When asked if the certification is a paid endorsement, 13 percent of respondents in the test condition state specifically that they think the certification is NOT a paid endorsement.  In the test condition, 19 percent of respondents think the certification is a paid endorsement, 18 percent say there is not enough information to determine whether or not it is a paid endorsement, and 17 percent say they don't know or have no opinion.  These results are shown below in Table 14.

**Table 14**
**Opinions about the American Heart Association certification**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| **If you have an opinion, please tell me whether you think …** | | | | |
| This product IS certified by the American Heart Association | 67 | 66% | 56 | 56% |
| This product is NOT certified by the American Heart Association | 3 | 3% | 9 | 9% |
| There is not enough information to determine whether or not this product is certified by the American Heart Association | 14 | 14% | 17 | 17% |
| Don't know/ no opinion | 17 | 17% | 18 | 18% |
| **Total** | 101 | 100% | 100 | 100% |
| | | | | |
| **You mentioned this product is certified by the American Heart Association. If you have an opinion, do you think …** | | | | |
| This certification IS a paid endorsement | 19 | 19% | 44 | 44% |
| This certification is NOT a paid endorsement | 13 | 13% | 5 | 5% |
| There is not enough information to determine whether or not this is a paid endorsement | 18 | 18% | 5 | 5% |
| Don't know/ no opinion | 17 | 17% | 2 | 2% |
| **Not asked the question [1]** | 34 | 34% | 44 | 44% |
| **Total** | 101 | 100% | 100 | 100% |

[1] Includes respondents who think this product is not certified by the American Heart Association, there is not enough information to determine, or don't know/no opinion

Source: Thomas' Survey Data

63.      Among those consumers in the control condition who were exposed to the statement that "The American Heart Association was paid for this endorsement" in concert with the Heart-Check Mark, only 5 percent of consumers think the certification is NOT a paid endorsement. The remainder of consumers in this condition either think the certification is a paid

endorsement (44 consumers), there is not enough information to determine whether or not it is a

paid endorsement (5 consumers), or they don't know or have no opinion (2 consumers).[45]

### C.   THE FACT THAT THE CERTIFICATION IS A PAID ENDORSEMENT HAS LITTLE INFLUENCE ON RESPONDENTS IN EITHER THE TEST OR THE CONTROL CONDITIONS AND LITTLE EFFECT ON THEIR LIKELIHOOD OF PURCHASING

64.     When consumers in the test condition are asked if the fact that the certification is a

paid rather than not a paid endorsement influences their decision to purchase the product, only 20

percent of respondents (20 out of 101) say it would influence their decision to purchase. When

those in the control group who were exposed to the disclaimer are asked that same question, 13

percent or 13 out of 100 say it would influence their decision to purchase.  These respondents

were then asked if the fact that the certification is a paid rather than not a paid endorsement would

make them more likely to purchase the product over similar products, neither more nor less likely

to purchase over similar products, or less likely to purchase over similar products.[46]

---

[45] Among respondents in the control condition who saw the disclosure "The American Heart Association was paid for this endorsement", nearly 80 percent who think that the product IS certified, think that it is a paid endorsement (44 respondents out of 56).

[46] Respondents could also say that they didn't know or had no opinion.

**Table 15**

**Influence on decision to purchase the Thomas' product over similar products because the certification is a paid rather than not a paid endorsement [1]**

| Responses | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| **Does/Would the fact that the certification is a paid rather than not a paid endorsement …** | | | | |
| Influence your decision to purchase this product | 20 | 20% | 13 | 13% |
| Not influence your decision to purchase this product | 31 | 31% | 28 | 28% |
| Don't know/No opinion | 16 | 16% | 15 | 15% |
| **Not asked the question [2]** | 34 | 34% | 44 | 44% |
| **Total** | 101 | 100% | 100 | 100% |
| | | | | |
| **Does/Would the fact that the certification is a paid rather than not a paid endorsement make you …** | | | | |
| More likely to purchase this product over similar products | 13 | 13% | 7 | 7% |
| Neither more nor less likely to purchase this product over similar products | 2 | 2% | 2 | 2% |
| Less likely to purchase this product over similar products | 5 | 5% | 3 | 3% |
| Don't know/No opinion | 0 | 0% | 1 | 1% |
| **Not asked the question [3]** | 81 | 80% | 87 | 87% |
| **Total** | 101 | 100% | 100 | 100% |

[1] The responses are combined for respondents who think this certification is a paid endorsement, and those who think this product is not a paid endorsement, there is not enough information to determine or don't know/no opinion.

[2] Includes respondents who answered this product is not certified by the American Heart Association, there is not enough information to determine, or don't know/no opinion.

[3] Includes respondents who were not asked the previous question, or who answered the fact that the certification is a paid rather than not a paid endorsement does/would not influence their decision to purchase this product or don't know/no opinion.

Source: Thomas' Survey Data

65.     While the number of respondents answering this question was small, it appears that the fact that the certification is a paid rather than not a paid endorsement causes consumers to be more likely to purchase the product over similar products.  Among the 20 respondents in the test condition who would be influenced, 13 respondents say it would make them more likely to purchase.  Among the 13 respondents in the control condition, 7 respondents say that the fact that the certification was a paid rather than not a paid endorsement would make them more likely to purchase the product over similar products.

66.     These results show that including a disclaimer on the Thomas' Bagel Thins that the Heart-Check Mark is a paid endorsement does not seem to affect whether or not consumers

are likely to purchase the product over similar products.  Moreover, respondents who indicated

that the fact that the Heart-Check Mark certification is a paid endorsement appear to indicate that

they would be interested in purchasing the product independent of the endorsement. See for

example Respondent 11553: "Even if it didn't have the American Heart Association logo I would

check the nutritional facts anyways. I would make my decision to purchase this product by the

nutritional facts on the back label" or Respondent 14724: "Cause it says right here it has

everything I like low calories no cholesterol high fiber."

67.     The results to the Thomas' Survey, as well as the results from the Oroweat and

Sara Lee Surveys do not appear to support Plaintiff's claim that the allegedly mislabeled,

misbranded, or deceptive labels are causing consumers to want to purchase these products over

other similar products.

### VII.     RESPONSES TO DR. JULIE CASWELL AND DR. DONALD MAY

68.     I have also been asked by counsel for Bimbo to review the Declarations of Dr.

Julie Caswell and Dr. Donald May.  As I understand it, Dr. Caswell has put in her declaration in

support of Plaintiffs' Second Amended Complaint, specifically expressing her opinion that the

labeling statements would be material to reasonable consumers.  Dr. May offers several methods

to estimate damages and relief for putative class members. I discuss each of these declarations

below.

### I.  DR. JULIE CASWELL'S CLAIMS ARE UNFOUNDED, AND DIRECTLY CONTRADICTED BY EMPIRICAL EVIDENCE

69.     Dr. Caswell asserts that the allegedly mislabeled statements are material to the

relevant consumers. She states, "The claims listed…are material because reasonable consumers

would rely on them to identify products that have particular nutrition, value/function, and process

attributes and in comparison shopping between food products."[47]  Dr. Caswell does not present

any data to support her assertion that consumers of the array of Bimbo products rely on the

statements on packaging that are alleged in this matter when making purchasing decisions, or

when selecting the Bimbo products over other similar products. In fact, the majority of Dr.

Caswell's report is a very general and theoretical discussion of how consumers broadly view

information in the marketplace with no data.

70.     In contrast, I have undertaken a study to understand consumer perception of

representative and "substantially similar" Bimbo product labels to address each of Plaintiffs' four

claims. My surveys of actual Oroweat, Sara Lee, and Thomas' purchasers and the testing of

actual Oroweat, Sara Lee, and Thomas' labels with the alleged misleading statements

demonstrates that, contrary to Dr. Caswell's assertions, the allegedly misleading statements do

not appear to be material to the majority of consumers and do not impact consumers likelihood to

purchase the products over other similar products. In fact, in my study, I found that a net -4

percent of consumers in the Oroweat Survey shown the allegedly misbranded product were less

likely to purchase.  In the Sara Lee Survey, among consumers shown the allegedly misleading

product label with "100% Whole Wheat", a net 3 were less likely to purchase because of the

presence of soy flour.  The rate at which consumers were more likely to purchase the Sara Lee

bread over similar products because they think the package indicates a specific level of whole

grain was 6 percent greater if package said "Good Source of Whole Grain" than when it did not.

Lastly, the Thomas' Survey showed that only two percent more respondents who were exposed to

the Heart-Check Mark without the disclaimer were less likely to purchase the product over other

similar products upon learning that the certification was paid.

---

[47] Caswell Declaration, p. 8.

## II.  DR. DONALD MAY'S PROPOSED DAMAGES MODELS FAIL TO ADDRESS KEY SHORTCOMINGS IN THE PROPOSED MODELS

71.     I was also asked to review the Declaration of Dr. Donald M. May and comment on how my results may relate to assumptions he uses in various approaches.  I understand that he proposes 4 different models to calculate damages: a Full Purchase Price Restitution or Restitutionary Disgorgement which both provide for consumers to receive a full refund for the products they have purchased; a Value of the Product Labeling Characteristic model which provides a portion of the sale price attributable to the value of a particular characteristic of the product; or an Incremental Sales Revenue model, which provides a portion of the sale price attributable to the value of the specific part of the label at issue.

72.     Regarding the first two approaches, the Full Purchase Price Restitution and Restitutionary Disgorgement, it is my understanding that these approaches suggest that consumers received no value from the allegedly mislabeled products.  Therefore consumers in the class should receive a full refund of the purchase price for products they have purchased during the class period, or an award based on Defendant's profits.[48]  It is my understanding these approaches suggest that the products with the allegedly misleading labels had no value whatsoever to consumers.

73.     With regard to these approaches, the results of my studies here show two important findings indicating that consumers do receive value for these products.  First, many respondents in the test conditions who saw the allegedly misleading labels are aware of the very thing about which Plaintiffs claim consumers have been deceived, and yet they still purchased the

---

[48] May Declaration, pp. 6-7.

products.  Consumers who are not deceived and who still make the purchase would be consumers for whom there was value, contrary to Dr. May's assumption for these models.

74.     Second, only a small proportion of respondents for any of the three surveys say they would have been less likely to buy the products had they understood the labels in the manner in which the Plaintiffs claim would not be misleading. Thus again, substantial proportions of consumers find value in the product separate and apart from the claimed deception.  In fact, in my Sara Lee Survey, consumers were asked specifically if the specific level of whole grain was the sole reason, the primary reason, or one of many reasons for purchasing.  More than half responded that it was one of many reasons for purchasing the product.  These findings suggest that most consumers are receiving value for their purchase as they either have bought or would buy the products with the allegedly misleading label even knowing the elements at issue here. Consumers in my studies report a wide array of messages conveyed by the packaging, and there is no evidence that the alleged misbranding or mislabeling of the products at issue was the sole reason why consumers purchased these products.

75.     With regard to the regression approaches, I understand that Dr. May has suggested that he can develop either a model that isolates the specific characteristic of the product (the 'bread' the '100% Whole Wheat', the 'Good Source of Whole Grain', or the 'Heart-Check Mark') or can isolate the impact of the change to the label to the allegedly deceptive label while controlling for other relevant factors that influence changing sales volume.

76.     Based on my study I would simply note the following concerns about these approaches as they relate to the results I have presented here.  First, in the verbatim responses to the question "What message or messages does this product's packaging convey to you," for each of my surveys, respondents provide a wide range of messages only a few of which related to the

key issues in the matter (i.e., the alleged deception or misbranding).  In these verbatim responses it is clear that consumers attend to many aspects of the products and the labels and not just the statements at issue here.  Thus, any changes to the products or to the labels (colors, wording, images, etc.) that were concurrently made at the time the allegedly misleading content was added would be alternative explanations for any observed changes in sales and could lead to a faulty inference that it was the allegedly misleading content that "caused" the sales changes.  For example, if the label was made more vibrant or printed on glossier paper at the same time the content of the label was updated to include the allegedly misleading statements, there would be no way to isolate the impact of these two sets of changes using Dr. May's regression approach.

77.     Both Dr. Caswell and Dr. May offer theoretical opinions and models in their declarations in this matter. My survey data show direct consumer impressions of the labels, and measure the rates at which the allegedly mislabeled or misbranded statements at issue in this case influence consumers' decision to purchase, and if so, if they make consumers more or less likely to purchase. These data contradict Dr. Caswell's and Dr. May's assumptions that the alleged mislabeling or misbranding of the products at issue were the sole reasons why consumers purchase these products or that these products have no value to consumers over similar products, if not for the accused statements.

**VIII.   CONCLUSIONS**

78.     I was asked to evaluate consumer perception of the presence of added coloring in a variety of products, the presence of soy flour in breads made with whole wheat flour, whether or not references to good or excellent source of whole grain on the packaging characterizes to consumers a specific level of whole grain, and consumer perception of an endorsement on certain products by the American Heart Association. I was also asked to evaluate the extent to which

these ingredients and statements would influence consumers' purchasing intentions, and if so, how.  Based on my research, I conclude the following.

79.     First, the results show that a majority of consumers in each of my three studies are not misled in the way claimed by Plaintiffs.  For example only 21 percent of respondents think that the Oroweat product does NOT have added caramel coloring, less than a quarter of respondents in the Sara Lee Survey think the Sara Lee bread does NOT have soy flour, and less than 20 percent of consumers think the Heart-Check Mark on the Thomas' bagel thins is NOT a paid endorsement.  Second, these results do not change between the test conditions and the control conditions; thus, the labels at issue in this case are not causing consumers to be misled.  For example, while more than half of respondents in the Sara Lee Survey think that the package indicates a specific level of whole grain, there were more respondents in the control condition who reported this than in the test condition.  Third, when consumers were asked if the alleged misbranding would make them more or less likely to purchase, there was no substantial evidence that the labels caused consumers to change their purchase decisions.

80.     My opinions and conclusions as expressed in this declaration are to a reasonable degree of professional certainty.  My work is ongoing and my opinions will continue to be informed by any additional material that becomes available to me.

81.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that I am competent to testify to the facts contained in this declaration if called as a witness.

Executed this 5th day of April, 2015, in Denver, CO

_____
                                        Kent D. Van Liere

54